DANIEL J. HERLING (SBN 103711)
LINA M. BRENNER (SBN 191075)
JESSICA E. LA LONDE (SBN 235744)
**DUANE MORRIS LLP**
One Market, Spear Tower, Suite 2000
San Francisco, CA 94105-1104
Telephone: 415.957.3000
Facsimile: 415.957.3001
E-Mail:    djherling@duanemorris.com
           lmbrenner@duanemorris.com
           jelalonde@duanemorris.com

Attorneys for Defendant
WIRELESS NETWORKS, INC.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CHARLES M. BROWN, an individual,<br><br>Plaintiff,<br><br>v.<br><br>WIRELESS NETWORKS, INC., a Delaware corporation,<br><br>Defendant. | Case No. C 07-4301 EDL<br><br>**DECLARATION OF RUY ROTHSCHILD DE SOUZA IN SUPPORT OF THE OPPOSITION OF DEFENDANT WIRELESS NETWORKS, INC. TO PLAINTIFF'S _EX PARTE_ APPLICATION FOR RIGHT TO ATTACH ORDER**<br><br>Date:    August 31, 2007<br>Time:    10:00 a.m.<br>Dept:    Courtroom E, 15th Floor<br><br>Judge:   Magistrate Elizabeth D. Laporte |

I, Ruy Rothschild de Souza, state as follows:

1.      I am a resident of Sao Paulo, Brazil, a member of the Board of Directors of defendant Wireless Networks, Inc. ("WNI"), and have personal knowledge of the facts set forth in this declaration. If called upon as a witness, I could and would competently testify to the facts contained in this declaration of my own personal knowledge.

2.      I have reviewed the declaration of Charles Brown in support of the Emergency _ex parte_ Application for Right to Attach Order. This declaration is fraught with mischaracterizations,

DMI\1180177.5
DECLARATION OF RUY ROTHSCHILD DE SOUZA

1

CASE NO.: C 07-4301 EDL

1  misrepresentations, and factual inaccuracies. For example, in my capacity as director of WNI and

2  principal of the controlling stockholder of WNI and WN do Brasil, I never refused to execute any

3  license agreement. Mr. Brown's declaration in paragraph 7 that I failed to put any license

4  agreement in place between WNI and WN do Brasil is false. It was exactly the contrary. After

5  many discussions about executing a license agreement that would be legal under both Brazilian

6  and U.S. laws, Mr. Brown refused to sign such an agreement. Instead, Mr. Brown attempted to

7  force WNI and WN do Brasil to execute a license agreement unacceptable under Brazilian law,

8  that would consequently disallow the remittance of royalties abroad. This is just one example of

9  Mr. Brown's mismanagement and intent to impede efforts to run WNI in the proper way.

10       As set forth above, I am ready and willing to rebut each and every misstatement of

11  Mr. Brown, but I will, in this declaration, address the issues relevant to the *ex parte* application.

12  Therefore, I am reserving my right to confront Mr. Brown on a point-by-point basis and my

13  silence on certain issues should not be construed as acquiescence to his declaration.

14       3.      The source code at issue is property of WNI. The source code has no value to the

15  market outside of WNI, as it is integral to WNI and its subsidiary operations, which will enable

16  WNI and its subsidiaries to generate revenue. In fact, these source codes would be valuable only

17  to someone that intends to copy/reproduce the same unique services that WNI renders to the

18  market.

19       4.      Mr. Brown's conjecture in paragraph 27 that I was trying to get the source code

20  without paying for it and then let the parent corporation go out of business has no basis in fact

21  and/or logic. The facts are that Cruzamerica/MRG International loaned WNI almost $4 million.

22  Part of this debt was converted into 112,791 shares of WNI. Furthermore, Cruzamerica/MRG

23  continues to be the major creditor of WNI, as almost $1 million of the amount it loaned WNI

24  remains due and was not converted into equity. Accordingly, I both have a major equity interest

25  in WNI and am the major creditor of the parent company and it would make no economic sense

26  for me to allow the parent company to fail. Additionally, WN do Brasil, alleged by Mr. Brown to

27  become the "illegal" recipient of the source code, is a wholly-owned subsidiary of WNI, the parent

28  company. Again, allowing the parent company to fail makes no economic sense for WN do

1  Brasil. This Brazilian subsidiary is responsible for the only operation established by WNI (there is

2  no operation in the US), prior to my entrance into WNI, and, thus, is the only cash generator of

3  WNI. So here, more than a guaranty for the present monetary dispute, the issue is WNI's access

4  to its own source codes, vital to continue the development and support of its operation.

5        5.    Exhibit A to Brown's declaration allegedly reflects that the promissory notes were

6  "ratified" by the Board of Directors of WNI, which consisted of Mr. Brown and myself. At the

7  time of the April 2005 board meeting, I was unaware of the full specifics of Mr. Brown's activity

8  as the President, Secretary, and Treasurer of WNI. As I later learned in detail, he was using the

9  monetary investments provided to WNI by my company (Cruzamerica/MRG International) to

10  develop software for a separate company, owned and operated by him. (Attached, incorporated,

11  and marked as Exhibit 1 to my declaration is a copy of a February 18, 2005 communication from

12  Charles Brown & Associates relating to an NDA addressed to engineers who, at that time, were on

13  the WNI payroll.) My attorneys, at my direction, are currently reviewing hundreds of e-mails that

14  reflect Mr. Brown's actions while he was a member of the Board of Directors and the holder of all

15  of the offices of WNI as it related to the development of his own company. Accordingly any

16  "ratification" of promissory notes issued to Mr. Brown was obtained via omission of facts,

17  misrepresentation of facts, and/or fraud by Mr. Brown. Had I understood the full extent of Mr.

18  Brown's efforts in attempting to set up and develop his own company, I never would have

19  "ratified" the promissory notes that were executed by Mr. Brown himself.

20        6.    The financial statements set forth in Exhibit D to Mr. Brown's declaration are more

21  than two and one half years old. They do not accurately reflect the financial condition of WNI.

22  Furthermore, paragraph 19 contradicts Mr. Brown's allegations that there is insufficient cash flow

23  to satisfy any potential judgment Mr. Brown may achieve.

24        7.    Neither any of WNI's agents other than Mr. Brown, nor I, as a director of WNI,

25  received any notice of the deposition that Mr. Brown appeared for on July 6, 2007, ostensibly on

26  behalf of WNI. Mr. Brown did not, in fact, have the authority to appear for that deposition

27  without counsel.

28

1        8.      Neither any of WNI's agents other than Mr. Brown, nor I, as a director of WNI,

2 received notice of the *ex parte* hearing on Mr. Hagan's application for a writ in *The Hagan Law*

3 *Firm v. WNI* matter, and did not learn of the application for a writ until after the order had already

4 been issued on July 11, 2007.

5

6 I declare under penalty of perjury under the laws of the State of California that the foregoing is

7 true and correct. The declaration was executed this 27th day of August 2007, in San Paulo, Brazil.

8

9

10                                    RUY Rothschild de Souza

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DM1\1180177.5

**DECLARATION OF RUY ROTHSCHILD DE SOUZA**

4

CASE NO.: C 07-4301 EDL

# EXHIBIT 1

# CHARLES BROWN & ASSOCIATES
## Memorandum

To:    Frank W. Sudia
       Cedric Berger
       Joao Araujo
       Dan Cochran
       Bob Arasmith
       Michael Hu

CC:

From:    Charles Brown

Subject:    CBA NDA

Date:    February 18, 2005

---

Gentlemen,

Please find enclosed the NDA I mentioned in previous email regarding NewCo. NewCo plans to file patents, trademarks and copyrights as we progress with the new product platform and service. The NDA is required to insure the confidentiality of any intellectual property that may evolve from our current discussions and work. Strict confidentiality is required to protect the filing status of any potential intellectual property filings we may wish to make in the future and the privacy of our work. Please let me know if you have any questions regarding the document.

The name, "Charles Brown & Associates" is a placeholder until such time that we have chosen a final name and have incorporated NewCo.

Please sign one copy and return in the enclosed stamped, self-addressed envelope. The second copy is to retain for your files.

Thank you for your assistance in this matter.

Charlie

CBA
55 Skylonda Drive
Woodside, CA 94062

Tel. 650-851-2930
Fax. 650-851-7914



# CONFIDENTIALITY AGREEMENT

This Confidentiality Agreement (the "Agreement") is entered into and is effective as of February 1, 2005 by and between **CHARLES M. BROWN & ASSOCIATES**, 55 Skylonda Drive, Woodside, California 94062 ("CBA") and **FRANK W. SUDIA**, 237 Banks St., San Francisco, CA 94110 ("Recipient").

1. **DEFINITION OF CONFIDENTIAL INFORMATION.** Recipient agrees that information disclosed by CBA to Recipient regarding Business Plans, electronic mail list discussions under the @Multimodalnetworks.com domain name, product planning, technology, security, cost and budget data, potential and proposed partners, potential and proposed projects, customers, services, financing, strategic planning and market positioning, and any other information, including but not limited to information learned by Recipient from CBA employees, agents or through inspection of CBA's property, that relates to CBA's products, designs, business plans, business opportunities, finances, research, development, know-how, personnel, or third-party confidential information disclosed to Recipient by CBA, the terms and conditions of this Confidentiality Agreement, and the existence of the discussions between Recipient and CBA will be considered and referred to collectively in this Agreement as "Confidential Information." Confidential Information, however, does not include information that: 1) is now or subsequently becomes generally available to the public through no fault or breach on the part of Recipient; 2) Recipient can demonstrate to have had rightfully in its possession prior to disclosure to Recipient by CBA; 3) is independently developed by Recipient without the use of any Confidential Information; or 4) Recipient rightfully obtains from a third party who has the right to transfer or disclose it.

2. **NONDISCLOSURE AND NONUSE OF CONFIDENTIAL INFORMATION.** Recipient will not disclose, publish, or disseminate Confidential Information to anyone other than those of its employees with a need to know, and Recipient agrees to take reasonable precautions to prevent any unauthorized use, disclosure, publication, or dissemination of Confidential Information. Recipient agrees to accept Confidential Information for the sole purpose of evaluation in connection with Recipient's business discussions with CBA. Recipient agrees not to use Confidential Information otherwise for its own or any third party's benefit without the prior written approval of an authorized representative of CBA in each instance.

3. **OWNERSHIP OF CONFIDENTIAL INFORMATION.** All Confidential Information, and any Derivatives thereof whether created by CBA or Recipient, remains the property of CBA and no license or other rights to Confidential Information is granted or implied hereby. For purposes of this Agreement, "Derivatives" shall mean: (i) for copyrightable or copyrighted material, any translation, abridgement, revision or other form in which an existing work may be recast, transformed or adapted; (ii) for patentable or patented material, any improvement thereon; and (iii) for material which is protected by trade secret, any new material derived from such existing trade secret material, including new material which may be protected by copyright, patent and/or trade secret.

4. **NO WARRANTY.** All information is provided "AS IS," and without any warranty, whether express or implied, as to its accuracy or completeness.

5. **RETURN OF DOCUMENTS.** Within ten business days of receipt of CBA's written request, Recipient will return to CBA all documents, records and copies thereof containing Confidential Information. For purposes of this section, the term "documents" includes all information fixed in any tangible medium of expression, in whatever form or format.

6. **EQUITABLE RELIEF.** Recipient hereby acknowledges that unauthorized disclosure or use of Confidential Information could cause irreparable harm and significant injury to CBA, and that may be difficult to ascertain. Accordingly, Recipient agrees that CBA will have the right to seek and obtain immediate injunctive relief to enforce obligations under this Agreement in addition to any other rights and remedies it may have.

7. **NO EXPORT.** Recipient certifies that no Confidential Information, or any portion thereof, will be exported to any country in violation of the United States Export Administration Act and regulations thereunder.

8. **ENTIRE AGREEMENT AND GOVERNING LAW.** This Agreement constitutes the entire agreement with respect to the Confidential Information disclosed herein and supersedes all prior or contemporaneous oral or written agreements concerning such Confidential Information. This Agreement may not be amended except by the written agreement signed by authorized representatives of both parties. This Agreement will be governed by and construed in accordance with the laws of the State of California, excluding that body of California law concerning conflicts of law.


Understood and Agreed to by the duly authorized representatives of the parties:

**CHARLES M. BROWN & ASSOCIATES**          **FRANK W. SUDIA**

*Charles M Brown* / 2·15·05                 _____
Charles M. Brown               Date          By (Signature)              Date

*CHARLES Brown, Principal*                   _____
Charles Brown, Principal                     Printed Name and Title
Rev. 10/04/97