JEFFREY F. RYAN, ESQ. SBN 129079
RYAN & STEINER
An Association of Attorneys
455 North Whisman Road, Suite 200
Mountain View, CA 94043-5721
Telephone:    (650) 691-1430
Facsimile:    (650) 968-2685

Attorneys for Plaintiff,
CHARLES M. BROWN

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| CHARLES M. BROWN,<br><br>    Plaintiff,<br><br>vs.<br><br>WIRELESS NETWORKS, INC., a Delaware corporation, and DOES 1 THROUGH 50,<br><br>    Defendants. | Case No.: C-07-04301 EDL<br><br>**PLAINTIFF CHARLES M. BROWN'S REPLY TO DEFENDANT'S OPPOSITION TO EX PARTE APPLICATION FOR RIGHT TO ATTACH ORDER FED R. CIV. PROC. 64, CAL. CODE CIV. PROC. 483.010, 485.010, 485.210 AND 572**<br><br>Date:    August 31, 2007<br>Time:    10:00 a.m.<br>Dept.:    Courtroom E, 15th Floor<br>Judge:    Magistrate Elizabeth D. Laporte |

## Table of Contents

Page

INTRODUCTION ........................................................................................................... 1

FACTUAL BACKGROUND .......................................................................................... 1

ARGUMENT ................................................................................................................... 1

    A.    Amounts Claimed On The Promissory Notes Are Readily Ascertained By Reference To Mr. Brown's Records .......................... 1

    B.    The Notes Are Enforceable And Not Barred By The Statute Of Limitations ........................................................................................... 4

    C.    Attachment Is Available As A Remedy And WNI's Aspersions About Motives Are Irrelevant ................................................................ 5

    D.    WNI's Business Is Harmed By Its Subsidiary's Refusal To Pay For The License, Not By The Attachment Of The Source Code ........ 6

    E.    Mr. De Souza Refused to Pay Down WNB's Debts to WNI ............... 6

    F.    WNI Mischaracterizes What Happened In The State Court Application for a Writ ............................................................................ 7

    G.    Plaintiff's Response To The Allegations Raised In De Souza's Declaration ............................................................................................ 8

    H.    What Mr. De Souza Has Been Doing In Brazil In Breach Of His Fiduciary Duties To Both WNI And WNB ................................. 13

CONCLUSION ............................................................................................................. 13

i

PLAINTIFF CHARLES M. BROWN'S REPLY TO DEFENDANT'S OPPOSITION TO EX PARTE APPLICATION FOR RIGHT TO ATTACH ORDER FED R. CIV. PROC. 64, CAL. CODE CIV. PROC. 483.010, 485.010, 485.210 AND 572

BROWN V. WIRELESS NETWORKS, INC.                                                                    CASE NO. C-07-04301 EDL

This is Plaintiff, Charles Brown's ("Mr. Brown") reply brief in support of his application for a writ of attachment.

## INTRODUCTION

A writ is required to have any practical means of obtaining payment under the promissory notes. Wireless Networks do Brasil ("WNB") has never had the source code and it has successfully operated its business without it for years. Mr. de Souza admits that he ratified the promissory notes at the April 19, 2005 Board of Director's meeting. WNI has no assets in this country other than the Source Code. If WNI does not want the Court to hold the Source Code then it should post a bond in an amount not less than $150,000.

## FACTUAL BACKGROUND

Mr. Brown was not removed as an officer and director of WNI. Mr. Brown resigned of his own volition on July 13, 2007. (See Supplemental Declaration of Charles Brown ("Brown Decl."), 1:23-25 and Exhibit "A" thereto). Mr. Brown signed the notes because he was the President, Secretary and Treasurer, and remained so even after the Board of Director's meeting attended by Mr. de Souza on April 19, 2005. In addition, Mr. Brown held these offices solely because Mr. de Souza refused to cooperate with Mr. Brown in expanding WNI for the benefit of its shareholders. It was not in Mr. de Souza's interest to do so since he only wanted control of the assets of WNI and to eliminate its obligations, particularly, the intellectual property in the form of its Source Code.

## ARGUMENT

### A.   Amounts Claimed On The Promissory Notes Are Readily Ascertained By Reference To Mr. Brown's Records

Wireless Networks, Inc. ("WNI") asserts that the amount owed cannot be readily ascertained. WNI is mistaken. In his declaration supporting the application Mr. Brown has included a compilation from his records of the amounts paid by WNI, and the amounts still owing. WNI's quarrel with this record is unsupported by any contrary evidence – an absence it attempts to justify by asserting that it "only recently" gained access to corporate records following Mr. Brown's "removal" as a director and officer. In truth, Mr. Brown resigned on

July 13, 2007 as an officer and director of WNI and on July 18, 2007, specifically asked for instructions from WNI as where to send the key to the storage unit. (See Brown Decl., 1:22-24; 1:25-28 and Exhibits "A" and "B" thereto). WNI's current feigned urgency for accessing the records is belied by the fact that it apparently continues to refuse to pay the storage company which is housing the records. (See Brown Decl., 2:1-7 and Exhibit "C" thereto).

This is a claim of breach in unusual circumstances where the assets that represent potential recovery for Mr. Brown can be removed electronically in five minutes. Mr. Brown has proven the promissory notes were verified by Mr. de Souza, he has proven that Mr. de Souza has refused to pay Mr. Brown under the promissory notes and accrued salary due, and due under any reasonable legal hearing of the facts. Plaintiff properly executed the notes pursuant to resolutions of the Board of Directors approved by WNI. Furthermore, payments of principal and interest were made on the notes which extended their dates of validity. Mr. Brown had no power to make payments on the promissory notes since the monthly amount received from WNB barely covered WNI's expenses. Mr. de Souza refused to negotiate a higher monthly payment to properly cover WNI's expenses. Attachment of the Source Code is sought for recovery of these claims.

Mr. de Souza/WNB consistently made monthly payments to WNI (on a tardy basis and Cedric Berger, Joao Araujo and Mr. Brown informed Mr. de Souza that it was unacceptable and given the uncertainty and cavalier manner is which he treated them, they were resolved to do the same by making sure they were covered the day the payments stopped. This was the only rational thing to do for people in their position. Cedric Berger, Joao Araujo and Mr. Brown held out until the last thinking they could negotiate with Mr. de Souza but instead, he pulled the plug. Mr. de Souza now complains that he lacks the technical data and knowledge to run the business. This notion is absurd given Mr. de Souza's actions, which directly put WNI into the position it is now in with respect to the software.

Like all employees at WNI, Mr. Brown was an "at will" employee. That constitutes a verbal agreement evidenced by Mr. Brown's employment by WNI for more than eight years.

Mr. Brown never claimed a written employment agreement existed and would have refused to sign any such document under the circumstances.

Accusations of self-dealing and harassment are more absurd allegations and false. This is just another ploy to stay any Writ and grab the Source Code. The only pattern of harassment is Mr. de Souza harassing Mr. Brown and the engineers for the Source Code since he cut them off from the network at WNB nearly one year ago. Mr. de Souza used the monthly payments as leverage for months trying to force Cedric Berger, Joao Araujo and Mr. Brown to deliver WNI's intellectual property and gut WNI. Again, Mr. de Souza refused to provide funds for adequate legal representation by WNI. When James Hagan ("Mr. Hagan"), WNI's corporate counsel, filed his lawsuit in July the Company had not had legal representation since Mr. Hagan quit in April, when WNB refused to make payments under the 'de facto' license agreement.

Mr. Brown answered questions at Mr. Hagan's deposition truthfully and without prejudice to any party, including WNI or Mr. Brown.

Mr. de Souza/WNB did not have any examples of Mr. Brown breaching his fiduciary duties to WNI. With respect to Sudia, Mr. Brown did not breach his fiduciary duties to WNI. Sudia was performing services to WNI but discussing issues entirely different than WNI's business. There was only one engineer on WNI's payroll, Joao Araujo, and he consented fully with signing an NDA, regardless of his involvement in any new venture. Further, nothing was done with C. Brown and Associates and was simply a placeholder idea.

With respect to Mr. de Souza's statements regarding the Source Code, they are incorrect. Mr. de Souza has been attempting to manipulate WNI through its indebtedness to his controlled entity, including stripping WNI of its value to shareholders. While Mr. de Souza does have a majority equity interest, he does not "own the company" as he is fond of going around saying, and he acts in this manner as well. Mr. de Souza has every interest in seeing WNI fail so he can grab the intellectual property of WNI, and wash the debt WNB owes to WNI of approximately $1.5 million and get rid of WNI's shareholders in a debt conversion for stock at a de minimis value. This should be clear to any objective observer, and is why Hagan filed for a Writ. As a creditor, Mr. Brown wants the same opportunity to be paid.

Was Mr. Brown supposed to not accept service of Mr. Hagan's complaint? WNI did not have legal counsel and Mr. Brown is not a lawyer. Mr. Hagan has settled without consulting Mr. Brown or helping his cause.

Mr. Brown did not volunteer to be deposed by Mr. Hagan. Mr. Hagan told Mr. Brown if he did not agree, Mr. Hagan would get a judge to issue a subpoena. Mr. Brown's statements regarding debt to Mr. Hagan and himself were simply factual answers in response to questions put to Mr. Brown in the deposition process.

Moreover, WNI's claim of unspecified potential offsets from an as yet unfiled cross-complaint does not mean that the amounts owed under the promissory notes are not readily ascertained. In short, **WNI has only offered arguments but no evidence to support its claim that the amount owed on the notes are not accurate.**

**All records have been, and are available to WNI.** WNI's failure to fulfill its obligations is no fault of Mr. Brown. Mr. Brown never stalled or otherwise prevented Mr. de Souza from gaining access to the records. Mr. Brown continually requested of Mr. de Souza to appoint a person of authority to send the key to the storage space. Mr. de Souza refused and even refused to appoint an agent for service of process for receipt of corporate documents. Mr. de Souza still has not done anything to change the storage space contract to WNI.

WNI has had more than ample opportunity to review the corporate records and this constitutes more delay so the source Code can be released under settlement of the Hagan lawsuit. Once the Source Code is released, Mr. Brown will have no means of recovery. This tactic is simply to delay the process until Mr. de Souza can obtain the Source Code and remove it to Brazil.

Any proposed offset by Mr. de Souza will be "hotly contested" by Mr. Brown. Mr. Brown has made an honest and accurate accounting to the Court.

**B.    The Notes Are Enforceable And Not Barred By The Statute Of Limitations.**

WNI asserts, without any significant evidentiary showing, that it intends to assert a fraudulent non-disclosure defense to the ratification and adoption of the notes. Initially, it is worth noting that in paragraph 5 of his declaration, **Mr. de Souza acknowledges that he did**

**indeed ratify the notes**, rendering WNI's assertions regarding the statute of limitations moot – the minutes of the meeting acknowledging the debt constitute a writing within the statutory period upon which the claim can be based. Returning to the suggested fraud issue, there is simply nothing supplied by WNI in its opposition upon which it can be reasonably determined that there is any merit to its assertions. The issue is whether on the evidence currently before the court it appears the notes will be enforced. WNI's unsupported suggestion of a defensive theory does not, without more, cast any significant doubt on the enforceability of the written promissory notes. Moreover, the Supplemental Declaration of Charles Brown filed herewith makes clear that this defense is without merit.

Finally, while Plaintiff's wage claims are part of the underlying suit, they were not raised as a basis for attachment.

### C. Attachment Is Available As A Remedy And WNI's Aspersions About Motives Are Irrelevant.

WNI seeks to impugn Mr. Brown's motives in seeking attachment as a preliminary remedy to protect his ability to collect on his claims against WNI. The critical point here is that nowhere does WNI identify any other asset present in the United States! While WNI's Brazilian subsidiary may indeed have revenues, it was the refusal of that subsidiary to pay its license fees duly owed to WNI that created WNI's insolvency. WNI does not dispute that it is insolvent. It simply tries to mislead the court by blending the subsidiary and WNI together where it deems convenient.

WNI also argues that Mr. Brown seeks to attach the Source Code in order to somehow use it in another venture. How that would be possible, given that upon attachment the Source Code is to be deposited into this Court, pending resolution of Mr. Brown's claims, is beyond comprehension. If Mr. Brown is successful with his claims, and obtains a judgment, WNI is free to pay the judgment. If it refuses, the Source Code becomes an asset upon which Mr. Brown may foreclose to satisfy the judgment. Until that happens, the Source Code would not be available to Mr. Brown to use *even if that was his intent, which it is not.* (See Brown Decl., 2:8-9).

Moreover, WNI has a novel view of what it considers harassment. Presumably Mr. Brown was to simply abandon his claims, and ignore a deposition subpoena or refuse to testify truthfully when called as a witness, and by seeking legal redress for WNI's wrongs, and participating in lawful discovery, Mr. Brown is somehow harassing WNI and breaching obligations to it. While WNI may wish things were different, Mr. Brown is under no obligation to refrain from protecting his rights simply because the defendant deems it harassing, and he is not entitled to refuse to testify as a witness because WNI would prefer that the truthful information he possesses not be disclosed.

### D. WNI's Business Is Harmed By Its Subsidiary's Refusal To Pay For The License, Not By The Attachment Of The Source Code.

WNI's assertion that it needs the Source Code in order to operate its revenue generating business suggests that it does not know its own business. WNI's business is the licensing of its proprietary process and technology. Its sole licensee, Wireless Networks do Brasil, has refused to pay its duly owed license fees to WNI, and is therefore not entitled to use the process or technology. If Wireless Networks do Brasil had paid its duly owed fees, WNI would have had a revenue stream sufficient to make the payments that would have rendered this, and the Hagan Firm's, legal actions unnecessary. The sophistry of WNI's argument is revealed when it is known that Mr. de Souza's ownership interest in the Wireless Networks do Brasil means that he profits personally if the license fees are not paid, but shares the profits from the fees paid if they go through to WNI. This is why WNI's attorneys blur the distinction between the entities when it suits their purpose.

### E. Mr. De Souza Refused to Pay Down WNB's Debts to WNI.

Mr. de Souza refused to make any payments on the debts from WNB to WNI. Mr. de Souza mentioned at subsequent Board of Director's meetings early this year, where he wanted to do away with WNB's debt to WNI with some creative accounting. Mr. Hagan was present at that meeting. Mr. Brown refused to go along with Mr. de Souza's proposed "creative accounting" practices as it was illegal. (See Brown Decl., 2:10-13).

### F. WNI Mischaracterizes What Happened In The State Court Application for a Writ.

Jeffrey F. Ryan, Attorney for Mr. Brown, attended the hearing. The ex parte application was to be heard in the Law and Motion Department. When Mr. Ryan arrived at the courthouse in Redwood City, he was informed that the Law and Motion Judge was on vacation and all ex parte applications would be heard in the Presiding Judge's (Hon. Marie S. Weiner), Department on the Eight Floor. Mr. Ryan then went upstairs to the Presiding Judge's Department and presented his moving papers to her clerk. Mr. Ryan overheard Judge Weiner's clerk and bailiff discussing who the research attorney was for the ex parte applications for that particular department on that day. The bailiff indicated the name of the research attorney to Judge Weiner's clerk. Judge Weiner's clerk then said to the bailiff in my presence **"Have you called that research attorney yet?"** The bailiff said **"No, I haven't."** The clerk said **"You better call him up because he never shows up when he is assigned to our department for ex parte applications, unless you call and insist that he shows up."** The bailiff then proceeded to call the research attorney. (See Declaration of Jeffrey F. Ryan ("Ryan Decl."), 2:1-12).

When the research attorney finally showed up, approximately 15 minutes late, Mr. Ryan noticed he was in a foul mood. The research attorney grabbed Mr. Ryan's moving and the opposition papers off of the counsel's table in a hasty and angry manner and disappeared to chambers. When the research attorney came out he had questions for Mr. Ryan which clearly indicated that he had not read the moving papers. Mr. Ryan then pointed out to him where in the moving papers he could find the information he was seeking and even opened the page and showed him the highlighted sections of the April 19, 2005 Board of Directors' Minutes showing Ruy Rothschild de Souza's ("Mr. de Souza") approval and ratification of the promissory notes. The research attorney still refused to read even the highlighted sentences on this one page. Mr. Ryan asked the research attorney if he wanted Mr. Ryan to read to him the words that were highlighted; at that point, he finally agreed to read the two sentences that had been highlighted for the Court's convenience. He then asked another question which showed he had not read any part of the Board of Directors' Minutes so Mr. Ryan pointed him to the second page of Board of

1  Directors' Minutes which had one sentence highlighted, which would have given him the answer
2  to his question. (See Ryan Decl., 2:13-26).

3  In short, it was clear that this research attorney did not want to be there for this ex parte
4  application, had no interest in reading and understanding the arguments raised in the application,
5  and was frankly upset that he had been called to the department by the bailiff. (See Ryan Decl.,
6  3:1-3).

7  When he came out the second time from the back room he said that the application was
8  "denied without prejudice" and Mr. Ryan asked him why and he said "I am not telling you, it is
9  just denied without prejudice." Mr. Ryan then asked to speak with the judge and he said "**No.**"
10  (See Ryan Decl., 3:4-7).

11  At no time did the research attorney use the word "extortion" to describe the relief
12  Mr. Brown was seeking in his ex parte application. (See Ryan Decl., 3:8-9).

13  Furthermore, as you can see in the attached writ of attachment which was filed with the
14  San Mateo Superior Court, many of the arguments raised in Mr. Brown's application to the
15  Federal Court, were not raised in the State Court application. (See Ryan Decl., 3:10-12 and
16  Exhibit "A" thereto). Mr. Brown did not have certain evidence, which he is presenting to the
17  Federal Court including, but not limited to, the Declaration of Joao Araujo, WNI's former
18  software engineer. (See Ryan Decl., 3:13-16).

19  Mr. Ryan spoke with James Hagan, WNI's former corporate counsel, about his ex parte
20  application. Mr. Hagan informed Mr. Ryan that he did in fact give notice to the Bryan Cave Law
21  Firm in Santa Monica, California, who was representing WNI and Mr. de Souza's interest at that
22  time. He also, of course, gave the Officer and Director of WNI, Charles Brown, notice of the
23  application as he was required to do. Therefore, WNI was duly notified of the Hagan Law
24  Firm's ex parte hearing. (See Ryan Decl., 3:17-21).

25  **G.    Plaintiff's Response To The Allegations Raised In De Souza's Declaration.**

26  **Paragraph 2:**   Mr. de Souza's statement that "**For example, in my capacity as director
27  of WNI and principal of the controlling stockholder of WNI and WN do Brasil, I never
28  refused to execute any license agreement**" is false. Mr. de Souza refused to sign the WNI

8
PLAINTIFF CHARLES M. BROWN'S REPLY TO DEFENDANT'S OPPOSITION TO EX PARTE APPLICATION FOR
RIGHT TO ATTACH ORDER FED R. CIV. PROC. 64, CAL. CODE CIV. PROC. 483.010, 485.010, 485.210 AND 572
BROWN V. WIRELESS NETWORKS, INC.                                    CASE NO. C-07-04301 EDL

License Agreement on several occasions, claiming that any such agreement would have to "conform to Brazilian law," as he and his attorney's interpreted it. He then had his attorney's prepare a Technology Transfer Agreement (TTA) between WNI and Wireless Networks do Brasil ("WNB"), under which WNI would have no remaining legal rights to the technology or any other intellectual property held by WNI, once transferred to WNB under his proposed agreement. (See Brown Decl. and Exhibits thereto). The proposed agreement and his claim that no license agreement other what he and his attorney had proffered was possible under Brazilian law, are false.

      a.      By this time, Mr. Brown had been operating in Brazil for nearly five years and knew of many other foreign technology companies doing business in Brazil, and had consulted legal counsel in Brazil on his own. Everything represented by Mr. de Souza is simply false, and a ruse to get Mr. Brown to agree to transfer the technology to WNB. This has been his objective from day one and continues to be the case today.

      b.      Mr. de Souza only agreed to sign a Technology Transfer Agreement prepared by his attorneys. Of course, any TTA he was willing to sign included delivery of the Source Code to WNB without compensation to its owner, WNI.

      c.      Further, what was acceptable under Brazilian law was a standard license agreement, including the provision of royalty or license fees for use of the technology. These agreements are required to be recorded with the Central Bank of Brazil to allow for payments to be made out of Brazil, but the Central Bank does not determine the terms and substance of the agreement. The purpose of the recordation is to account for payments made to an overseas entity under license agreements because unscrupulous people like Mr. de Souza are fond of outmaneuvering the government of tax revenue. License agreements like the one given to Mr. de Souza and his attorneys in Brazil are recorded and approved in Brazil every day. There was no legitimate reason for him to refuse to sign the proposed license agreement. (See Brown Decl., Exhibit "D"). Compare the legitimate license agreement proposed by Mr. Brown with the TTA proposed by Mr. de Souza. (See Brown Decl, Exhibit "E").

1         d.       Furthermore, Mr. de Souza's attorneys (Eduardo Monteira da Silva) were acting both on his behalf as an investor and as attorneys for WNB. An obvious conflict of interest that Mr. Brown brought up several times which Mr. de Souza chose to ignore. WNI did not have the funds to hire an attorney for this purpose.

2.     **Paragraph 3:** Mr. de Souza's statement that "[t]he **Source Code has no value to the market outside of WNB, as it is integral to WNI**" is disingenuous at best.

    a.    The Source Code might or might not have value in the general market. As a practical matter, it is possible to use the bulk of the Source Code in other markets and implement the service in a short period of time, assuming the proper business relationships are in place. Parts of the Source Code are customized for the Brazilian market, but the Source Code was built for worldwide markets, not just Brazil. Further, it is not worth customizing the Source Code without the team that built it, who are off pursuing other ventures because Mr. de Souza refused to pay their wages.

3.     **Paragraphs 4 and 5:** The statements contained in these two paragraphs are important and a subtle admission of guilt. In fact, WNB does not need WNI and wants it to fail to:

    a.    dilute its shareholders with the remaining loan balances.

    b.    obtain clear rights to all intellectual property without paying for it.

    c.    clear the accounts payable due WNI from WNB, which WNB has no intention of every paying.

    d.    WNB is the only operation that was established by WNI because de Souza, under the terms of the Option Agreement, prevented any new capital or business operations without his approval. His MO in this regard was to kill initiatives by neglect. Mr. de Souza never had, and does not have any motivation to keep WNI in business. As he states, it has no business other than WNB. That was his management decision, not Mr. Brown's. He said, "We can't handle more than the market in Brazil" on numerous occasions and expressed no interest in developing new markets, and did nothing when asked in this regard.

   e. Mr. Brown never used any WNI intellectual property or any other asset to setup another company.

   f. The major creditor of WNB is WNI, to the tune of about $1.5 million. What is the best way to get rid of debt and get the Source Code? Get rid of Mr. Brown and WNI. In fact, payments could have been made to WNI by way of the Central Bank by repaying loans from the parent corporation, but naturally Mr. de Souza did not like that method as it did not benefit him financially.

  4. **Paragraph 5:** WNI's staff and engineers were not paid market wages. Mr. Brown was paid a paltry $60,000 per year in wages. The chief software engineer only $80,000 (who was moved to a consulting capacity at his request) and Joao Araujo only $60,000. These are ridiculous compensation for people of their caliber and expertise, and Mr. de Souza knew it.

   a. It was expressly agreed by Mr. de Souza that Cedric Berger, Joao Araujo and Mr. Brown, needed to "freelance" occasionally to make up for lost income, since he refused to pay market salaries. He was glad to agree if it meant that the monthly license fee did not exceed $25,000. While it is true that everyone was required to sign an NDA for any consulting work done on our behalf, individually or as a group, Mr. de Souza specifically requested that such work not be done in the Company's name because he was embarrassed that Mr. Brown and the engineers would tell people the truth as to their substandard wages. He also did not want it to get out that Mr. Brown and the engineers might be available for hire by other entities or competitors. Mr. de Souza needed the staff and engineers to function but did not want to pay them for their invaluable services.

   b. No work was ever performed by any of the engineers or Mr. Brown in this regard, and no revenue was ever received. Mr. Brown was unable to deploy the WNI business solution outside of Brazil. It was impossible to do so without Mr. de Souza's knowledge and agreement, which he refused to give.

      c.      More than once Mr. de Souza said to Mr. Brown, "**WNI owns the Source Code and I own WNI, and I do not need WNI to make a success of the business in Brazil.**" (See Brown Decl., 5:5-7).

      d.      If the Source Code was vital to the continuance of WNB's operations why did Mr. de Souza cease making payments to WNI in April of 2005 and force the dismissal of the only engineers left at WNI who knew anything about it? The expression "penny wise, pound foolish" comes to mind.

      e.      Mr. de Souza insisted on five extensions to the Option Agreement so that he could build up the loan balance due from WNI at 12% interest. The bulk of the funds owed to Cruzamerica/MRG International are interest accrued since 2002.

5.      <u>**Paragraph 6:**</u>  Mr. Brown said exactly the opposite. The financial statements of WNI were incomplete because Mr. de Souza refused to provide information for consolidated financial statements. When Mr. Brown informed Mr. de Souza that the shareholders had called him asking for a proper presentation of the financial condition of WNI and its subsidiaries, Mr. de Souza said "**it would cost too much money and they don't need to see that.**"

      a.      There is no contradiction about Mr. Brown's statement in his declaration at paragraph 19. Mr. Brown said that WNI did not have the funds to satisfy payment of its obligations, which is true. WNB does have funds to satisfy the payment of its obligations to WNI and its creditors, it just refuses to pay those obligations.

6.      <u>**Paragraph 7:**</u>  Mr. de Souza was notified of James Hagan's resignation as corporate counsel and further, had previously refused to provide any funds to hire adequate professional and legal services for WNI. Mr. de Souza liked it that way because it suited his purposes to misappropriate WNI's assets. WNI did not have counsel and Mr. de Souza knew it. In fact, that suited Mr. de Souza's purposes of "foreclosing" on the assets of WNI and defrauding the creditors. Further, Mr. Hagan had not been paid for the same reason. Mr. de Souza did not want Mr. Brown to have access to competent legal counsel. Mr. Brown appeared on behalf of WNI as its President at his duly noticed deposition, which was his fiduciary duty.

### H. What Mr. De Souza Has Been Doing In Brazil In Breach Of His Fiduciary Duties To Both WNI And WNB.

a. Paying his investment and other personal legal fees from WNB.

b. Using WNB's funds to finance other small business entities in which Cruzamerica/MRG has an investment; to wit, the marketing and sales firm he hired to work for WNB, and which he overpays every month. They are completely worthless. There is another entity as well but Mr. Brown is not sure about any of the details on that one.

c. Mr. de Souza is pilfering from WNB on his own behalf; putting family members on the payroll, paying other personal bills, etc. Mr. de Souza runs the company as his personal fiefdom.

d. Mr. de Souza sued the last entrepreneur where Mr. de Souza made an investment and tried to take over the company, just like WNI.

### CONCLUSION

For all of the foregoing reasons, the court should keep the current order in effect having the Source Code remain in the possession of the Court as it is the only remaining asset of WNI in the United States from which Mr. Brown and other creditors of WNI can recover WNB's obligation to them. Alternatively, the Court should require Mr. de Souza to post a bond in the amount of $150,000 as WNI has no assets and is insolvent.

Respectfully submitted

RYAN & STEINER
An Association of Attorneys

Dated: August 29, 2007     BY:     /s/
                                   JEFFREY F. RYAN, Attorneys for Plaintiff
                                   CHARLES M. BROWN