JEFFREY F. RYAN, ESQ. SBN 129079
RYAN & STEINER
An Association of Attorneys
455 North Whisman Road, Suite 200
Mountain View, CA 94043-5721
Telephone:   (650) 691-1430
Facsimile:   (650) 968-2685

Attorneys for Plaintiff,
CHARLES M. BROWN

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CHARLES M. BROWN,<br><br>  Plaintiff,<br><br>vs.<br><br>WIRELESS NETWORKS, INC., a Delaware corporation, and DOES 1 THROUGH 50,<br><br>  Defendants. | Case No.: C-07-04301 EDL<br><br>**SUPPLEMENTAL DECLARATION OF CHARLES M. BROWN IN REPLY TO DEFENDANT'S OPPOSITION TO EMERGENCY EX PARTE APPLICATION FOR RIGHT TO ATTACH ORDER**<br><br>Date:   August 31, 2007<br>Time:   10:00 a.m.<br>Dept.:   Courtroom E, 15th Floor<br>Judge:   Magistrate Elizabeth D. Laporte |

I, Charles M. Brown, declare and state as follows:

1.  I am the plaintiff in this matter. I am a resident of the State of California over the age of eighteen years. I am aware of the following facts of my own personal knowledge. If called upon as a witness, I could and would competently testify to the facts contained in this declaration of my own personal knowledge.

2.  On July 13, 2007, I resigned from Wireless Networks, Inc. ("WNI"). (A true and correct copy of my resignation letter addressed to the Board of Directors of WNI, dated July 13, 2007, is attached hereto as **Exhibit "A."**)

3.  On July 18, 2007, I sent an email to Ruy Rothschild de Souza ("Mr. de Souza"), specifically requesting instructions on where to send the key to the storage unit. (A true and

1 | correct copy of my email to Mr. de Souza, dated July 18, 2007, is attached hereto as

2 | **Exhibit "B."**)

3 |     4.    WNI has continued to refuse to pay the storage company which is housing the

4 | records. I have had to advance payments to the storage facility to keep them from becoming

5 | delinquent. (True and correct copies of the Preliminary Lien Notice, dated July 30, 2007, from

6 | Extra Storage Redwood City showing the amount of $160.00 due; a Transaction Receipt, dated

7 | July 31, 2007, showing I paid the lien in the amount of $160.00; and Preliminary Lien Notice,

8 | dated August 25, 2007, from Extra Storage Redwood City showing the amount of $145.00 due,

9 | are attached hereto as **Exhibit "C"**).

10 |     5.    Mr. de Souza refused to make any payments on the debts from WNB to WNI.

11 | Mr. de Souza mentioned at subsequent Board of Director meetings early this year that he wanted

12 | to do away with WNB's debt to WNI with some "creative accounting." James Hagan, WNI's

13 | corporate counsel, was present at that meeting. I refused to go along with it.

14 | **RUY ROTHSCHILD DE SOUZA'S DECLARATION**

15 |     6.    **Paragraph 2:**   False. Mr. de Souza refused to sign the WNI License Agreement

16 | on several occasions, claiming that any such agreement would have to "conform to Brazilian

17 | law," as he and his attorney's interpreted it. (A true and correct copy of an email thread between

18 | Mr. de Souza and I, dated January 23, 2004, regarding the agreed upon license agreement and

19 | Mr. de Souza's excuses for not executing it, is attached hereto as **Exhibit "D"**). (A true and

20 | correct copy of an email thread between Mr. de Souza and I, dated October 22, 2004, in which

21 | Mr. de Souza is again coming up with excuses for not executing the license agreement he had

22 | verbally agreed to excute, is attached hereto as **Exhibit "E"**). He then had his attorney's prepare

23 | a Technology Transfer Agreement (TTA) between WNI and Wireless Networks do Brasil

24 | ("WNB"), under which WNI would have no remaining legal rights to the technology or any

25 | other intellectual property held by WNI, once transferred to WNB under his proposed agreement.

26 | (A true and correct copy of the Software License Agreement Mr. de Souza sent me which

27 | included a provision on page 6 transferring the Source code to Mr. de Souza in Brazil and

28 | referenced herein as the TTA, is attached hereto as **Exhibit F"**). The agreement and his claim

that no license agreement other what he and his attorney had proffered was possible under Brazilian law is false.

    a. By this time, I had been operating in Brazil for nearly five years and knew of many other foreign technology companies doing business in Brazil, and had consulted legal counsel in Brazil on my own. Everything represented by Mr. de Souza is simply false, and a ruse to get me to agree to transfer the technology to WNB for nothing. This has been his objective from day one.

    b. Mr. de Souza's statement that he never refused to sign a license agreement with WNI is false. Mr. de Souza only agreed to sign a Technology Transfer Agreement prepared by his attorneys. Of course, any TTA he was willing to sign included delivery of the Source Code to WNB. The license agreement our lawyers (James Hagan) prepared and sent to Mr. de Souza is a standard license agreement and it keeps the ownership of the technology with the inventor, here WNI. (A true and correct copy of the second draft to the license agreement between WNI and WNB, which Mr. de Souza refused to sign because he would not get the Source Code, is attached hereto as **Exhibit "G"**).

    c. Further, what was acceptable under Brazilian law was a standard license agreement, including the provision of payments for use of technology. These agreements are required to be recorded with the Central Bank of Brazil to allow for payments to be made out of Brazil, but the Central Bank does not determine the terms and substance of the agreement. The purpose of the recordation is to account for payments made to an overseas entity under license agreements because unscrupulous people like Mr. de Souza are fond of outmaneuvering the government of tax revenue. License agreements like the one given to Mr. de Souza and his attorneys in Brazil are recorded and approved in Brazil every day.

    d. Furthermore, Mr. de Souza's attorneys (Eduardo Monteira da Silva) were acting both on his behalf as an investor and as attorneys for WNB, an obvious conflict of interest that I brought up several times but which Mr. de Souza chose to ignore. WNI did not have the funds to hire an attorney for this purpose.

3
SUPPLEMENTAL DECLARATION OF CHARLES M. BROWN IN REPLY TO DEFENDANT'S
OPPOSITION TO EMERGENCY EX PARTE APPLICATION FOR RIGHT TO ATTACH ORDER
BROWN v. WIRELESS NETWORKS, INC.                                    CASE NO. C-07-04301 EDL

7. **Paragraph 3:** Mr. de Souza's statement that "**[t]he Source Code has no value to the market outside of WNB, as it is integral to WNI**" is false.

    a. The Source Code might or might not have value in the general market. This statement lacks understanding or veracity. As a practical matter, it is possible to use the bulk of the Source Code in other markets and implement the service in a short period of time, assuming the proper business relationships are in place. Parts of the Source Code are customized for the Brazilian market, but the Source Code was built for worldwide markets, not just Brazil. Further, it is not worth doing without the team that built it, who are off pursuing other ventures.

8. **Paragraphs 4 and 5:** The statements contained in these two paragraphs are important and a subtle admission of guilt. In fact, WNB does not need WNI and wants it to fail to:

    a. dilute its shareholders with the remaining loan balances.

    b. obtain clear rights to all intellectual property

    c. clear the accounts payable due WNI from WNB, which WNB has no intention of every paying.

    d. WNB is the only operation that was established by WNI because Mr. de Souza, under the terms of the Option Agreement, prevented any new capital or business operations without his approval. His MO in this regard was to kill initiatives by neglect. Mr. de Souza had, and does not have any motivation to keep WNI in business. As he states, it has no business other than WNB. That was Mr. de Souza;s management decision, not mine. Mr. de Souza said, "**We can't handle more than the market in Brazil**" on numerous occasions and expressed no interest in developing new markets, and did nothing when asked in this regard.

    e. I never used any WNI intellectual property or any other asset to setup another company.

    f. The major creditor of WNB is WNI, to the tune of about $1.5 million. What is the best way to get rid of debt and get the Source Code? Get rid of me and WNI, of course. In fact, payments could have been made to WNI by way of the Central Bank by repaying loans from the parent corporation, but naturally Mr. de Souza did not like that method.

9. **Paragraph 5:** WNI's staff and engineers were not paid market wages. I was paid a paltry $60,000 per year in wages. The chief software engineer was paid an annual salary of only $80,000 (who was moved to a consulting capacity at his request) and Joao Araujo received an annually salary of $60,000. These are ridiculously low compensation for people of our caliber and expertise, and Mr. de Souza knew it.

   a. It was expressly agreed by Mr. de Souza that Cedric Berger, Joao Araujo and I, needed to "freelance" occasionally to make up for lost income, since he refused to pay market salaries. He was glad to agree if it meant that the monthly license fee did not exceed $25,000. While it is true that everyone was required to sign an NDA for any consulting work done on our behalf, individually or as a group, Mr. de Souza specifically requested that such work not be done in the Company's name because he was embarrassed that we would tell people the truth as to our substandard wages. He also did not want it to get out that we might be available for hire by other entities or competitors.

   b. No work was ever performed by any of the engineers or I in this regard, and no revenue was ever received. We were unable to deploy the WNI business solution outside of Brazil. It was impossible to do so without Mr. de Souza's knowledge and agreement, which he refused to give.

   c. More than once Mr. de Souza said to me, "**WNI owns the Source Code and I own WNI, and I do not need WNI to make a success of the business in Brazil.**"

   d. If the Source Code was vital to the continuance of WNB's operations why did he cease making payments to WNI in April of 2005 and force the dismissal of the only engineers left in the Company that knew anything about it? The answer is Mr. de Souza intended to grab the Source Code without paying for it and then once he had it safely in Brazil, he would shut down WNI.

   e. Mr. de Souza insisted on five extensions to the Option Agreement so that he could build up the loan balance due from WNI at 12% interest. The bulk of the funds owed to Cruzamerica/MRG International is interest accrued since 2002.



10. **Paragraph 6:** I said exactly the opposite. The financial statements of WNI were incomplete because Mr. de Souza refused to provide information for consolidated financial statements. When I informed Mr. de Souza that the shareholders had called me asking for a proper presentation of the financial condition of WNI and its subsidiaries, Mr. de Souza said "**it would cost too much money and they don't need to see that.**"

    a. There is no contradiction about my statement in my declaration at paragraph 19. I said that WNI did not have the funds to satisfy payment of its obligations. WNB does have funds to satisfy the payment of its obligations to WNI and its creditors. It simply refuses to pay its obligations.

11. **Paragraph 7:** Mr. de Souza was notified of James Hagan's resignation as corporate counsel and further, had previously refused to provide any funds to hire adequate professional and legal services for WNI. Mr. de Souza liked it that way because it suited his purposes to misappropriate WNI's assets. WNI did not have counsel and Mr. de Souza knew it. In fact, Mr. Hagan had not been paid for the same reason. Mr. de Souza did not want me to have access to competent legal counsel. I appeared on behalf of WNI as its President at my deposition, which was my fiduciary duty.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct. This declaration was executed this _____ day of August, 2007, in Woodside, California.

_____
CHARLES M. BROWN

DECLARATION OF CHARLES M. BROWN IN REPLY TO DEFENDANT'S
OPPOSITION TO EMERGENCY EX PARTE APPLICATION FOR RIGHT TO ATTACH ORDER