# EXHIBIT A

1  JEFFREY F. RYAN, ESQ. SBN 129079
   RYAN & STEINER
2  An Association of Attorneys
   455 North Whisman Road, Suite 200
3  Mountain View, CA 94043-5721
   Telephone:     (650) 691-1430
4  Facsimile:     (650) 968-2685
5
   Attorneys for Plaintiff,
6  CHARLES M. BROWN

7                    UNITED STATES DISTRICT COURT

8                    NORTHERN DISTRICT OF CALIFORNIA

9

10  CHARLES M. BROWN,                   Case No.: C07-4302 EDL

11         Plaintiff,                   **DECLARATION OF CHARLES M.
                                        BROWN IN SUPPORT OF EMERGENCY
12     vs.                              EX PARTE APPLICATION FOR RIGHT
                                        TO ATTACH ORDER**
13  WIRELESS NETWORKS, INC., a Delaware
    corporation, and DOES 1 THROUGH 50,  **Dept.:   Courtroom E, 15th Floor**
14                                        **Judge:   Magistrate Elizabeth D. Laporte**
           Defendants.
15

16

17      I, Charles M. Brown, declare and state as follows:

18      1.      I am the plaintiff in this matter. I am a resident of the State of California over the

19  age of eighteen years. I am aware of the following facts of my own personal knowledge. If

20  called upon as a witness, I could and would competently testify to the facts contained in this

21  declaration of my own personal knowledge.

22  **HISTORY OF MY RELATIONSHIP WITH THE MAJORITY SHAREHOLDERS OF**

23  **WIRELESS NETWORKS, INC., THE CALIFORNIA PARENT CORPORATION**

24      2.      Defendant WIRELESS NETWORKS, INC. ("Wireless Network" or "the

25  Company"), a Delaware corporation started business in California in 1998. Wireless Network

26  was formed to design and develop wireless software and hardware technologies that would be

27  used to provide wireless transaction services for financial institutions. These services would be

28

1  marketed specifically to banks and financial institutions worldwide. The technology included

2  development of hardware and software specific to the financial services industry.

3        3.    The Company created a subsidiary in Brazil in 1999 called Wireless Networks do

4  Brasil. This subsidiary was setup to be the existence-proof for the implementation of the

5  Company's technology products and services. By virtue of my previous relationship with bank

6  executives in Brazil, specifically at Visanet do Brasil, Redecard do Brasil (Mastercard), AMEX

7  and Banco do Bradesco in Brazil, I was able to gain access to the market and implement the

8  business plan. These are all large financial institutions in Brazil providing financial services to

9  industry, retail merchants and consumers.

10        4.    I and my associates raised approximately $6 million of capital from local

11  investors in California and from private investors in Europe. The business plan was to prove the

12  technology and business model at a seed location in Brazil and then expand worldwide, with the

13  second market in Europe which had been seeded. I and my associates completed all of the

14  technology, acquired service contracts and had setup and were operating a subsidiary in Brazil

15  called Wireless Networks do Brasil by October of 2000. This company was formed as a

16  Brazilian corporation and was a wholly-owned subsidiary of Wireless Network. It held the

17  customer contracts, cash flow from operations and operating assets in Brazil. It was the intention

18  of the companies to enter into a standard technology license agreement since Wireless Network

19  owned all of the technology and intellectual property used by the Brazilian operation. Without

20  such license agreement, technically, Wireless Networks do Brasil had no legal right to use the

21  software, hardware intellectual property and other products the Company had developed.

22        5.    In January of 2002, an Option Agreement was executed between Mr Ruy

23  Rothschild de Souza ("Mr. de Souza") and his controlled investment companies, Cruzamerica /

24  MRG International ("MRG"), which had been previously approved by the Company's Board of

25  Directors and Shareholders. Mr. de Souza was a private investor in Brazil. In December of

26  2004, Mr. de Souza elected to exercise the election under the Option Agreement to acquire a

27  majority interest in the Company and MRG became a majority shareholder in the Company. The

28  Company issued the shares and took care of other outstanding issues by holding two Special

1  Meetings of the Board of Directors, held back-to-back, on April 19 2005. The Board Minutes

2  from the second meeting were provided with the original Declaration of Charles M. Brown for

3  the Writ of Attachment.

4        6.       The first Special Meeting of the Board of Directors was attended by James

5  Hagan, Esq. ("Mr. Hagan") attorney for the Company, Mr. de Souza, the sole remaining director

6  of the corporation and I. I called the meeting to order and Mr. Hagan was elected as the

7  recording secretary to record the minutes of the meeting. In the first Board Meeting, the issuance

8  of the shares to Cruzamerica / MRG was approved and the other director, Mr. Richard Redett

9  ("Mr. Redett") immediately resigned from the Board.

10        7.       The second Special Meeting of the Board of Directors was attended by James

11  Hagan, Esq. ("Mr. Hagan") attorney for the Company, Mr. de Souza and I. At this second

12  meeting I was the sole director of the Company at the beginning of the meeting, but I then

13  elected Mr. de Souza to the Board of Directors. I observed at the time that I was the President,

14  Secretary and Treasurer of the company and thought it would be appropriate for Mr. de Souza to

15  take a position as an Officer, or to hire an additional executive. It was discussed and he declined.

16  No change was made. There were several reasons why Mr. Redett resigned. He did not know

17  Mr. de Souza but what he did know of him he did not like, and felt uncomfortable continuing.

18  For my part, I did not like the way Mr. de Souza and the wholly-owned subsidiary in Brazil had

19  refused to sign and execute the license agreement after repeated attempts to finish this task, and

20  for which that very software is the subject of this writ of attachment application. Mr. de Souza

21  continued to play games with respect to the license agreement and ultimately refused to sign it

22  even though he had agreed to do so and even though he had the benefit of the software at the

23  company in Brazil. Mr. de Souza had total control of the Brazilian subsidiary's operations and it

24  soon became apparent that I was not welcome. Mr. de Souza micromanaged the Brazilian

25  operation which was offensive to me and the staff I had built there, and the development staff of

26  engineers who had built the Company with me from the beginning. Mr. de Souza refused to

27  provide timely and accurate information to the Board of Directors of Wireless Network. As a

28  director I had a fiduciary duty to look at the financial statements of the wholly-owned subsidiary

1   and other important documents, which Mr. de Souza consistently refused to provide to the

2   Company. Finally, Mr. de Souza refused to cooperate in providing timely information to the

3   shareholders of the Company under the standard procedures of reporting to the minority

4   shareholders, including annual financial statements, refusing to agree to provide the professional

5   personnel or wherewithal to have consolidated financial statements prepared on behalf of the

6   Company combining Wireless Networks do Brazil and Wireless Networks, Inc., or even to hold

7   annual shareholders meetings as was required by the ByLaws of the Company. Mr. de Souza's

8   obfuscation and duplicity made me extremely uncomfortable and I confronted him with it on

9   several occasions. He failed to respond in any meaningful way, and refused to sign the license

10  agreement on behalf of Wireless Networks do Brasil, and refused to hold a Board Meeting to

11  discuss his refusal and put it on the record.

12        8.      The license agreement between Wireless Networks and Wireless Networks do

13  Brasil was important in terms of the original investment and agreement with Mr. de Souza

14  because Wireless Networks was the owner and developer of the technology, a separate parent

15  corporation based in the United States. Wireless Networks do Brazil was an operating entity and

16  a subsidiary of Wireless Networks, and a Brazilian corporation. Substantial investments of

17  money and personnel resources had been made by the Company directly into the Brazilian

18  subsidiary. It was clear that the Company owned the technology, patents and other intellectual

19  property developed prior to Mr. de Souza's involvement. He had agreed with the original

20  business plan published in 1998 and said he had made his investment based on the business

21  model. Mr. de Souza had agreed prior to making an investment that that was very important to

22  expand the Company's business model to other countries, and how Brazil would serve as an

23  excellent existence-proof. On numerous occasions he mentioned to me that the license

24  agreement needed to be completed, but he would fail to do anything to make that happen. It is

25  standard procedure in the technology business under such circumstances to have proper

26  intellectual property agreements in place between separate legal entities, especially operating

27  under the laws of different countries, the US and Brazil. Mr. de Souza has assured everyone that

28  he agreed that it was just a matter of procedure, but subsequently refused and consistently failed

1  to follow up or follow through with constant requests and admonitions from me for his failure to

2  perform in this regard.

3       9.    It was against this background that Wireless Networks lost Mr. Redett as a

4  member of the Board, leaving myself as the sole Director of the Company. At the April 19, 2005

5  Board of Director's meeting of the Company, I decided to elect Mr. de Souza as the second

6  member of the Board to replace Mr. Redett. I noted in the Minutes of the Board meeting that the

7  Company had just issued to Mr. de Souza's company, MRG International, Inc. an affiliate of

8  Cruz America, 112,791 shares of its common stock. This gave Mr. de Souza's company a

9  majority of Wireless Networks' outstanding common stock. As such, I felt it was appropriate to

10  elect Mr. de Souza as a Director of the Company to serve without compensation. Mr. de Souza

11  accepted the position of Director of the Company and thereafter participated in the meeting as a

12  Director. A true and correct copy of the Minutes of the Special Meeting of the Board of

13  Directors of Wireless Networks, Inc., dated April 19, 2005 are attached hereto as **Exhibit "A"**

14  and incorporated herein by reference.

15       10.    At that time I was serving as president, secretary and treasurer of the Company.

16  One of the key things that occurred at the Board meeting of April 19, 2005 was that I presented

17  the financial statements as of December 31, 2004 for the Company and for its wholly-owned

18  subsidiary, Wireless Networks do Brasil. These financial statements were reviewed in detail by

19  the Directors. Thereafter, on motions duly made, those financial statements were discussed,

20  reviewed and approved. Mr. de Souza asked detailed questions about the liabilities listed on the

21  Balance Sheet due to me, specifically the loan balance represented by the promissory notes and

22  the accrued salary payable to me, which at that time was $17,000. He agreed that these were all

23  payable and as an inducement to my continuing involvement with the Company, assured me they

24  would be paid in due course, but not necessary to complete the details at that meeting. I took

25  him at his word and the understanding everyone had was the date was reset for all obligations to

26  me from that Board Meeting.

27       11.    A second item of business was the two promissory notes which evidenced

28  indebtedness from the Company to me. One note was in the amount of $71,892.29 and the other

1 note was in the amount of $2,000.00. These notes were discussed and considered. One of the

2 topics of discussion was the fact that the earlier promissory note, the larger one, was due and

3 owing back in 2004. It was decided by Mr. de Souza and myself that note would be reaffirmed

4 and ratified by the Company and would therefore be still be due and owing as of April 19, 2005.

5 The purpose of ratifying the notes was to reaffirm that the Company's obligations to pay those

6 notes. The notes were extended indefinitely by the Board at the Board meeting. Mr. de Souza

7 agreed to extend the notes in order to retain my services at the Company which were essential to

8 its operations.

9        12.      The Board meeting also included the financial statements and balance sheets of

10 the Company which showed the notes still due and payable and the accrued salary which was

11 due and owing by the Company to me. The financial statements and balance sheets were

12 reviewed and approved. As the Court can see from Exhibit "A" those financial statements which

13 included both the promissory notes due and payable to me as well as the wages owed to me were

14 included and approved by the Board. A true and correct copy of the two promissory notes

15 executed by me and which were ratified and approved by Mr. de Souza at the April 19, 2005

16 Board meeting are attached as **Exhibit "B"** and incorporated herein by reference.

17        13.      I have been paid $51,062.02 on the promissory notes to date. I know this because

18 I have reviewed the accounting records prepared by the Company's accountant showing entries

19 for payments. The amount currently owed on those notes is $51,617.32. This is the exact

20 amount that is owed on the two promissory notes to me. This payment history is accurate to the

21 best of personal knowledge. A true and correct copy of a spreadsheet showing the payment

22 history on the two promissory is attached as **Exhibit "C"** and incorporated herein by

23 reference.

24        14.      In addition to the amounts owed to me on the promissory notes, I am also owed

25 wages totaling $46,876.60. That amount has not been paid to me to date. The accrued wages at

26 the time of the April 19, 2005 Board meeting was $17,000.00. That amount was approved and

27 ratified at the April 19, 2005 Board meeting as well by Mr. de Souza. A true and correct copy of

28 the financial statements for December 31, 2004 of the Company, which were approved and

1  ratified by the Board of the Directors on April 19, 2005, which includes the amounts owed to me

2  under the two promissory notes, the first of which had been owing since 2001 and became due in

3  2003, as well as wages which were due since 2002 is attached as **Exhibit "D"** and incorporated

4  herein by reference.

5  **EVENTS SINCE APRIL 19, 2005, THE BOARD MEETING TO THE PRESENT**

6  **WHICH HAVE CAUSED AND NECESSITATED THIS *EX PARTE* APPLICATION**

7  15.    From April 2005 to the end of March 2007, the communications between Mr. de

8  Souza and I, and personnel under Mr. de Souza's management in Brazil, was limited.

9  Information was lacking and Mr. de Souza refused to cooperate in bringing in additional capital

10  to the Company stating that his majority position was supreme and that nothing could be done

11  without his approval. He also continued to refuse to sign the license agreement which he knew

12  was very important to Wireless Networks to be able to not only take the business model that I

13  and my associates had proven in Brazil prior to Mr. de Souza's involvement to other countries,

14  and which was part of the original business plan.

15  16.    In addition, I was extremely agitated by the fact that Mr. de Souza failed to

16  execute contracts with companies in the market in Brazil that were very beneficial to the

17  Company. Specifically, he failed to renew the contracts that I had originally obtained with

18  Visanet do Brazil, Redecard do Brasil, and other customers, which were the basis upon which the

19  Company in Brazil was built and its services were provided, all of which had been negotiated

20  prior to Mr. de Souza's involvement. Further, Mr. de Souza failed to execute two contracts from

21  Siemens in Brazil which would have provided ready expanded market access for the Company

22  beyond Brazil. Mr. de Souza effectively prevented the Company from bringing in additional

23  capital, failed to provide information to shareholders and crippled the Company's abilities to

24  expand its business beyond the borders of Brazil.

25  17.    Further, I received various reports from former and current employees about their

26  dissatisfaction with the management of the Company, including his current top lieutenant who

27  used to call me at home at nights. It was proving nearly impossible to keep competent people

28  employed in Brazil. The Company's US staff would spend months training operations engineers

1   and Mr. de Souza would fire them as either being too friendly with us or not subservient enough

2   to him. I was told by former and current employees about their dissatisfaction with the situation

3   and how on occasion they had been told that communicating with me in any form would result in

4   the termination of their employment. They would implore me to do something about it. I would

5   talk to Mr. de Souza in a respectful manner and the result would be emails from me, requests for

6   information and all other correspondence to staff of Wireless Networks do Brazil were ignored.

7   The people were afraid of losing their jobs.

8        18.    In the meantime, I was in continual contact with the forty or so shareholders of

9   Wireless Networks in the US and Europe trying to communicate the status of the Company in

10   my capacity as a corporate officer. Mr. de Souza would not help in this regard and refused to

11   provide any information or return phone calls from shareholders. During this period it became

12   apparent to me that Mr. de Souza's objective was to undermine the value and ability of Wireless

13   Networks to do business, other than to be a surrogate to Wireless Networks do Brazil and Mr. de

14   Souza's majority ownership and management. All of the cash flow from the business was built

15   on the operating entity in Brazil. The whole premise of the business theory was that the

16   operating entity in Brazil would pay Wireless Networks license and support fees to maintain its

17   operation, expand the technology base and put together new projects in other countries. The

18   business and technical support included technical support for operations, software, engineering

19   and business support, which was duly provided in a professional manner by Wireless Networks

20   under difficult circumstances.

21        19.    The agreed upon license fee amount that had originally been stipulated in the

22   original agreements, which Mr. de Souza refused to sign, was $25,000 per month. Although

23   Mr. de Souza refused to sign these agreements, Wireless Networks do Brazil continued to pay

24   Wireless Networks $25,000 per month from June of 2002 up to March 31, 2007. These payment

25   abruptly ceased in March 2007, without discussion or notice from Mr. de Souza. I later learned

26   that the Brazilian company had revenues of about $3 million annually with ample cash flow to

27   make payments to the Company.

28

20.     On or about April and May 2006, Mr. de Souza instructed the engineering personnel at Wireless Networks do Brazil to close down network connections maintained for the support of the support engineers at Wireless Networks do Brazil. This effectively limited the ability of Wireless Networks to provide support and maintenance pursuant to the original license agreement. No notice was provided and Mr. de Souza refused to explain why he had done this. I went to great lengths to explain that he was putting the business in jeopardy as the Company provided 24x7 financial network services. In addition, he has just fired the last capable, trained engineer at Wireless Networks do Brazil and the new staff was not yet capable of supporting the technology or operations. Network failures ensued on which Mr. de Souza blamed Wireless Networks.

21.     During this period as well Mr. de Souza had access to any and all Wireless Networks' corporate records. In fact, prior to Mr. de Souza and MRG's involvement with the Company, I had copied all of the corporate records, including all of the shareholders and corporate records in large bound notebooks and given them to his attorneys in Brazil. Mr. de Souza regularly received copies of the financial statements and any other documents related to corporate issues and matters. All he had to do was ask. The reverse was not the case, but I thought I would set a good example by working as best I could with the staff and professional personnel in Brazil.

22.     Shortly after Mr. de Souza and the engineering staff of Wireless Networks do Brazil disconnected Wireless Networks from its own technology base in Brazil, Mr. de Souza and his new engineering staff started making demands for delivery of the source code from Wireless Networks to Wireless Networks do Brazil. I pointed out that the intellectual property in Wireless Networks was property of Wireless Networks and any dispersal of such source code or other intellectual property to Wireless Networks do Brazil should be done pursuant to a proper and legal technology licensing agreement, which he had consistently refused to sign since November of 2003.

23.     After badgering and threatening me consistently during this period, Mr. de Souza ceased payments to Wireless Networks in March 2007. Mr. de Souza gave no reason or

1  otherwise as to why this was done. I was forced to layoff the remaining engineers and cease any

2  technical support. Mr. de Souza was well aware of the effect that this would have on the ability

3  of the Company to continue as a going concern and did so intentionally. In summary, during this

4  period Mr. de Souza was working a calculated plan to strip Wireless Networks of its assets, drive

5  off its personnel and blackmail me into delivering corporate assets illegally to Brazil. Because of

6  my fiduciary duties as a Director and Officer of the Company, I could not do that and refused to

7  do that after being repeatedly threatened with legal action if I did not turn over the source code.

8  Wireless Networks do Brazil had no right to the source code because it had consistently refused

9  to sign a license agreement. Mr. de Souza maintained that because he had a majority ownership

10  in the Company, he could order me to turn the source code over to Wireless Networks do Brazil.

11  I pointed out to him that that would be defrauding the investors, that, in my opinion, it was

12  illegal, and that I would not go along with it. His attorney told me that the US investors would

13  never sue Mr. de Souza in Brazil and that any concern regarding legal actions from shareholders

14  was nonsense.

15      24.      Prior to the April 2005 Board of Director's meeting, Mr. Hagan expressed a

16  strong desire to be paid. The Company had not paid Mr. Hagan for nearly a year. Mr. de Souza

17  was aware of this fact but refused to respond to me to make adequate provision for Mr. Hagan's

18  outstanding bills. Prior to the April meeting, arrangements were made to pay Mr. Hagan at least

19  for the legal fees he incurred during the April meeting. Mr. de Souza further agreed with me that

20  he would make payments to Wireless Networks in a monthly amount sufficient to pay Mr. Hagan

21  off within 12 months. This would have amounted to approximately $5,000.00 per month.

22  Mr. de Souza subsequently reneged on this agreement and never paid Mr. Hagan a nickel. Out

23  of the monthly de facto license payment of $25,000.00 that was received by Wireless Networks

24  from Wireless Networks do Brasil, I allocated $500 per month, which was difficult to do under

25  the current Company's circumstances. The $25,000.00 per month amount was negligible given

26  the knowledge and value of the people at the Company.

27      25.      In addition, I knew of and was able to bring in additional investors during this

28  period. Mr. de Souza refused, even after discussing that in light of the outstanding bill to

10

1   Mr. Hagan. It was clear to me at this time that Mr. Souza had no intention of paying Mr. Hagan

2   or anyone else that was listed as an account payable on the Company. I felt an obligation to the

3   Company's attorney, who had served the Company faithfully for over four years, through

4   various ups and downs, had acted in good faith. I felt that it was only proper that the Company

5   pay its bill to its attorney and honor the commitment that Mr. de Souza made at the Board

6   meeting of April 19, 2005. Therefore, when Mr. Hagan asked me to attend the deposition, I

7   agreed to do so. I testified truthfully at my deposition and did so as my fiduciary obligation to

8   the Company required me to do.

9        26.    In effect, Mr. de Souza was running a conspiracy to transfer the assets of Wireless

10  Networks to Wireless Networks do Brazil by defrauding the creditors and shareholders of

11  Wireless Networks, by not paying for those assets, by not signing the license agreement and by

12  destroying the value of the minority stockholders in the Company. Mr. de Souza systematically

13  destroyed Wireless Networks by the following course of conduct: (1) he stopped paying the

14  $25,000 *de facto* license fee; (2) he refused to pay the Company's attorney; (3) he stopped

15  paying the employees, including myself; (4) he refused to approve any outside potential funding

16  that I could bring because he wanted to continue to have control over the Company's operation;

17  (5) he refused to give the financials or other information that was necessary for me and the Board

18  to fulfill our fiduciary duties as the Directors of this wholly-owned subsidiary in Brazil; (6) he

19  sabotaged all communications between the subsidiary and the parent corporation by threatening

20  employees of the Wireless Networks do Brazil with termination if they spoke with me or anyone

21  in the California operation, with the one exception and that was to demand delivery of the source

22  code; (7) he systematically abused the remaining shareholders all the while pointing the finger at

23  me.

24       27.    In essence, what Mr. de Souza was trying to do was to get the source code

25  without paying for it and once he would get the source code then he was going to let the parent

26  corporation go out of business. That is why Mr. Hagan deposited the source code with this

27  Court. It is the reason why Mr. de Souza has finally honored his commitment to pay Mr. Hagan

28  at least some portion of the attorneys' fees that are owed to him by Wireless Networks. If this

1   Court allows that source code to fall into the hands of Mr. de Souza, I will never be paid as

2   Mr. de Souza and the cash generating subsidiary reside in Brazil. There is no way that I can

3   collect a judgment in Brazil from Mr. de Souza. If the Court holds onto the source code and

4   allows me to prove my claims at trial, I will be able to show that all of the monies that I am

5   seeking in this lawsuit are due and payable to me and Mr. de Souza be required to pay it and, if

6   he does not, I should be given the source code and be able to sell the source code to a third party

7   so as to get the Company's obligations to me satisfied. The bottom line is that if this Court

8   releases the source code to Wireless Networks do Brazil it will be on the first plane to Brazil

9   never to be seen again. All of the shareholders and the creditors of Wireless Networks will be

10   left with an absolute zero remedy. That is why a writ of attachment or a temporary restraining

11   order keeping the source code in the Court's possession pending the outcome of this case is

12   essential to effect justice.

13

14       I declare under penalty of perjury under the laws of the State of California that the

15   foregoing is true and correct. This declaration was executed this 22nd day of August, 2007, in

16   Woodside, California.

17

18                                             CHARLES M. BROWN

19                                      CHARLES M. BROWN

20

21

22

23

24

25

26

27

28

---

12

# EXHIBIT A


# MINUTES OF A SPECIAL MEETING OF THE BOARD OF DIRECTORS
## OF
## WIRELESS NETWORKS, INC.

A special meeting of the Board of Directors of Wireless Networks, Inc., a Delaware corporation, (the "Company") was held as follows:

| | |
|---|---|
| Date: | April 19, 2005 |
| Time: | 10:00 AM Pacific Time |
| Place: | 350 Cambridge Avenue, Suite 150 |
| | Palo Alto, California. |
| Kind of Meeting: | Special |
| How Called or Noticed: | Due written notice to all Directors |
| Directors Present: | Mr. Charles Brown (present in person) and Mr. Richard Redett (by telephone conference call) |
| Directors Absent: | None |
| Other Persons Present: | James Hagan, Esq. attorney for the Company, and Mr. Ruy Rothschild de Souza, as representative of Cruzamerica and its affiliate, MRG International, Inc. |

The following matters of business were considered and conducted.

1. Mr. Brown, President of the Company, called the meeting to order. He noted that a quorum of directors was present and participating in the meeting as set forth above. On motion duly made, seconded, and unanimously carried, Mr. Hagan was elected as Recording Secretary to record the minutes of this meeting.

2. Mr. Brown noted that the company has received from Cruzamerica a written election for the conversion of $2,929,264 of debt into 112,791.2064 shares of the Company's common stock pursuant to the loan and option agreement by and between the Company and Cruzamerica that was approved by shareholders and the Board of Directors and executed in January, 2002. This matter was discussed and considered. Mr. Ruy Rothschild de Souza, as the duly authorized representative of Cruzamerica, approved the calculation of the number of shares, delivered to the company written instructions to issue the stock to a related company, MRG International, Inc., and executed the Standard Investment Representations as the authorized representative of MRG International, Inc. Thereafter, on motions duly made, seconded, and unanimously carried, the following resolutions were adopted:

RESOLVED, that in compliance with all applicable securities laws, rules and regulations, and Rule 506 of SEC Regulation D, and pursuant to the aforesaid loan and option agreement between this company and Cruzamerica, in exchange for the cancellation of $2,929,264 of debt and $100,000 previously paid in cash by Cruzamerica, this Company shall issue to MRG International, Inc., as directed by Cruzamerica, 112,791.2064 shares of its common stock at the price of $25.97 per share;

RESOLVED FURTHER, that the officers of this corporation shall be, and they are hereby, authorized, directed, and empowered to sign and deliver all documents, certificates, and agreements, file all required notices, and to take any and all actions, as may in their judgment be necessary or appropriate to carry out and implement the foregoing resolution.

Thereafter, Mr. Brown dated, signed, sealed, and delivered to Mr. Rothschild for MRG International, Inc., this Company's common stock certificate No. 168 for 112,791.2064 shares. Mr. Hagan noted that this issue of stock would require the filing of a Form D with the SEC and with the California Commissioner of Corporations.

3. Mr. Brown noted that the Company previously entered into a Management Agreement with Cruzamerica which by its terms expired on August 31, 2004. This matter was discussed and considered. Thereafter, on motion duly made, seconded, and unanimously carried, the expiration of the Management Agreement was approved and ratified.

4. Mr. Redett tendered his resignation as a director of the Company to be effective upon the adjournment of this meeting. Mr. Brown expressed his appreciation to Mr. Redett for his years of service to this Company as one of its directors.

5. There being no further business to come before the meeting, on motion duly made, seconded and unanimously carried, the meeting was adjourned at 10:25 A. M. Pacific Time.

Date: April 19, 2005

as Recording Secretary

MINUTES OF A SPECIAL MEETING OF THE BOARD OF DIRECTORS
OF
WIRELESS NETWORKS, INC.

A special meeting of the Board of Directors of Wireless Networks, Inc., a Delaware corporation, (the "Company"), was held as follows:

| | |
|---|---|
| Date: | April 19, 2005 |
| Time: | 10:45 AM Pacific Time |
| Place: | 350 Cambridge Avenue, Suite 150 |
| | Palo Alto, California. |
| Kind of Meeting: | Special |
| How Called or Noticed: | Notice waived |
| Director Present: | Mr. Charles Brown |
| Directors Absent: | None |
| Other Persons Present: | James Hagan, Esq. attorney for the |
| | Company, and Mr. Ruy Rothschild de Souza |

The following matters of business were considered and conducted.

1. Mr. Brown, as President of the Company, called the meeting to order. On motion duly made, seconded, and unanimously carried, Mr. Hagan was elected as Recording Secretary to record the minutes of this meeting.

2. Mr. Brown noted that Mr. Redett, previously a director of the Company, has resigned from that position, leaving Mr. Brown as the only director of the Company. Mr. Brown also noted that the Company has just issued to Mr. Ruy Rothschild de Souza's company, MRG International, Inc., an affiliate of Cruzamerica, 112,791.2064 shares of its common stock, a majority of the Company's outstanding common stock. Acting under and pursuant to Section 223(a)(1) of the Delaware Corporation Law, Mr. Brown elected Mr. Ruy Rothschild de Souza as a director of the Company to serve as such without compensation. Mr. Ruy Rothschild de Souza accepted the position of a director of the Company and thereafter participated in the meeting as a director. Mr. Brown observed that Mr. Brown presently serves as the President, Secretary, and Treasurer of the company. This matter was discussed. No change was made.

3. Mr. Brown presented to the meeting financial statements as of December 31, 2004, for the company and for its wholly-owned subsidiary, Wireless Networks do Brazil. These financial statements were reviewed in detail by the directors. Thereafter, on

motions duly made, seconded, and unanimously carried, each of those financial statements was approved.

4. Mr. Brown presented to the meeting two promissory notes which evidence indebtedness due from the company to him, one in the amount of $71, 892.29 and one in the amount of $2,000.00. These promissory notes were discussed and considered. Thereafter, on motions duly made, seconded, and unanimously carried, the following resolutions were adopted:

> RESOLVED, that each of the aforesaid promissory notes shall be, and each of them is hereby, approved and ratified;

> RESOLVED FURTHER, that the officers of this corporation shall be, and they are hereby, authorized, directed, and empowered to sign and deliver said promissory notes and to take any and all actions as may in their judgment be necessary or appropriate to carry out and perform said promissory notes and the foregoing resolution.

5. Mr. Brown presented to the meeting a Fourth Amendment (to August 31, 2004) and a Fifth Amendment (to December 31, 2004) to the loan and option agreement executed by and between the Company and Cruzamerica in January, 2002. These documents were reviewed and considered. Thereafter, on motions duly made, seconded, and unanimously carried, the following resolutions were adopted:

> RESOLVED, that the Fourth Amendment and the Fifth Amendment to the aforesaid loan and option agreement shall be, and each of them hereby is, approved and ratified;

> RESOLVED FURTHER, that the officers of this corporation shall be, and they are hereby, authorized, directed, and empowered to sign and deliver said Fourth Amendment and Fifth Amendment and to take any and all actions as may in their judgment be necessary or appropriate to carry out and perform said agreements and the foregoing resolution.

6. Mr. Brown presented to the meeting a promissory note due from Wireless Networks do Brazil to this company in the amount of $1,074,010.52 as of December 31, 2004. This promissory note was reviewed and considered. Thereafter, on motions duly made, seconded, and unanimously carried, the following resolution was adopted:

RESOLVED, that the aforesaid promissory note shall be, and it is hereby, approved and accepted;

7. Mr. Brown presented to the meeting a power of attorney, similar in form and content to other powers of attorney approved in the past, by means of which to authorize Mr. Ruy Rothschild de Souza to conduct the business of the Company in Brazil. This document was reviewed and considered. Thereafter on motions duly made, seconded, and unanimously carried, the following resolutions were adopted:

RESOLVED, that the aforesaid power of attorney shall be, and it is hereby, approved and ratified;

RESOLVED FURTHER, that the officers of this corporation shall be, and they are hereby, authorized, directed, and empowered to sign and deliver said power of attorney and to take any and all actions as may in their judgment be necessary or appropriate to carry out and perform said power of attorney and the foregoing resolution.

8. Mr. Hagan suggested that the Company send a letter to all shareholders informing them of the conversion by Cruzamerica of debt into common stock, the resignation of Mr. Redett as a director, and the election of Mr. Ruy Rothschild de Souza as a director. Mr. Brown and Mr. Ruy Rothschild de Souza undertook to do so.

9. Mr. Brown noted that the company was current in its tax and filings and its Delaware corporation filings.

10. Mr. Brown observed that the Company may need a small line of credit of up to $5,000 for use in the immediate future. This matter was discussed and considered. Thereafter, on motions duly made, seconded, and unanimously carried, the standard bank line of credit resolutions attached hereto were approved, ratified, and adopted, and the officers of the corporation were authorized and empowered to sign and deliver such documents, and to take such actions, as may be in their judgment necessary or appropriate to obtain such a line of credit and to carry out and implement the foregoing resolutions.

11. There being no further business to come before the meeting, on motion duly made, seconded and unanimously carried, the meeting was adjourned at 11:05 A. M. Pacific Time.

Date: April 19, 2005

as Recording Secretary

**EXHIBIT B**

$71,892.29                                                          Woodside, CA
                                                                   June 30, 2001

### PROMISSORY NOTE

FOR VALUE RECEIVED, **Wireless Networks, Inc.,** a Delaware corporation ("Borrower") hereby promises to pay to the order of **Charles M. Brown** ("Lender") in lawful money of the United states of America, on **June 30, 2003**, the principal sum of **Seventy One Thousand Eight Hundred Ninety Two Dollars and Twenty Nine Cents ($71,892.29).** This Note will bear interest at the rate of nine percent (9%) per annum until the date of maturity, and thereafter will bear interest at the rate of nine percent (9%) per annum until fully paid.

In the event that Borrower shall fail to make full and timely payment of the principal hereunder when due, the entire unpaid principal amount of this Note shall automatically become immediately due and payable without demand or notice, and Borrower shall pay such further amount as shall be sufficient to cover all costs and expenses (including reasonable attorney's fees) directly or indirectly incurred by Lender in connection with the collection of this Note.

Borrower hereby waives notice of default, notice of acceleration, notice of prepayment, presentment, protest, or notice of dishonor. Borrower may prepay at any time, in part or in full, without penalty.

**WIRELESS NETWORKS, INC. (Borrower)**


By: **Charles Brown, President**          By:  **Secretary**

$2,000.00

Woodside, CA
January 30, 2003

## PROMISSORY NOTE

FOR VALUE RECEIVED, **Wireless Networks, Inc.,** a Delaware corporation
("Borrower") hereby promises to pay to the order of **Charles M. Brown** ("Lender") in
lawful money of the United states of America, on **January 30, 2005,** the principal sum of
**Two Thousand Dollars and No Cents ($2,000,00).** This Note will bear interest at the
rate of nine percent (9%) per annum until the date of maturity, and thereafter will bear
interest at the rate of nine percent (9%) per annum until fully paid.

In the event that Borrower shall fail to make full and timely payment of the
principal hereunder when due, the entire unpaid principal amount of this Note shall
automatically become immediately due and payable without demand or notice, and
Borrower shall pay such further amount as shall be sufficient to cover all costs and
expenses (including reasonable attorney's fees) directly or indirectly incurred by Lender
in connection with the collection of this Note.

Borrower hereby waives notice of default, notice of acceleration, notice of
prepayment, presentment, protest, or notice of dishonor. Borrower may prepay at any
time, in part or in full, without penalty.

**WIRELESS NETWORKS, INC. (Borrower)**


By: Charles Brown, President                    By:  Secretary

**EXHIBIT C**

## Notes Payable - Shareholder (C. Brown)
### Jul '00 - Dec 05

| Type | Date | Num | Name | Memo | Acct: | Amount | Balance | No. of Days | Interest @ 9.00% | Acc. Accrued Interest |
|---|---|---|---|---|---|---|---|---|---|---|
| General Journal | 06/30/2001 | CPA ADJ 111 | Adjustment CPA | Promissory Note 1 | 2800 | 56,192.29 | 0.00 | 0 | 0.00 | |
| General Journal | 06/30/2001 | CPA ADJ 111 | Adjustment CPA | Payment on Loan to C. Brown | 2800 | 13,700.00 | 71,892.29 | 0 | 0.00 | |
| Check | 02/20/2002 | 1230 | Wells Fargo Bank | Office Depot | 2800 | -6,791.38 | 65,100.91 | 230 | 3,692.02 | |
| Credit Card Charge | 04/03/2002 | | Office Depot | Office Supplies | 2800 | -375.21 | 64,725.70 | 43 | 696.27 | |
| Credit Card Charge | 04/16/2002 | | Office Depot | Office Supplies | 2800 | -95.43 | 64,630.27 | 13 | 207.17 | |
| Check | 07/15/2002 | 1325 | Charles Brown | Repay Loan to C. Brown | 2800 | -3,000.00 | 61,630.27 | 89 | 1,352.49 | |
| Check | 07/15/2002 | 1330 | Charles Brown | Repay Loan to C. Brown | 2800 | -3,000.00 | 58,630.27 | 16 | 231.31 | |
| Check | 08/21/2002 | 1348 | Charles Brown | Repay Loan to C. Brown | 2800 | -3,000.00 | 55,630.27 | 21 | 288.57 | |
| Check | 09/10/2002 | 1360 | Charles Brown | Repay Loan to C. Brown | 2800 | -3,000.00 | 52,630.27 | 19 | 246.57 | |
| Deposit | 12/31/2002 | | Charles Brown | Promissory Note 2 | 2800 | 1,000.00 | 53,630.27 | 111 | 1,467.85 | |
| Deposit | 01/27/2002 | | Charles Brown | Promissory Note 2 | 2800 | 1,000.00 | 54,630.27 | 27 | 363.70 | |
| General Journal | 06/30/2003 | 2003-No.5 | Adjustment CPA | Promissory Note 2 | 2800 | -31,000.00 | 23,630.27 | 153 | 881.48 | |
| General Journal | 06/30/2003 | WNI-No.5 | Adjustment WNI | Accrue Interest through 06-30-03 | | | 33,057.19 | 153 | 9,426.92 | 9,426.92 |
| | 12/16/2004 | 3029 | Note Interest Payment 12-16-04 | Note dated June 30, 2001 | | $150.00 | | | | (300.00) |
| | 12/17/2004 | 3029 | Note Interest Payment 12-16-04 | Note dated January 30, 2003 | | $150.00 | | | | |
| General Journal | 12/31/2004 | #3-FY2004 | Adjustment WNI | Principal + Interest through 12-31-04 | | | 35,903.58 | 540 | 3,146.39 | 12,273.31 |
| General Journal | 06/30/2005 | #6-FY2005 | Adjustment WNI | Accrue Interest through 6-30-05 | | | 37,497.11 | 160 | 1,593.53 | 13,866.84 |
| General Journal | 12/31/2005 | #1-FY2006 | Adjustment WNI | Accrue Interest through 12-31-05 | | | 39,161.36 | 180 | 1,664.26 | 15,531.09 |
| | 02/13/2006 | 3119 | Note Interest Payment 2-13-06 | Note dated June 30, 2001 | | $250.00 | | | | (500.00) |
| | 06/30/2006 | 3119 | Note Interest Payment 2-13-06 | Note dated January 30, 2003 | | $250.00 | | | | |
| General Journal | 06/30/2006 | #4-FY2006 | Adjustment WNI | Accrue Interest through 6-30-06 | | | 40,399.48 | 180 | 1,738.12 | 16,769.21 |
| General Journal | 12/31/2006 | #1-FY2007 | Adjustment WNI | Accrue Interest through 12-31-06 | | | 42,192.56 | 180 | 1,793.07 | 18,562.29 |
| | 04/30/2007 | | | Principal + Interest through 4-30-07 | | | 43,440.99 | 120 | 1,248.44 | 19,810.72 |
| | 06/30/2007 | | | Principal + Interest through 6-30-07 | | | 44,083.68 | 60 | 642.69 | 20,453.41 |

Additions:

| Date | Name | Memo | Balance |
|---|---|---|---|
| 08/25/2007 | | Loan from C. Brown | 2,500.00 |
| 04/16/2007 | | Bills Paid directly by C. Brown | 3,351.05 |
| | | Bills Paid directly by C. Brown | 1,182.59 |
| | | Loan from C. Brown | 500.00 |
| | | Total Loan Balance due C. Brown | 51,617.32 |

**EXHIBIT D**

## Wireless Networks, Inc.
## Balance Sheet
### As of December 31, 2004

|  | Dec 31, 04 |
|---|---|
| **ASSETS** | |
| **Current Assets** | |
| **Checking/Savings** | |
| 1030 · Citibank, F.S.B. | 3,926.67 |
| **Total Checking/Savings** | 3,926.67 |
| | |
| **Accounts Receivable** | |
| 1210 · Accounts Receivable - WNB | 472,279.04 |
| **Total Accounts Receivable** | 472,279.04 |
| | |
| **Other Current Assets** | |
| 1120 · Inventory | 687,989.65 |
| 1255 · Acct Rec - Brazil Modems | 122,151.00 |
| 1260 · Acct Rec - Brazil Computers | 36,101.00 |
| 1410 · Notes Receivable - WNB | 923,926.88 |
| 1411 · Accrued Interest Rec. - WNB | 150,084.72 |
| **Total Other Current Assets** | 1,920,252.25 |
| | |
| **Total Current Assets** | 2,396,457.96 |
| | |
| **Fixed Assets** | |
| 1500 · Property & Equipment | 68,139.72 |
| 1600 · Accumulated Depreciation | -61,915.00 |
| **Total Fixed Assets** | 6,224.72 |
| | |
| **Other Assets** | |
| 1900 · Investments | 1,861,245.54 |
| 1930 · Patents | 171,436.00 |
| 1940 · Organization Cost | 0.00 |
| **Total Other Assets** | 2,032,681.54 |
| | |
| **TOTAL ASSETS** | 4,435,364.22 |

(UNAUDITED)

## Wireless Networks, Inc.
## Balance Sheet
### As of December 31, 2004

**LIABILITIES & EQUITY**

  **Liabilities**

    **Current Liabilities**

      **Accounts Payable**

| | |
|---|---:|
| 2000 · Accounts Payable | 229,218.86 |
| **Total Accounts Payable** | 229,218.86 |
| | |
| **Other Current Liabilities** | |
| 2210 · Accrued Salaries Payable | 17,000.00 |
| 2230 · Notes Payable | 553,486.44 |
| 2235 · Accrued Interest Payable | 33,161.01 |
| 2800 · Due to Shareholder | 36,203.58 |
| **Total Other Current Liabilities** | 639,851.03 |
| | |
| **Total Current Liabilities** | 869,069.89 |
| | |
| **Total Liabilities** | 869,069.89 |
| | |
| **Equity** | |
| 3000 · Common Stock | 330,525.30 |
| 3200 · Paid in Capital | 9,095,650.97 |
| 3900 · Retained Earnings | -5,737,100.05 |
| Net Income | -122,781.89 |
| **Total Equity** | 3,566,294.33 |
| | |
| **TOTAL LIABILITIES & EQUITY** | 4,435,364.22 |

**Wireless Networks, Inc.**
**Profit & Loss**
July through December 2004

| | Jul - Dec 04 |
|---|---|
| **Ordinary Income/Expense** | |
| Income | |
| 4000 · Revenue | 31,264.20 |
| 4050 · Freight-In Reimbursed | 342.01 |
| 4051 · Freight-Out Reimbursed | 491.70 |
| 4085 · Support Fees | 2,500.00 |
| Total Income | 34,597.91 |
| | |
| Cost of Goods Sold | |
| 5000 · Cost of Goods Sold | 32,807.20 |
| 5050 · Freight-In Expense | 221.14 |
| 5051 · Freight-Out Expense | 328.72 |
| Total COGS | 33,357.06 |
| | |
| **Gross Profit** | 1,240.85 |
| | |
| Expense | |
| 6000 · Engineering and Development | 81,097.38 |
| 6010 · Salaries-Gen & Admin | 36,000.00 |
| 6020 · Consulting | 12,000.00 |
| 6120 · Bank Service Charges | 336.86 |
| 6160 · Dues and Subscriptions | 222.85 |
| 6180 · Insurance | 718.76 |
| 6200 · Interest Expense | 73,340.15 |
| 6210 · Bus Development-Brazil | 1,136.77 |
| 6270 · Professional Fees | 12,802.25 |
| 6280 · Payroll Tax Expense | 5,346.50 |
| 6290 · Rents | 810.00 |
| 6340 · Communications | 2,412.33 |
| 6350 · Business Development | 10,312.01 |
| 6550 · Office Expense | 1,777.58 |
| 6570 · Expense HW & SW | 157.86 |
| 6824 · State - Tax | 1,387.50 |
| Total Expense | 239,858.80 |
| | |
| **Net Ordinary Income** | -238,617.95 |
| | |
| Other Income/Expense | |
| Other Income | |
| 7010 · Interest Income | 115,417.06 |
| 7032 · Debts Written Off (Contingent) | 419.00 |
| Total Other Income | 115,836.06 |
| | |
| **Net Other Income** | 115,836.06 |
| | |
| **Net Income** | -122,781.89 |

(UNAUDITED)                                         Page 3 of 5

**Wireless Networks, Inc.**
## Statement of Cash Flows
### July through December 2004

|  | Jul - Dec 04 |
|---|---|
| **OPERATING ACTIVITIES** |  |
| Net Income | -122,781.89 |
| Adjustments to reconcile Net Income |  |
| to net cash provided by operations: |  |
| 1210 · Accounts Receivable - WNB | -25.00 |
| 1410 · Notes Receivable - WNB | -245,390.80 |
| 1411 · Accrued Interest Rec. - WNB | -115,417.06 |
| 2000 · Accounts Payable | 14,125.00 |
| 2230 · Notes Payable | -1,992,010.64 |
| 2235 · Accrued Interest Payable | -416,675.02 |
| 2240 · Option Deposit | -100,000.00 |
| 2500 · Income tax payable | -835.00 |
| 2800 · Due to Shareholder | 3,146.39 |
| **Net cash provided by Operating Activities** | -2,975,864.02 |
|  |  |
| **INVESTING ACTIVITIES** |  |
| 1915 · Wireless Networks Do Brazil | 45,000.00 |
| **Net cash provided by Investing Activities** | 45,000.00 |
|  |  |
| **FINANCING ACTIVITIES** |  |
| 3000 · Common Stock | 1,127.91 |
| 3200 · Paid in Capital | 2,928,136.09 |
| **Net cash provided by Financing Activities** | 2,929,264.00 |
|  |  |
| **Net cash increase for period** | -1,600.02 |
|  |  |
| **Cash at beginning of period** | 5,526.69 |
| **Cash at end of period** | 3,926.67 |

(UNAUDITED)

**Wireless Networks, Inc.**
## Vendor Balance Summary
As of December 31, 2004

|  | Dec 31, 04 |
|---|---|
| Crew Software | 3,800.00 |
| Cruzamérica Empreendimentos Ltda. | 174,000.00 |
| The Hagan Law Firm | 50,989.86 |
| Townsend & Townsend & Crew | 429.00 |
| **TOTAL** | **229,218.86** |

(UNAUDITED)