# EXHIBIT C

1  JEFFREY F. RYAN, ESQ. SBN 129079
   RYAN & STEINER
2  An Association of Attorneys
   455 North Whisman Road, Suite 200
3  Mountain View, CA 94043-5721
   Telephone:    (650) 691-1430
4  Facsimile:    (650) 968-2685
5
   Attorneys for Plaintiff,
6  CHARLES M. BROWN

7                    UNITED STATES DISTRICT COURT

8                   NORTHERN DISTRICT OF CALIFORNIA

9

10  CHARLES M. BROWN,                      Case No.: C-07-04301 EDL

11              Plaintiff,                 **SUPPLEMENTAL DECLARATION OF
                                           CHARLES M. BROWN IN REPLY TO
12      vs.                                DEFENDANT'S OPPOSITION TO
                                           EMERGENCY EX PARTE
13  WIRELESS NETWORKS, INC., a Delaware    APPLICATION FOR RIGHT TO
    corporation, and DOES 1 THROUGH 50,    ATTACH ORDER**
14
15              Defendants.
                                           **Date:    August 31, 2007**
16                                         **Time:    10:00 a.m.**
                                           **Dept.:   Courtroom E, 15th Floor**
17                                         **Judge:   Magistrate Elizabeth D. Laporte**

18      I, Charles M. Brown, declare and state as follows:

19      1.      I am the plaintiff in this matter.  I am a resident of the State of California over the

20  age of eighteen years.  I am aware of the following facts of my own personal knowledge.  If

21  called upon as a witness, I could and would competently testify to the facts contained in this

22  declaration of my own personal knowledge.

23      2.      On July 13, 2007, I resigned from Wireless Networks, Inc. ("WNI").  (A true and

24  correct copy of my resignation letter addressed to the Board of Directors of WNI, dated July 13,

25  2007, is attached hereto as **Exhibit "A."**)

26      3.      On July 18, 2007, I sent an email to Ruy Rothschild de Souza ("Mr. de Souza"),

27  specifically requesting instructions on where to send the key to the storage unit.  (A true and

28

SUPPLEMENTAL DECLARATION OF CHARLES M. BROWN IN REPLY TO DEFENDANT'S
OPPOSITION TO EMERGENCY EX PARTE APPLICATION FOR RIGHT TO ATTACH ORDER
BROWN v. WIRELESS NETWORKS, INC.                    CASE NO. C-07-04301 EDL

1   correct copy of my email to Mr. de Souza, dated July 18, 2007, is attached hereto as

2   **Exhibit "B."**)

3       4.      WNI has continued to refuse to pay the storage company which is housing the

4   records. I have had to advance payments to the storage facility to keep them from becoming

5   delinquent. (True and correct copies of the Preliminary Lien Notice, dated July 30, 2007, from

6   Extra Storage Redwood City showing the amount of $160.00 due; a Transaction Receipt, dated

7   July 31, 2007, showing I paid the lien in the amount of $160.00; and Preliminary Lien Notice,

8   dated August 25, 2007, from Extra Storage Redwood City showing the amount of $145.00 due,

9   are attached hereto as **Exhibit "C"**).

10       5.      Mr. de Souza refused to make any payments on the debts from WNB to WNI.

11   Mr. de Souza mentioned at subsequent Board of Director meetings early this year that he wanted

12   to do away with WNB's debt to WNI with some "creative accounting." James Hagan, WNI's

13   corporate counsel, was present at that meeting. I refused to go along with it.

### RUY ROTHSCHILD DE SOUZA'S DECLARATION

15       6.      **Paragraph 2:**  False. Mr. de Souza refused to sign the WNI License Agreement

16   on several occasions, claiming that any such agreement would have to "conform to Brazilian

17   law," as he and his attorney's interpreted it. (A true and correct copy of an email thread between

18   Mr. de Souza and I, dated January 23, 2004, regarding the agreed upon license agreement and

19   Mr. de Souza's excuses for not executing it, is attached hereto as **Exhibit "D"**). (A true and

20   correct copy of an email thread between Mr. de Souza and I, dated October 22, 2004, in which

21   Mr. de Souza is again coming up with excuses for not executing the license agreement he had

22   verbally agreed to excute, is attached hereto as **Exhibit "E"**). He then had his attorney's prepare

23   a Technology Transfer Agreement (TTA) between WNI and Wireless Networks do Brasil

24   ("WNB"), under which WNI would have no remaining legal rights to the technology or any

25   other intellectual property held by WNI, once transferred to WNB under his proposed agreement.

26   (A true and correct copy of the Software License Agreement Mr. de Souza sent me which

27   included a provision on page 6 transferring the Source code to Mr. de Souza in Brazil and

28   referenced herein as the TTA, is attached hereto as **Exhibit F"**).  The agreement and his claim

1  that no license agreement other what he and his attorney had proffered was possible under

2  Brazilian law is false.

3           a.      By this time, I had been operating in Brazil for nearly five years and knew

4  of many other foreign technology companies doing business in Brazil, and had consulted legal

5  counsel in Brazil on my own. Everything represented by Mr. de Souza is simply false, and a

6  ruse to get me to agree to transfer the technology to WNB for nothing. This has been his

7  objective from day one.

8           b.      Mr. de Souza's statement that he never refused to sign a license agreement

9  with WNI is false. Mr. de Souza only agreed to sign a Technology Transfer Agreement prepared

10  by his attorneys. Of course, any TTA he was willing to sign included delivery of the Source

11  Code to WNB. The license agreement our lawyers (James Hagan) prepared and sent to

12  Mr. de Souza is a standard license agreement and it keeps the ownership of the technology with

13  the inventor, here WNI. (A true and correct copy of the second draft to the license agreement

14  between WNI and WNB, which Mr. de Souza refused to sign because he would not get the

15  Source Code, is attached hereto as **Exhibit "G"**).

16           c.      Further, what was acceptable under Brazilian law was a standard license

17  agreement, including the provision of payments for use of technology. These agreements are

18  required to be recorded with the Central Bank of Brazil to allow for payments to be made out of

19  Brazil, but the Central Bank does not determine the terms and substance of the agreement. The

20  purpose of the recordation is to account for payments made to an overseas entity under license

21  agreements because unscrupulous people like Mr. de Souza are fond of outmaneuvering the

22  government of tax revenue. License agreements like the one given to Mr. de Souza and his

23  attorneys in Brazil are recorded and approved in Brazil every day.

24           d.      Furthermore, Mr. de Souza's attorneys (Eduardo Monteira da Silva) were

25  acting both on his behalf as an investor and as attorneys for WNB, an obvious conflict of interest

26  that I brought up several times but which Mr. de Souza chose to ignore. WNI did not have the

27  funds to hire an attorney for this purpose.

28

7.  **Paragraph 3:** Mr. de Souza's statement that "[t]he **Source Code has no value to the market outside of WNB, as it is integral to WNI**" is false.

    a.    The Source Code might or might not have value in the general market. This statement lacks understanding or veracity. As a practical matter, it is possible to use the bulk of the Source Code in other markets and implement the service in a short period of time, assuming the proper business relationships are in place. Parts of the Source Code are customized for the Brazilian market, but the Source Code was built for worldwide markets, not just Brazil. Further, it is not worth doing without the team that built it, who are off pursuing other ventures.

8.  **Paragraphs 4 and 5:** The statements contained in these two paragraphs are important and a subtle admission of guilt. In fact, WNB does not need WNI and wants it to fail to:

    a.    dilute its shareholders with the remaining loan balances.

    b.    obtain clear rights to all intellectual property

    c.    clear the accounts payable due WNI from WNB, which WNB has no intention of every paying.

    d.    WNB is the only operation that was established by WNI because Mr. de Souza, under the terms of the Option Agreement, prevented any new capital or business operations without his approval. His MO in this regard was to kill initiatives by neglect. Mr. de Souza had, and does not have any motivation to keep WNI in business. As he states, it has no business other than WNB. That was Mr. de Souza;s management decision, not mine. Mr. de Souza said, "**We can't handle more than the market in Brazil**" on numerous occasions and expressed no interest in developing new markets, and did nothing when asked in this regard.

    e.    I never used any WNI intellectual property or any other asset to setup another company.

    f.    The major creditor of WNB is WNI, to the tune of about $1.5 million. What is the best way to get rid of debt and get the Source Code? Get rid of me and WNI, of course. In fact, payments could have been made to WNI by way of the Central Bank by repaying loans from the parent corporation, but naturally Mr. de Souza did not like that method.

9.   **Paragraph 5:**  WNI's staff and engineers were not paid market wages.  I was paid a paltry $60,000 per year in wages.  The chief software engineer was paid an annual salary of only $80,000 (who was moved to a consulting capacity at his request) and Joao Araujo received an annually salary of $60,000.   These are ridiculously low compensation for people of our caliber and expertise, and Mr. de Souza knew it.

a.    It was expressly agreed by Mr. de Souza that Cedric Berger, Joao Araujo and I, needed to "freelance" occasionally to make up for lost income, since he refused to pay market salaries.  He was glad to agree if it meant that the monthly license fee did not exceed $25,000.  While it is true that everyone was required to sign an NDA for any consulting work done on our behalf, individually or as a group, Mr. de Souza specifically requested that such work not be done in the Company's name because he was embarrassed that we would tell people the truth as to our substandard wages.  He also did not want it to get out that we might be available for hire by other entities or competitors.

b.    No work was ever performed by any of the engineers or I in this regard, and no revenue was ever received.  We were unable to deploy the WNI business solution outside of Brazil.  It was impossible to do so without Mr. de Souza's knowledge and agreement, which he refused to give.

c.    More than once Mr. de Souza said to me, "**WNI owns the Source Code and I own WNI, and I do not need WNI to make a success of the business in Brazil.**"

d.    If the Source Code was vital to the continuance of WNB's operations why did he cease making payments to WNI in April of 2005 and force the dismissal of the only engineers left in the Company that knew anything about it?  The answer is Mr. de Souza intended to grab the Source Code without paying for it and then once he had it safely in Brazil, he would shut down WNI.

e.    Mr. de Souza insisted on five extensions to the Option Agreement so that he could build up the loan balance due from WNI at 12% interest.  The bulk of the funds owed to Cruzamerica/MRG International is interest accrued since 2002.

10.   **Paragraph 6:**  I said exactly the opposite.  The financial statements of WNI were incomplete because Mr. de Souza refused to provide information for consolidated financial statements.  When I informed Mr. de Souza that the shareholders had called me asking for a proper presentation of the financial condition of WNI and its subsidiaries, Mr. de Souza said "**it would cost too much money and they don't need to see that.**"

a.   There is no contradiction about my statement in my declaration at paragraph 19.  I said that WNI did not have the funds to satisfy payment of its obligations.  WNB does have funds to satisfy the payment of its obligations to WNI and its creditors.  It simply refuses to pay its obligations.

11.   **Paragraph 7:**  Mr. de Souza was notified of James Hagan's resignation as corporate counsel and further, had previously refused to provide any funds to hire adequate professional and legal services for WNI.  Mr. de Souza liked it that way because it suited his purposes to misappropriate WNI's assets.  WNI did not have counsel and Mr. de Souza knew it.  In fact, Mr. Hagan had not been paid for the same reason.  Mr. de Souza did not want me to have access to competent legal counsel.  I appeared on behalf of WNI as its President at my deposition, which was my fiduciary duty.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.  This declaration was executed this _____ day of August, 2007, in Woodside, California.

_____
CHARLES M. BROWN

# EXHIBIT A

☑005

# Charles Brown
## 55 Skylonda Drive
## Woodside, CA   94062

July 13, 2007

Board of Directors
Wireless Networks, Inc.
c/o Mr. Ruy de Souza
Rua Jerônimo da Veiga, 164, , cj. 16-E
16 andar
São Paulo SP 04536-900

RE:  Resignation
1:55PM PST

Gentlemen,

I hereby resign from any and all positions held by me at Wireless Networks, Inc. and Wireless Networks do Brasil.

Sincerely,

*Charles Brown*

Charles Brown

# EXHIBIT B

-----Mensagem original-----
De: Charles Brown [mailto:cbrown@flyingcircuit.com]
Enviada em: quarta-feira, 18 de julho de 2007 19:58
Para: Ruy Rothschild de Souza
Cc: Charles M Brown
Assunto: Re: Resignation Letter as of July 13, 2007

Dear Ruy,

To the best of my knowledge, I have moved all Company property in my
possession to the Company's warehouse space.

To protect the company's property, since payments were abruptly
ceased from Wireless Networks do Brasil as of March 2007, I have been
paying the monthly storage space fees from my personal funds since
April 2007. I will not be making any further payments from personal
funds on behalf of the Company. Therefore, and as I have stated
before, I urge you to make sure that these monthly fees are paid
promptly.  I believe the current month fees are due on July 17th.  If
the storage fees are not paid when due, the storage company will
padlock the space until they are paid current, proceed to file for a
judgment for possession of its contents, and subsequently sell the
property within at a liquidation price.  My understanding is that
they can accomplish this in a matter of 60 days or so. So once again,
I strongly suggest you to make these payments when due.

Please let me know where you would like to have the key to the lock
on the storage space mailed.  The storage space number is:  B267.
The storage space location is as follows:

Extra Storage
1940 Spring St.
Redwood City CA 94063
Tel:  650-367-7224

Regards,

Charlie

# EXHIBIT B

-----Mensagem original-----
De: Charles Brown [mailto:cbrown@flyingcircuit.com]
Enviada em: quarta-feira, 18 de julho de 2007 19:58
Para: Ruy Rothschild de Souza
Cc: Charles M Brown
Assunto: Re: Resignation Letter as of July 13, 2007

Dear Ruy,

To the best of my knowledge, I have moved all Company property in my
possession to the Company's warehouse space.

To protect the company's property, since payments were abruptly
ceased from Wireless Networks do Brasil as of March 2007, I have been
paying the monthly storage space fees from my personal funds since
April 2007. I will not be making any further payments from personal
funds on behalf of the Company. Therefore, and as I have stated
before, I urge you to make sure that these monthly fees are paid
promptly.  I believe the current month fees are due on July 17th.  If
the storage fees are not paid when due, the storage company will
padlock the space until they are paid current, proceed to file for a
judgment for possession of its contents, and subsequently sell the
property within at a liquidation price.  My understanding is that
they can accomplish this in a matter of 60 days or so. So once again,
I strongly suggest you to make these payments when due.

Please let me know where you would like to have the key to the lock
on the storage space mailed.  The storage space number is:  B267.
The storage space location is as follows:

Extra Storage
1940 Spring St.
Redwood City CA 94063
Tel:  650-367-7224

Regards,

Charlie

# EXHIBIT C

07/30/07

EXTRA STORAGE RDWD CITY
1940 SPRING ST.
REDWOOD CITY, CA 94063

## Preliminary Lien Notice

UNIT ID# B267 (PLN)

CHARLES BROWN - C/O WIRELESS NETWORK, INC.
P.O. BOX 620042

WOODSIDE, CA 94062

Dear CHARLES BROWN - C/O WIRELESS NETWORK, INC.,

According to our records, we have not received payment for rent and/or other charges for the use of storage unit # B267 at:

EXTRA STORAGE RDWD CITY
1940 SPRING ST.
REDWOOD CITY, CA 94063

These charges which are summarized below total $160.00. This sum includes accrued rent, a $10 late fee, and a $15 preliminary lien fee, and has been due for more than 14 days in accordance with California law.

| Due Date | Description | Amount |
|----------|-------------|--------|
| 07/15/07 | Rent Charge | $135.00 |
| 07/25/07 | Late | $10.00 |
| 07/30/07 | Late | $15.00 |
| Total: | | $160.00 |

If this sum is not paid in full before 08/17/07 your right to use the storage space will terminate, you will be denied access, a $15 Notice of Lien Sale fee will be added to your account balance, and a self storage owner's lien on any stored property will be imposed pursuant to Section 21705 of the California Business and Professions Code.

**You may pay this sum in cash, check, credit card, cashier's check or money order. We do not accept partial payments** and you will be responsible for the entire amount due at the time of payment which may include any additional rent or fees that accrue after this notice is printed and mailed. If you have any questions concerning your account, please call us at (650) 367 7224.

Sincerely,

Manager
EXTRA STORAGE RDWD CITY

EXTRA STORAGE RDWD CITY
1940 SPRING ST.
REDWOOD CITY, CA  94063
(650) 367 7224

BROWN, CHARLES  - C/O WIRELESS NETWORK, INC.
P.O. BOX 620042
WOODSIDE, CA  94062

## Transaction Receipt

Account #:  4195                     Date: 07/31/2007  12:41PM                     Receipt #: 38810

| Unit | Paid Thru | Item Description | Amount |
|------|-----------|------------------|--------|
| B267 | 08/14/07 | Rent | $135.00 |
|      |          | Fee | $25.00 |

| Credit Card | VISA XXXXXXXXXXXX7179<br>Auth.: 031571 | $160.00 |
|-------------|-----------------------------------------|---------|
| Total |  | $160.00 |

The undersigned acknowledges receipt of goods and/or services in the amount of the total shown hereon and agrees to payment of this amount. If payment has been made in the form of a credit card or credit card account debit, such payment will be in accord with the card issuer agreement, and the undersigned agrees to performance according to the obligations set forth therein.

_Charles Brown_                     7.31.07
Customer                            Date                            Employee

08/25/07

EXTRA STORAGE RDWD CITY
1940 SPRING ST.
REDWOOD CITY, CA 94063

# Late Notice

UNIT ID# B267 (LTN)

CHARLES BROWN - C/O WIRELESS NETWORK, INC.
P.O. BOX 620042
WOODSIDE, CA 94062

Dear CHARLES BROWN - C/O WIRELESS NETWORK, INC.,

The rent for unit # B267 was due on 8/15/2007 and has not been received. Please forward payment to:

EXTRA STORAGE RDWD CITY
1940 SPRING ST.
REDWOOD CITY, CA 94063

Per your rental agreement, a late fee of $10.00 has been charged to your account.

We appreciate your business and hope to continue to service your storage needs. If you have any questions, you may contact us at (650) 367 7224.

If you have already sent a payment, thank you and please remember to add the $10.00 late fee to your next payment.

Sincerely,

**TIM AND PAT ESPASANDIN**

Manager
EXTRA STORAGE RDWD CITY

Account Summary - Unit # B267

| | |
|---|---|
| Date of Last Payment | : 07/31/07 |
| Amount of Last Payment | : $160.00 |
| Rent Paid-Thru Date | : 08/14/07 |
| Current Balance | : $145.00 |

Save money by taking advantage of our Pre-pay Discounts!
Pre-pay 5 and a 1/2 months and you will receive 1/2 off the 6th month free.
Pre-pay 11 months and receive the 12th month free.

Save money by "Telling A Friend." For each friend you refer to our facility and they rent, you will receive a $20 credit toward your next rent due.

# EXHIBIT D

> From: "Ruy Rothschild de Souza" <ruysouza@uol.com.br>
> Date: January 23, 2004 6:53:05 AM PST
> To: "Charles Brown" <brown@wireless-networks.com>
> Subject: RES: Going Forward
>
> Hi Charlie,
>
> I hope you are getting better. Sorry for not been available
> sometimes, I
> also miss talking to you more frequently.
>
> I haven't read WNI's Balance sheet yet. I also didn't discuss with Dr
> Eduardo the drafts he has sent to me regarding the exercise of the
> option.
> Any way I am forwarding it to you for your evaluation. When we
> receive the
> license and support agreement(s) we can discuss everything as a
> whole. I
> know that $25.000 is an ideal minimum monthly payment for WNI and
> will be
> suitable for WNB as soon as we reach a minimum amount of
> transactions in
> Brazil.
>
> We didn't arrive to this point yet, but we continue to work day
> after day
> for this purpose. Things are going very well with Redecard and they
> finally
> are treating our service as a priority for the development of their
> business. The opposite is ocurring with Visanet at this moment, and
> we are
> working to restablish a good communication channel there, but no
> result has
> been achieved yet.
>
> We will finally sign contracts with Tecban in the next 2 weeks and
> I believe
> that with AMEX very soon.
>
> I noticed that I forgot to send the wire on the 15th of january, so
> I will
> send a wire of $25.000 on next monday, 26th antecipating the next
> one. Sorry
> again for this.
>
> Best regards,
>
> Ruy
>

1

> >
> >
> -----Mensagem original-----
> De: Charles Brown [mailto:brown@wireless-networks.com]
> Enviada em: quinta-feira, 22 de janeiro de 2004 22:15
> Para: ruysouza@uol.com.br
> Assunto: Going Forward
> >
> >
> Hi Ruy,
> >
> I hope to have something back from Jim Hagan soon regarding the
> license and
> support agreement.  He said he would keep it simple.  Per your
> suggestion,
> I asked him to make the effective date Dec. 31, 2003 and so we can
> use the
> WNI Balance Sheet I sent to you previously.  Under the  agreement, we
> tentatively agreed before Xmas to structure a minimum payment
> (technology
> license + support) to WNI from WNB of $25,000 per month, payable
> $12,500 on
> the 1st and 15th of each month.  Is that suitable to you?
> >
> I hope you are doing well.  I have tried to call you but haven't
> been able
> to get through to you.
> >
> Regards,
> >
> Charlie
> >
> >

# EXHIBIT E

> From: "Ruy Rothschild de Souza" <ruysouza@uol.com.br>
> Date: October 22, 2004 7:49:07 AM PDT
> To: "Charles Brown" <brown@wireless-networks.com>
> Cc: "Eduardo Monteiro (E-mail)" <monteiro@choaibpaiva.com.br>,
> <marina@choaibpaiva.com.br>
> Subject: RES: WNI- CZ
>
> Hi Charlie,
>
> I think there are two different issues.
> One issue is a societary one, concerning the subscription of WNI
> shares by Cruzamérica according to what was stablished on the
> option agreement and to the exercise of this option made on August
> 30 th. This subscription needs some legal steps to be completed, as
> we have discussed during your visit to São Paulo and this was the
> object of Marina's e-mail in order to conclude this process.
> Another issue is the license agreement and/or others between WNI
> and its subsidiary WNB, that is an internal issue for the company,
> regarding its development both for WNI and WNB.
> Both issues are very important but I understand that the license
> agreement is not a pre-requisite for completing the subscription,
> even because considering that Cruzamérica would not subscribe
> shares of WNI, you would be discussing these internal issues with
> someone else.
>
> After more than two years supporting the company, I really don't
> feel confortable to continue to discuss and help to implement
> several projects for the company without this societary issue
> concluded, what would make myself a legitimate part of the process.
>
> Regards,
>
> Ruy
> -----Mensagem original-----
> De: Charles Brown [mailto:brown@wireless-networks.com]
> Enviada em: quinta-feira, 21 de outubro de 2004 17:25
> Para: marina@choaibpaiva.com.br
> Cc: Ruy Rothschild de Souza (E-mail); Eduardo Monteiro (E-mail);
> consult@fwsudia.com
> Assunto: Re: WNI- CZ
> Prioridade: Alta
>
> Hello Marina,
>
> The first thing we need to do is complete the license agreement
> between WNI and WNB, and a separate license to cover the period
> from August 31, 1999 (the date of incorporation of WNB in Brazil)
> to June 30, 2004, for the WNI Wireless POS Protocol.  There are
> about 10 things to do so I suggest we focus on one task at a time.
> First, we need to complete the License Agreements.
>

1

> Frank Sudia has a draft of discussion points on the license
> agreement, with only specific questions and suggestions about the
> technology transfer agreement, which will be a schedule to the
> license agreement.  Unfortunately, he was robbed at gunpoint in SF
> last week and has been busy mending his personal situation   after
> this unfortunate event.  Fortunately, he was unharmed, but this has
> caused some delay, as you can appreciate.
>
> Regards,
>
> Charlie
>
> At 03:41 PM 10/21/2004 -0200, Marina Meirelles Giannini wrote:
>> Dear Charles, regarding the issue of new shares of WNI, we would
>> like to know if you have an aswer of the lawyer confirming the
>> necessary legal steps to issue the new shares.
>> Besides, we send you attached a charter of the powers of attorneys
>> on behalf os WNI. We would like to point out that the POA we gave
>> you when you were in Brazil is a translations into English of the
>> Powers of Attorney granted to Dr. Eduardo on June 18th. 2002. We
>> are sending you again the draft of the POA on Behalf of WNI and
>> WNL to Ruy.
>>
>> Please feel free to contact us if you need any clarification.
>>
>> Best Regards,
>>
>> Marina Meirelles Giannini
>>
>> CHOAIB, PAIVA, MONTEIRO DA SILVA E JUSTO Advogados Associados
>> Rua Padre João Manuel, 755, 8° andar - Cerqueira César - São Paulo
>> - SP - 01411-001
>> Tel.: (11) 3065-0006 - Fax: (11) 3065-0001 - http://
>> www.choaibpaiva.com.br
>>
>> AVISO-LEGAL
>> O conteúdo desta mensagem e dos documentos anexos é destinado
>> somente às pessoas indicadas no endereçamento eletrônico, podendo
>> conter informações confidenciais e/ou legalmente protegidas na
>> relação entre advogado e cliente. O recebimento desta mensagem por
>> qualquer pessoa não indicada no seu endereçamento eletrônico não
>> implica qualquer perda de confidencialidade do seu conteúdo. Caso
>> esta mensagem tenha sido recebida por engano, solicitamos a
>> gentileza para que seja imediatamente devolvida ao seu remetente e
>> eliminada completamente do seu sistema.
>> É expressamente vedado a qualquer pessoa que não seja o
>> destinatário desta mensagem revelar, distribuir, copiar ou, sob
>> qualquer forma, utilizar o todo ou parte desta mensagem ou dos
>> documentos a ela anexados.
>>
>> LEGAL-NOTICE
>> The content of this message and of the attached documents is
>> addressed only to those persons indicated in the electronic
>> address and may contain information of confidential nature and/or
>> legally protected as client-attorney privilege. The receipt of
>> this message by any person who is not indicated in the electronic
>> address does not result in a waiver of the confidentiality
>> treatment that shall be provided to the content of this message
>> and of the attached documents. If you have received this message
>> as a mistake, we kindly request you to immediately reply to the
>> sender of this message and entirely eliminate the message from
>> your system. It is expressly prohibited to any person who is not
>> the recipient of this message to reveal, distribute, copy or, in
>> any form, utilize the whole or part of this message or of the
>> attached documents.
>>
>>

# EXHIBIT F

## SOFTWARE LICENSE AGREEMENT

By this private agreement, the undersigned parties:

(A)   **WIRELESS NETWORK, INC.**, a company duly organized and existing under the laws of the State of Delaware, in the United States of America, with its head-offices located at P.O. Box 620752, Woodside, State of California, Zip Code 94062, herein in the form of its By-Law, by it undersigned Chief Executive Officer Mr. **Charles Michael Brown**, an American citizen, executive, holder of the Passport n.º 157105715, resident at 55 Skylonda, in the City of Woodside, State of California (hereinafter referred to as "**LICENSOR**"); and

(B)   **WIRELESS NETWORK DO BRASIL LTDA.**, a limited liability quota company duly organized and existing under the laws of the Federate Republic of Brazil, with its head-offices located in the City of Barueri, State of São Paulo, at Alameda Araguaia n.º 933, 5th floor, room 51, enrolled with the CNPJ/MF (Corporate Federal Taxpayers Registry – Finance Department) under No. 03.358.131/0001-33, herein in the form of its By-Law, by it undersigned Chief Executive Officer Mr. **Jorge Antonio Silveira Vieira**, a Brazilian citizen, business administrator, married, bearer of the ID card, RG number 10.203.174 SSP/SP, enrolled at Individual Taxpayer's Registry (C.P.F./M.F.) under number 032.051.418-81, resident in the City of São Paulo, at Rua Estrada José Roberto Faleiros, number 85, house 61, Condomínio Arueira; (hereinafter referred to as "**LICENSEE**"),

   (**LICENSEE** and **LICENSOR** hereinafter individually referred to as "PARTY" and jointly refereed to as "PARTIES")

WHEREAS, **LICENSOR** owns any and all proprietary rights and copyright of the software listed in Exhibit A, here in after the "Software"

WHEREAS, pursuant to the terms and conditions set forth herein, **LICENSEE** desires to use the Software, and **LICENSOR** wants to license the software to **LICENSEE** and to render certain services related to the Software, as set forth herein,

NOW, THEREFORE, for good and valuable consideration for the premises and covenants contained herein, the PARTIES hereof agree to enter into this Software License Agreement ("Agreement") as follows:

## 1.   THE OBJECT

   1.1.   This Agreement sets forth the terms and conditions under which the **LICENSOR** agrees to (i) grant to **LICENSEE** the exclusive and transferable license to use the Software that **LICENSOR**

1

makes available to **LICENSEE** in hardcopy or electronic form in conjunction with the License ("License"), and (ii) grant the rights for **LICENSEE** requests to **LICENSOR** any alteration, modification, assistance, support, services and updates related to the Software, according to the provisions contained in this Agreement and allowed by Brazilian law.

## 2.   THE LICENSE

2.1.   Upon this agreement the **LICENSOR** grants to **LICENSEE** a exclusive and transferable license to install, use and reproduce the Software, solely for **LICENSEE**'s own business purposes. **LICENSEE**'s own business purposes concern develop business of data transmission in Brazil (Territory).

2.1.1.   **LICENSEE** shall assume all responsibility for the quality of the copies made hereunder. **LICENSEE** shall include **LICENSOR**'s and any third party licensors' copyright notices, proprietary rights legends, and other indicia of ownership on all copies, in the content and format as those that were contained on the Software. **LICENSEE** shall not pay any duplication and distribution costs incurred by copying the Software as permitted under this Agreement.

2.1.2.   **LICENSEE** shall not, and shall not permit any employee or other related third party, to: modify, analyze, reverse engineer, decompile, disassemble, convert, or apply any procedure or process to the Software in order to ascertain, derive, and/or appropriate for any reason or purpose, the source code of the Software or to create derivative works using the source code of the Software.

2.2.   Upon performance of any customization, **LICENSOR** shall ensure that all graphic interfaces of the Software are in accordance with the **LICENSEE**'s systems.

2.3.   **LICENSOR** shall revise, update, maintain, install and/or support the Software during the term of this Agreement when requested by **LICENSEE,** without any collection of extra payments and/or fees.

## 3.   TERM

3.1.   **LICENSOR** grants the License to **LICENSEE** under an indeterminate period of time ("Term").

4.   **PAYMENT**

4.1.   **LICENSEE** shall pay to **LICENSOR** for the License in accordance with the terms and conditions set forth herein, the minimum amount of USD 15,000.00 (fifteen thousand dollars), the equivalent of 4% (four percent) over the Net Revenue of the products developed with **LICENSOR**'s new technology, monthly during the term at the Agreement. ("Price").

4.2.   It is included in the Price for the License any alteration, modification, assistance, support, services and updates related to the Software.

4.3.   All tax levies or contributions falling upon this Agreement and due outside Brazil shall be paid by WNI and borne by it.  All tax levies and contributions falling upon this Agreement and due in Brazil shall be paid by WNB and borne by it, except for income tax (IR) that shall be borne by WNI.

5.   **INTELLECTUAL PROPERTY AND COPYRIGHT**

5.1.   **LICENSOR** grants to **LICENSEE** any right to use any trademark, trade name, logo, or other intellectual property and/or copyright, whether registered or unregistered, of **LICENSOR** only if related to the Software. **LICENSEE** shall not alter or remove any patent, intellectual property, copyright, trademark, trade secret, or other proprietary notices contained on or in copies of the Software, and **LICENSEE** shall reproduce all such notices on or in all copies of the Software permitted to be made hereunder.

5.2.   **LICENSEE** does not grant to **LICENSOR** any right to use any trademark, trade name, logo, or other intellectual property and/or copyright, whether registered or unregistered, of **LICENSEE**.

5.3.   Upon violation of any patent, intellectual property, copyright, trademark, trade secret, or other proprietary notices **LICENSEE** shall promptly report to **LICENSOR** any actual or suspected violation of this Section 5 and shall take all reasonable and necessary further steps reasonable to prevent or remedy any such violation.

6.   **PROPRIETARY INFORMATION AND CONFIDENTIALITY.**

6.1.   All trade secret, confidential, and proprietary information ("Proprietary Information") designated as such in writing by either **LICENSEE** or **LICENSOR** (a "Disclosing Party") to the other (the "Recipient"), whether by letter or by the use of an appropriate proprietary stamp or legend, prior to

3

or at the time any such trade secret, confidential, or proprietary information is disclosed by the Disclosing Party to the Recipient. Notwithstanding the foregoing, information which is orally or visually disclosed or is disclosed in writing without an appropriate letter, proprietary stamp, or legend shall constitute Proprietary Information if the Disclosing Party (i) so indicates at the time of disclosure and (ii) within thirty (30) days after such disclosure, delivers to the Recipient a written document or documents describing such Proprietary Information and referencing the place and date of such oral, visual, or written disclosure and the names of the employees or officers of the Recipient to whom such disclosure was made. Proprietary Information shall not include any information to the extent it:

> (i) is in the Recipient's possession at the time of disclosure otherwise than as a result of the Recipient's breach of any legal obligation;

> (ii) becomes known to the Recipient through disclosure by sources other than the Disclosing Party who have the legal right to disclose such Proprietary Information;

> (iii) is independently developed by or for the Recipient without reference to or reliance upon the Disclosing Party's Proprietary Information; or

> (iv) is required to be disclosed by the Recipient to comply with applicable laws or governmental regulations, provided that the Recipient provides prior written notice of such disclosure to the Disclosing Party and takes reasonable and lawful actions, as specified by and at the expense of the Disclosing Party, to avoid and minimize the extent of such disclosure.

6.2.    Each of **LICENSEE** and **LICENSOR** shall hold the other's Proprietary Information in confidence using the same standard of care as using to protect its own information of a similar nature (but in any case not less than a reasonable degree of care) and shall not disclose the other's Proprietary Information to any person except such of the Recipient's employees and agents who have a need to know such Proprietary Information in the course of the performance of their duties for the Recipient and who are bound in writing to preserve the confidentiality of the Proprietary Information. The Recipient shall use Proprietary Information only for the purpose for which it was disclosed and shall not otherwise use or exploit the Proprietary Information for its own benefit or the benefit of another without the prior written consent of the Disclosing Party. Each of **LICENSEE** and **LICENSOR** shall take appropriate action by instruction or agreement with its employees and agents to satisfy its obligations under this Section 6. Either PARTY shall promptly report to the other PARTY any actual or suspected violation of this Section 6 and shall take all reasonable and necessary further steps requested by the other party to prevent or remedy any such violation.

4

7.    **WARRANTY AND EXCLUSION OF WARRANTIES.**

7.1.    This warranty is given by **LICENSOR** for an indeterminate period of time in the event of defects, errors or problems inherent to the concept of the Software.

7.2.    Without any cost to **LICENSEE**, **LICENSOR** shall use all appropriate resources for correct any defect, error or problem of the Software to perform the proper functions if the Software is used in accordance with **LICENSOR's** instruction, will perform substantially in accordance with the performance warranty by the **LICENSOR**.

8.    **TERMINATION**

8.1.    **LICENSOR** may immediately terminate this Agreement, the licenses granted hereunder, and **LICENSOR's** obligations to **LICENSEE** if **LICENSEE** breaches any of its material obligations under this Agreement and does not correct the failure within 30 (thirty) days after the receipt of a prior written notice from **LICENSOR**.

8.1.1    Such termination shall not prejudice **LICENSOR's** right to damages or any other remedy available at law. Upon the effective date of termination of this Agreement by **LICENSOR** in the case **LICENSEE** has breached any of its material obligations under this Agreement, except as otherwise provided in this Agreement, **LICENSEE** shall (i) stop all use of the Software; and (ii) delete all copies of the Software from its computer.

8.2.    **LICENSEE** may immediately terminate this Agreement and **LICENSEE's** obligations to **LICENSOR** if (i) at its own discretion, **LICENSEE** notifies **LICENSOR** in writing, at least thirty (30) days in advance, of its intention to terminate this Agreement, provided that **LICENSEE** has paid all fees and expenses due to **LICENSOR** under this Agreement, or (ii) **LICENSOR** breaches any of its material obligations under this Agreement, and does not correct the failure within 30 (thirty) days after the receipt of a prior written notice from **LICENSEE**; or (iii) **LICENSOR** goes bankrupt or ceases to operate or to produce, maintain, update or upgrade the Software.

8.2.1.    Such termination shall not prejudice **LICENSEE's** right to damages or any other remedy available at law. Upon the effective date of termination by **LICENSEE** of this Agreement, **LICENSOR** shall (i) reimburse or pay to **LICENSEE** any amount or penalty due under this Agreement, without prejudice to **LICENSEE's** right to continue using the Software in accordance with the provisions of this Agreement until such time when **LICENSEE** is able to replace them.

(i) take all measures incumbent thereon for the definitive delivery and transfer to **LICENSEE** of the source codes for the Software (em caso de falência ou falta de condições para atualização)

## 9. NOTICES

9.1. All notices, consents, requests and other communications herein shall be in writing and shall be sent by hand delivery, by certified or registered mail (return-receipt requested), by e-mail or by recognized national overnight courier service as set forth below:

If to **LICENSEE**:

Attention:
Address:
Fax:
E-mail:

If to **LICENSOR**:

Attention:
Address:
Fax:
E-mail:

9.1.1. Notices delivered pursuant to this Section 14 shall be deemed given: (i) at the time delivered, if personally delivered; (ii) at the time received, if by e-mail or mail; and (iii) two (2) business days after timely delivery to the courier, if by overnight courier service.

## 10. GENERAL PROVISIONS

10.1. Force Majeure. Neither PARTY shall be liable for a delay in the performance of its obligations and responsibilities under this Agreement due to causes beyond its control, including, but not limited to, failures or delays in transportation or communication, failures or substitutions of equipment, labor disputes, accidents, shortages of labor, fuel, raw materials or equipment or technical failures, acts of God, catastrophes and war, provided that the delayed party has taken reasonable measures to notify the other, in writing, of the delay. The time for completion of any obligation to which this provision applies shall be extended for a period equivalent to the delay.

10.2. Amendment. This Agreement shall not be deemed or construed to be modified, amended, or waived, in whole or in part, except by a written agreement executed by the authorized representatives of both PARTIES.

10.3. Waiver. No term or provision of this Agreement shall be deemed waived and no breach excused unless such waiver or consent shall be in writing and signed by the PARTY claimed to have

waived or consented. Any consent to or waiver of a breach by either PARTY shall not constitute a consent to or waiver or excuse of any other different or subsequent breach.

10.4.   Severability. In the event that any provision of this Agreement is held by a court of competent jurisdiction to be unenforceable, invalid or in conflict with any law of any relevant jurisdiction, then that provision shall be enforced to the maximum extent permissible so as to effect the intent of the PARTIES. The validity of the remaining provisions of this Agreement shall not be affected, and the rights and obligations of the PARTIES shall be construed and enforced as if the Agreement did not contain the particular provision(s) held to be unenforceable.

10.5.   Assignment. Neither this Agreement nor any rights hereunder may be assigned or duties delegated (whether by operation of law or otherwise) by the PARTIES without the prior written consent of the other Any attempted assignment or delegation without such prior written consent shall be wholly void and totally ineffective for all purposes.

10.6.   Relationship of the PARTIES. In the performance of its services hereunder, PARTIES will at all times be independent contractors, and this Agreement shall not constitute, nor be deemed to constitute, either PARTY as an employee, agent, partner or joint venture of the other PARTY.

10.7.   Governing Law and Venue. The validity, construction, and interpretation of this Agreement and the rights and duties of the PARTIES shall be governed by and construed in accordance with the laws of the Federative Republic of Brazil, excluding its conflicts of laws provisions. The PARTIES expressly agree that any action arising out of or relating to this Agreement shall only be brought in a federal or state court in the City of São Paulo, State of São Paulo, and the PARTIES hereby submit themselves to the exclusive jurisdiction and venue of such courts.

10.8.   Authority. Each PARTY represents that it has full power and authority to enter into and perform this Agreement, has the right to disclose all information and materials made available to the other, and the person signing this Agreement, on behalf of each, has been properly authorized and empowered to execute this Agreement.

10.9.   Entire Agreement. This Agreement constitutes the entire agreement between **LICENSEE** and **LICENSOR** with respect to the subject matter of this Agreement and supersedes all prior agreements and understandings, whether oral or written, between the parties with respect to the subject matter of this Agreement. If **LICENSEE** issues a purchase order or other similar document, it shall be for its internal purposes and, even if it is acknowledged by **LICENSOR**, will have no effect on this Agreement.

10.10. <u>Dispute Resolution</u>. All disputes arising out of or in connection with the present Agreement shall be finally settled under the Rules of Arbitration of the International Chamber of Commerce of Paris - ICC by one or more arbitrators appointed in accordance with the said rules.

10.10.1 The arbitration shall take place in the city of São Paulo - SP, Brazil. The language adopted for the arbitration shall be English.

10.10.2. This Agreement shall be governed by Brazilian law and binds the parties and their successors under any heading, being executed in an irrevocable nature.

10.11.    <u>Language</u>. This Agreement is executed in English and Portuguese. In case on any discrepancy, the Portuguese version shall prevail.

IN WITNESS WHEREOF, the PARTIES hereby executed this Agreement by and through their, respective and duly authorized representatives.

São Paulo, ___, 2004

**WIRELESS NETWORK, INC**
Mr. **Charles Michael Brown**

**WIRELESS NETWORK DO BRASIL LTDA.**
Mr. **Jorge Antonio Silveira Vieira**

WITNESSES:

1. _____        2. _____

**EXHIBIT A: SOFTWARE**

8