# EXHIBIT G

ComNect Strategic Alliance

Contract No. WNI-_____

# Strategic Alliance, License, Sales & Support Agreement

1.1. PARTIES ...................................................................................................................3
1.2. RECITALS ...............................................................................................................3
1.3. DEFINITIONS............................................................................................................4

2. PROJECT IMPLEMENTATION AND DEPLOYMENT.............................................7

2.1. PROJECT SCOPE ......................................................................................................7
2.2. DUTIES OF LICENSEE..............................................................................................7
2.3. DUTIES OF COMPANY (LICENSOR) .........................................................................9

3. LICENSES GRANTED.........................................................................................10

3.1. SOFTWARE AND DOCUMENTATION LICENSE .........................................................11
3.2. SOFTWARE SOURCE CODE ESCROW ......................................................................12
3.3. TRADEMARK LICENSE...........................................................................................13
3.4. QUALITY STANDARDS AND CONTROL ...................................................................14
3.5. PATENT LICENSE...................................................................................................15
3.6. SUPPLEMENTARY AGREEMENTS ...........................................................................15
3.7. INDUSTRIAL TRADE SECRET & KNOW-HOW LICENSE ...........................................15
3.8. CONDITIONS OF EXCLUSIVITY ..............................................................................16
3.9. EXCLUSIVITY AND NON-COMPETITION .................................................................17
3.10. SUB-LICENSING AND TRANSFERABILITY ..............................................................17

4. FEES, ROYALTIES & OTHER COMPENSATION.................................................18

4.1. UP-FRONT EXCLUSIVITY FEE ...............................................................................18
4.2. PERCENTAGE ROYALTY .......................................................................................18
4.3. MINIMUM ROYALTY.............................................................................................18
4.4. RECORDS AND AUDIT ...........................................................................................19
4.5. SUPPORT AND MAINTENANCE AGREEMENT ..........................................................19
4.6. NEW PRODUCT MARKETING AND SALES ..............................................................20
4.7. REMITTANCE PROCEDURES (BRAZIL) ...................................................................20
4.8. PRICE ADJUSTMENTS (BRAZIL) ............................................................................21

5. OTHER PROVISIONS .........................................................................................22

5.1. HARDWARE SALES TERMS ...................................................................................22
5.2. NEW DEVELOPMENT.............................................................................................22
5.3. INTELLECTUAL PROPERTY RIGHTS .......................................................................23
5.4. QUALITY AND SECURITY STANDARDS PROCESS....................................................24
5.5. DISCLAIMER, INDEMNIFICATION AND LIMITATION OF LIABILITY ..........................25
5.6. EXPORT CONTROLS...............................................................................................26
5.7. TERMINATION AND SURVIVAL..............................................................................28
5.8. NOTICES...............................................................................................................28

6. GENERAL PROVISIONS .....................................................................................30

7. SCHEDULES .......................................................................................................34

7.1. SCHEDULE 1: LICENSED TRADEMARKS & TRADE NAMES......................................34
7.2. SCHEDULE 2: LICENSED PATENTS .........................................................................34
7.3. SCHEDULE 3: LICENSED SOFTWARE MODULES .....................................................34
7.4. SCHEDULE 4: LICENSED DOCUMENTATION ...........................................................35
7.5. SCHEDULE 5: NOC HARDWARE REQUIREMENTS ..................................................37
7.6. SCHEDULE 6: FALCON HARDWARE PRICING PLAN ...............................................37
7.7. SCHEDULE 7: LICENSEE STAFFING REQUIREMENTS...............................................38
7.8. SCHEDULE 8: LICENSEE TERRITORY ROLLOUT PLAN ............................................39

DRAFT 9

Case 3:07-cv-04301-EDL   Document 32-8   Filed 08/08/2007   Page 3 of 48

ComNect Strategic Alliance

Contract No. WNI-_____

7.9.   SCHEDULE 9: COMPANY MARKETING SUPPORT COMMITMENTS ...............................................40

8.   ATTACHMENTS ..........................................................................................................41
8.1.   ATTACHMENT A: COMNECT™ SOLUTION DESCRIPTION...........................................41
8.2.   ATTACHMENT B: LICENSEE SERVICE LEVEL AGREEMENT.........................................42
8.3.   ATTACHMENT C: CONFIDENTIALITY AND NONDISCLOSURE AGREEMENT ...................44
8.4.   ATTACHMENT D: SUPPORT & MAINTENANCE AGREEMENT........................................46
8.5.   ATTACHMENT E: DEVELOPMENT AGREEMENT TEMPLATE .......................................47

DRAFT 9

ComNect Strategic Alliance

Contract No. WNI-_____

# Strategic Alliance, License, Sales & Support Agreement

## 1.1.   Parties

This Strategic Alliance, License, Sales and Support Agreement (the "Agreement") is made by and between --

1. WIRELESS NETWORKS, INC., a company duly organized and existing under the laws of the State of Delaware, in the United States of America, with its head-offices located at P.O. Box 620752, Woodside, State of California, Zip Code 94062, having the US Federal Taxpayer Identification Number 94-3319700, by its undersigned Chief Executive Officer Mr. Charles Michael Brown, an American citizen, executive, holder of the Passport n.º 157105715, resident at 55 Skylonda, in the City of Woodside, State of California (hereinafter referred to as "COMPANY"); and

2. WIRELESS NETWORKS DO BRASIL, LTDA., a limited liability quota company duly organized and existing under the laws of the Federative Republic of Brazil, with its head-offices located in the City of Barueri, State of São Paulo, at Alameda Araguaia n.º 933, 5th floor, room 51, enrolled with the CNPJ/MF (Corporate Federal Taxpayers Registry – Finance Department) under No. 03.358.131/0001-33, by its undersigned Chief Executive Officer Mr. Jorge Antonio Silveira Vieira, a Brazilian citizen, business administrator, married, bearer of the ID card, RG number 10.203.174 SSP/SP, enrolled at Individual Taxpayer's Registry (C.P.F./M.F.) under number 032.051.418-81, resident in the City of São Paulo, at Rua Estrada José Roberto Faleiros, number 85, house 61, Condomínio Arueira; (hereinafter referred to as "LICENSEE"),

each a "Party" and collectively "the Parties."

## 1.2.   Recitals

WHEREAS, Company has developed a hardware and software solution (the "Solution"), generally known as ComNect™ for providing wireless and wireline network services, which can accept transactions from merchant POS terminals for routing through the ComNect network operations center (NOC) for delivery to credit/debit card acquirers, as well as support other distributed applications and services.

WHEREAS, Licensee desires to implement the Solution, and market and operate the ComNect Service within the Territory on an exclusive basis.

WHEREAS, Licensee and Company mutually desire to enter a strategic alliance, wherein Company will offer Licensee marketing support, technical assistance, and training, in

DRAFT 9

addition to licenses and products, to help Licensee achieve adequate market penetration and economic scale.

NOW, THEREFORE, in consideration of the promises and the mutual covenants and conditions contained herein, the Parties mutually agree as follows:

### 1.3.    Definitions

1. "Acquirer" means a financial service provider that acquires electronic credit and debit card transactions from merchants and processes them on behalf of the card issuers.

2. "Agreement" means this "Strategic Alliance, License, Sales and Support Agreement."

3. "Back End Processor" means a data processing company which contracts with Acquirers to provide communication and processing systems that connect to interchange systems for clearing and settlement services.

4. "Card Association" (or "Bank Card Association") means an association that sponsors a bank card program, using common rules and regulations, administrative center, methodology, data formats, and interchange process for credit and debit card transactions. Their membership includes both issuing banks and acquirer networks. (Example: Visa and MasterCard.)

5. "Business Plan" means the implementation, deployment, and marketing milestones and targets set forth in Schedule 8.

6. "Certified Application Provider" (CAP) means a software development company operating within the Territory that has been certified by one or more Acquirers to create new applications for installation in POS Terminals or related equipment.

7. "Commercial Service" means the earliest date when any of Licensee's customers begins to use the Service to process transactions. [Brazil only] Licensee stipulates that Commercial Service has already commenced.

8. "Company Intellectual Property" means Licensed Software, Licensed Documentation, Licensed Trademarks, Licensed Patents, Licensed Hardware, and Licensed Trade Secrets and Know-how.

9. "Development" means modification or enhancement of the Software or Hardware at the request of Licensee (or Licensee's Customer) to enable it to perform new features and/or functions, including but not limited to new protocols, applications, or services.

10. "Development Terms" means Section 5.2, as further reflected in the Development Agreement Template located in Attachment E.

DRAFT 9

ComNect Strategic Alliance

Contract No. WNI-_____

11. "Effective Date" means the earliest date by which duly authorized officers of both Parties have signed this Agreement.

12. "Escrow Agent" means DSI Technology Escrow Services, Inc., a leading provider of software source code escrow services.

13. "Escrow Agreement" means the software source code escrow agreement between Company and Escrow Agent.

14. "Front-End Processor" means a company or vendor that provides communication and data processing services for the authorization of card payments and the transfer of data between merchants' point-of-sale equipment to the back end clearing and settlement processor.

15. "License Period" means the time period during which Licensee is obligated to pay the Minimum Royalty provided in Section 4.3, commencing on the Effective Date and continuing until an effective Termination by either Party, as defined in Section 5.6.

16. "Licensed Documentation" means all user manuals, training manuals, release notes, and other similar written materials, to be provided in English, as may be updated by Company from time to time. At Licensee's request and expense, the Documentation may be translated into [Portuguese].

17. "Licensed Hardware" (or "Hardware") means the network systems devices (including "Falcons") which are deployed at merchant sites to implement the Solution.

18. "Licensed Patents" means the patents listed in Schedule 2.

19. "Licensed Software" (or "Software") means the software components needed to implement the NOC, as listed in Schedule 3, as well as software and firmware contained within the Hardware.

20. "Licensed Trademarks" means the trademarks, trade names, logos, and logotypes listed in Schedule 1, plus associated trade dress.

21. "Maintenance" means (a) correction of programming errors and minor enhancements to the Software, and (b) scheduled new releases of the Software which may, in the sole discretion of Company, include new feature or protocol support. Maintenance does not include adding new Protocols, features, applications, or services at Licensee request.

22. "Maintenance and Support Agreement" means Attachment D.

DRAFT 9

ComNect Strategic Alliance

Contract No. WNI-_____

23. "Network Operations Center" (or "NOC"), means one or more data centers implemented by Licensee to offer, monitor and control the Service within the Territory.

24. "Non-Disclosure Agreement" means Attachment C.

25. "Other Applications and Services" means other applications and services, including non-payment related applications or services for business or consumer use, that may be developed by Company or Licensee, that are designed to be offered and deployed through the Solution. These may utilize customer input devices other then POS Terminals, and front-end or back-end processors or service providers other than banks or Acquirers.

26. "Platform Software" means software from other commercial vendors required or advisable for proper implementation of the Solution, including computer operating systems, database systems, security, and data center management software.

27. "POS Terminal" means a Point Of Sale (POS) device to capture and process a consumer credit or debit card transaction at a merchant establishment.

28. "Products" means collectively all software and hardware components, subsystems, and associated documentation delivered by Company and/or its subcontractors.

29. "Protocol" means a set of electronic message formats for transmission of digital information and transactions.

30. "Regulatory Compliance" means compliance with local laws, regulations, customs, and practices, including rules and guidance issued by telecommunications and radio regulatory authorities, equipment certification authorities, financial and banking authorities, as well as business licenses, occupancy permits, and the like.

31. "Service" or "ComNect Service" means the communications access, transaction routing, security, and transaction management capabilities provided through the Solution, as further described in Attachment A .

32. "Solution" means the combination of Software, Equipment, licenses, Documentation, Training, and Support provided by Company under this Agreement and implemented or deployed by Licensee to provide the Service to its customers, as further described in Attachment A.

33. "Subsidiary" means any entity, a majority of whose voting shares or securities are owned or controlled, directly or indirectly, by a Party, provided that such entity shall be deemed to be a subsidiary only so long as such majority control exists.

DRAFT 9

ComNect Strategic Alliance

Contract No. WNI-_____

34. "Support" means first, second, and third level support for reported problems or anomalies within the Software or Hardware, as further set forth in the Support and Maintenance Agreement (<u>Attachment D</u>).

35. "Territory" means the Federative Republic of Brazil.

36. "WNI Protocol" means a set of proprietary electronic message formats developed by Company and widely licensed that facilitates remote management of POS Terminals.

# 2. Project Implementation and Deployment

## 2.1. Project Scope

1. The purpose of this Agreement is to define and establish the conditions, rights, obligations, responsibilities and other related stipulations under which Licensee, with assistance from Company as provided herein, will implement, deploy, market, and operate the ComNect Solution within the Territory, to provide wireless and wireline Services to shopping centers, merchants, and acquirers, and for other applications and services, throughout the Territory.

2. With consultation and assistance from Company, as delimited in <u>Schedules 8 and 9</u>, Licensee will:

a. Hire and train Licensee's managerial, professional, and technical staff (see <u>Schedule 7</u>) to implement the Solution, including building and provisioning the primary and backup NOCs.

b. Identify within the Territory the relevant Acquirer networks, Bank Card Associations, Front End Processors, Back-End Processors, Certified Application Providers, POS terminal vendors, shopping center owners, and major merchant organizations to whom the Service should be marketed.

c. Enter into agreements with local Acquirers, Front-End Processors, and Back-End Processors for Licensee's Service to serve as a front end to their transaction hosts, and maintain ongoing contacts and liaison with them to maintain their ongoing interest in supporting and promoting the Service within their client bases.

d. Enter into agreements with local Certified Application Providers (certified by the relevant Acquirer networks) to implement the WNI protocol in new POS terminals or systems hardware shipped to merchants within the Territory.

e. Enter into agreements with local shopping center owners and major merchant organizations within the Territory to offer wireless and wireline (e.g., DSL, Cable,

DRAFT 9

ComNect Strategic Alliance

Contract No. WNI-_____

Ethernet) POS terminal communications and network operations control services to merchants, and other applications and services, throughout the Territory.

3. It is mutually understood and agreed that the foregoing activities constitute providing the Solution and marketing and sales of the Service within the Territory. Company cannot and does not assure that Licensee will make such sales or secure such agreements. Success will require skill, effective strategies, relationship development, and competent execution by Licensee. By providing the Solution to Licensee, Company is enabling Licensee to develop such marketing and sales relationships at its own expense and risk, with support from Company as delimited herein.

4. [Brazil only] Licensee stipulates that the steps listed above under Section 2.1.2 (a) through (d) have substantially been accomplished within the Territory, and minimal further Company assistance is required.

5. The following summaries of the duties of the Licensee (Section 2.2) and Company (Section 2.3) are not exclusive and are supplemented by all other terms and conditions of this Agreement.

## 2.2.  *Duties of Licensee*

1. The paramount duties of Licensee are to implement the Solution, market the ComNect Service within the Territory; operate, maintain, and control the ComNect Service in accordance with the standards and criteria established herein and with competitive market conditions; and pay all royalties, fees, Hardware sales invoices, and other compensation owed to Company when due.

2. Licensee must establish, maintain, and operate primary and backup network operations centers (NOCs). This includes obtaining all leases, renovation, environmental controls, premises security, business licenses, electric power and telecommunication services. It also includes purchase or lease of all necessary computers, networking devices and other hardware and cabling (see Schedule 5), plus purchasing and maintaining valid licenses to all required third party software, including operating systems and databases.

3. Licensee must obtain any and all required regulatory certifications or licenses for the operation of the Solution, including any radio frequency (RF) broadcasting licenses, from the appropriate authorities within the Territory.

4. Licensee must recruit, hire, and train an adequate number of qualified managerial and technical staff, to include at least the manning roster provided in Schedule 7.

5. Licensee must develop and execute a plan to market the Service within the Territory, including presentations to locally dominant Acquirers, shopping center owners, merchant organizations, and others.

DRAFT 9

ComNect Strategic Alliance

Contract No. WNI-_____

6. Licensee must adhere to the Service Level Agreement (<u>Attachment B</u>), service level agreements required by local Acquirers, and other quality control standards established herein.

7. Licensee agrees to use best efforts to achieve the Performance Milestones provided in <u>Schedule 8</u>, as a condition of exclusivity. In case of deficiencies the procedures listed in <u>Section 3.8</u> will be followed, and in case of persistent failure to achieve minimum agreed Performance Milestones, Company may convert this Agreement and the Licenses granted herein to non-exclusive or may terminate them.

8. Licensee agrees to cross-license royalty-free to Company any new applications it develops to run over the ComNect network. (See <u>Section 5.3</u>) Licensee will retain the exclusive rights to deploy such applications within the Territory. Company may re-license such Licensee-developed applications to its other licensees in other territories (and/or deploy them itself in any territory where Company operates the Service directly).

9. Licensee must conform to all applicable local laws and regulations, pay in a timely manner all applicable taxes (whether based on its income, property, sales, value added, or any other basis) and licensee fees levied on it within the Territory, and maintain its corporate existence in good standing.

10. Licensee must attract an adequate capital investment, which is required to properly implement the Solution and market the Service, which is hereby agreed to be a minimum of US$ 2.5 million during the first year, plus an additional US$ 1.5 million during the second year.

11. Licensee must negotiate contractual commitments or agreements with Acquirers, merchants, processors, or banks to provide ComNect services in the market.

12. Licensee must maintain strict confidentiality and security of customer records and transaction information, and must not disclose, data mine, sell, or otherwise use for its own benefit such information. Licensee acknowledges that strict confidentiality and security of customer records is essential to preserve the Service quality and reputation within the Territory, and to avoid endangering the worldwide reputation and goodwill of the Licensed Trademarks. Licensee must require all of its employees, consultants, vendors, and contractors having access to customer data to agree in writing to this provision. Company reserves the right to terminate this license Agreement in case of violation of this provision.

## 2.3.   Duties of Company (Licensor)

1. The paramount duty of Company is to provide the licensed technology Solution that enables the Service, with associated maintenance updates and technical support.

DRAFT 9

ComNect Strategic Alliance

Contract No. WNI-_____

2. Company will offer appropriate technical support, software maintenance, and training pertaining to the Solution, as further detailed in Attachment D, including training and support visits at least semi-annually, according to the schedules and prices agreed herein.

3. Company will communicate to Licensee all training, trade secrets, and know-how necessary for Licensee to successfully implement the Solution and operate the Service, subject to receipt of payment for support and training as provided herein.

4. Company will provide Licensee with strategic marketing support with Acquirers, certified application providers, shopping centers, and merchants according to the schedules and prices agreed herein.

5. If requested Company will provide Licensee with technical and professional support to assist Licensee to secure required radio operating licenses from the regulatory authorities within the Territory, according to the schedules and prices agreed herein.

6. Company will use best efforts to offer development services, as described in Section 5.2, for new software, hardware, applications, or services as requested by Licensee.

7. Company will assure that Licensee receives access, concurrently with other licensees, to future Company products related to the Solution, including new Hardware models, new Software releases, and future Company applications and services, including any new applications, services, or hardware developed by other licensees. Licensee must pay all costs associated with any required localization, Acquirer Protocol support, staff training, language translation, or platform (computer type or operating system) conversions.

8. Company will pay all legal, filing, maintenance, and renewal fees to maintain the Licensed Trademarks and Licensed Patents in force in the Territory.

## 3.    Licenses Granted

A. Subject to the terms and conditions contained herein, Company grants to Licensee the following licenses, which are in all cases are exclusive within the Territory and applicable solely within the Territory.

B. The conditions of transferability or sub-licensing of these licenses are defined in Section 3.9, below.

C. Licensee acknowledges that these licenses are essential to enable it to implement the Solution and offer the Service.

D. Reservation of Rights. Company Intellectual Property remains the sole and exclusive property of Company, and Company hereby reserves any and all rights not expressly and

DRAFT 9

ComNect Strategic Alliance

Contract No. WNI-_____

explicitly granted in this Agreement, including Company's right to use, authorize use, or license use of Company Intellectual Property to any third party in any other territory and in any language.

E. Licensee will promptly notify Company if it learns of or suspects any infringement of any of the licensed software, trademarks, or patents by any third party.

## 3.1. Software and Documentation License

1. Company hereby grants to Licensee a license to use the Licensed Software (Schedule 3), and associated Licensed Documentation (Schedule 4), to provide the Service to its customers within the Territory.

2. This Software License is for object code, executable code, and library code only. Licensee may run the Licensed Software on any number of Licensee computers and make any number of backup copies solely for internal use. Licensee will reproduce all of Company's labeling, trademarks, copyright notices, and patent notices on each backup copy.

3. The Licensed Software and Licensed Documentation will be held in confidence, subject to the mutual Non-Disclosure Agreement (Attachment C).

4. Licensee computers must be located in a secure data center, network operating center (NOC), administrative office, or other Licensee-controlled facility. Backup copies must be securely stored in a Licensee-controlled area.

5. The Licensed Software may be used only to process Licensee and Licensee customer data and transactions, and may not be used to perform data or transaction processing for any other entity.

6. Licensee shall not, and shall not permit any employee or other third party to modify, analyze, reverse engineer, decompile, disassemble, convert, or apply any procedure or process to the Software to ascertain, derive and/or appropriate for any reason or purpose the source code of the Software or a description of its internal functioning.

7. Company represents and warrants that it either (a) owns the exclusive right and title to all software delivered to Licensee, or (b) in the case of components licensed from other sources, that Company has procured valid licenses to distribute the components to Licensee, and that no further royalties are or will payable by Licensee to such sources.

8. Licensee is responsible for obtaining, at its own expense, licenses to required platform software including operating systems, database engines, management consoles, and security software.

DRAFT 9

Contract No. WNI-_____

9. New releases of the Licensed Software will be delivered to Licensee via online downloading from Company's development website. Upon Licensee request, for an additional handling charge of US$ 120.00, Company will furnish Licensee with two (2) copies (in CD ROM format) of each new release of the Licensed Software.

### 3.2. Software Source Code Escrow

1. To protect Licensee's operations if Company ceases operations or fails to perform agreed maintenance or support functions, Company will enter into a source code escrow agreement with Escrow Agent, and enroll License as a SAFE beneficiary. Company will send confirmation of the account (including the account number and other details) to Licensee within thirty days after the Effective Date.

2. Upon due and punctual payment by Licensee of applicable support and maintenance fees and royalties, company shall (a) continue its Deposit Agreement with Escrow Agent, and (b) continue Licensee as a SAFE beneficiary under this Deposit Agreement without interruption.

3. Licensee will bear all expenses of the escrow, as a line item under the Support and Maintenance Agreement. Upon signing this Agreement Licensee will remit US$ 2,000 to Company (for the Deposit Account setup fee, first annual fee, and a 25% administrative fee to Company). Company will pro rate the cost of the Deposit Account among all its licensees. Licensee will pay its pro rata share, based on the number of licensees one (1) month before the due date of the then-current annual fee as published by the Escrow Agent, plus a 25% administrative fee, with a minimum administrative fee of US$ 200.00 per licensee per year.

4. Company will deposit with the Escrow Agent a complete copy of (a) the human-readable commented source code with build files and instructions for each new release of the Licensed Software, (b) all relevant program and system documentation, and (c) the names and contact information of the software developers (to enable Licensee to contact and potentially hire them if Company ceases operations). It is anticipated that each deposit will generally consist of a single CD ROM containing the foregoing items.

5. A filing for debt reorganization by Company under "Chapter 11" of the US Bankruptcy Code will not trigger the release of the deposit materials unless Company actually ceases operations or fails to provide contracted support and maintenance services.

6. In case the source code is released from escrow, it shall remain confidential under the terms of this Agreement, and Licensee will only obtain a license to maintain and enhance such source code for its own internal use, and not for resale or re-licensing of the source code, object code, executable code, or any derivative works, to any party inside or outside the Territory.

DRAFT 9

Contract No. WNI-_____

### 3.3. Trademark License

1. Company hereby grants to Licensee an exclusive license to use the Licensed Trademarks and Trade Names (<u>Schedule 1</u>), solely within the Territory, and solely in connection with Licensee's offering of the Solution and Service, utilizing the Licensed Software, subject to the requirements of <u>Section 3.4</u>.

2. Licensee may use the Licensed Trademarks on or in its sales and marketing literature, advertising, directory listings, website, stationery, business cards, invoices, equipment labels, vehicles, uniforms, buildings, signs, and any other appropriate places related to the provision of the Solution and Service.

3. Licensee shall not remove nor alter, nor permit the removal or alteration of, any Company or third-party trademarks, copyright notices, tags, labels, or other identifying markings placed on any Products, Hardware, packages, or containers provided hereunder without the prior written consent of Company.

4. Licensee may use the existing logotype design, or may execute a new design or rendering of the Licensed Trademarks, provided, however, that any new design or rendering must first be approved by Company in accordance with <u>Section 3.4.5</u>, below, prior to any public use or display, and once approved must within a reasonable time be uniformly displayed on all new materials, products, and offerings.

5. If any of the Licensed Trademarks should become unavailable in the Territory, or if Licensee desires to introduce a different trademark for the Service or any new application to be offered through the Service, Licensee shall submit its candidate word mark(s) and any associated design(s) to Company. With the cooperation of Licensee, Company will screen such candidate mark(s) for availability, legality, appropriateness, and market appeal within the Territory, and upon approval of a candidate mark by both Company and Licensee, Company will register such mark in the Territory at its own expense (see <u>Section 5.3</u>). Such mark will then be added to the list of Licensed Trademarks in <u>Schedule 1</u>, and all quality control and other provisions of this Agreement will apply to its use by Licensee. Company may subsequently register and license the mark in other territories, without payment to Licensee, provided it requires the same or similar quality standards of such other licensees.

6. The foregoing <u>Section 3.3.5</u> does not apply to unrelated trademarks of Licensee, and Company will acquire no rights with respect to Licensee trademarks that are not used in connection with the Service or applications that utilize the Service.

6. If Company registers additional trademarks within the Territory or begins using additional trade names in connection with the Service, these will be added to the list of Licensed Trademarks and Trade Names (<u>Schedule 1</u>) without any change in royalties or fees payable by Licensee.

DRAFT 9

ComNect Strategic Alliance

7. Licensee shall use the Licensed Trademark(s) to identify the Service in commerce when Licensee offers the Service directly to customers. If Licensee offers the Service indirectly through a third party, the Service may be offered under the trademarks of the third party. All applicable Company copyright and/or patent notices must be reproduced in the third party's product labels, manuals, and/or package inserts. Licensee and Company will cooperate to attempt to induce such third party to list or display the Licensed Trademark(s), and potentially Licensee's and Company's company names, in the third party's marketing materials, product guides, and packaging.

### 3.4.   Quality Standards and Control

1. Licensee will implement the Solution and provide the Service in strict accordance with the specifications, methods, and standards provided by Company, including conformance with the Service Level Agreement (Attachment B), strict customer data confidentiality (Section 2.2.12), and adherence to applicable customer service and security standards (see Section 5.4).

2. No changes to the specifications, methods, or standards shall be made by Licensee without in each instance first submitting to Company complete information and reasons for any proposed changes and modifications, setting forth the details thereof, and securing written approval of Company, such approval not to be unreasonably withheld.

3. Representatives of Company shall have the right, at all reasonable times, to inspect all aspects of Licensee's operations relating to the implementation of the Solution and the provision of the Service, both at the Licensee's premises and elsewhere, to fulfill Company's duties and requirements for appropriate quality control.

4. Should Company ever notify Licensee that aspects of the Solution or the Service fail to comply with the aforementioned standards and specifications, Licensee shall promptly correct such defects in accordance with Company's instructions. Licensee shall also refrain from using any trademarks of Company in relation to any deficient Service offerings, until such defects shall have been cured to the satisfaction of Company.

5. Upon receipt by Company of new or revised configuration plans, service specifications, or marketing materials, Company shall promptly advise Licensee of Company's approval, which approval shall not be unreasonably withheld, or shall set forth with specificity Company's reasons for denial of approval. Any item submitted to Company for approval shall be deemed approved by Company if Company has not responded within 60 days.

6. Company shall maintain in confidence, and shall obligate any representatives to maintain in confidence, all information received pursuant to this Section 3.4.

7. Licensee shall not use any Company trademark or trade name in any manner likely to bring disrepute or disparagement, or in connection with any illegal, immoral, or obscene

DRAFT 9

ComNect Strategic Alliance

Contract No. WNI-_____

matter, or other than in connection with goods or services otherwise meeting Company's quality control requirements.

### 3.5. Patent License

1. Company hereby grants to Licensee an exclusive license to practice the Licensed Patents (Schedule 2), and any foreign counterparts, solely within the Territory, and solely in connection with Licensee's implementing the Solution and offering the Service.

2. If Company files or obtains any other patents within the Territory which are required or desirable to implement the Solution and offer the Service, these will be added to the list of Licensed Patents (Schedule 2) with no change to the royalties payable by Licensee.

3. Company will pay all legal fees, filing fees, renewal fees, or maintenance fees associated with obtaining or maintaining patent protection within the Territory.

### 3.6. Supplementary Agreements

This Agreement plus all amendments, statements of work, change orders, and related correspondence are hereby deemed "supplementary" to a license of intellectual property under US Code Title 11 Section 365(n)(1)(b).

### 3.7. Industrial Trade Secret & Know-How License

1. In addition to transferring Licensed Software and Hardware components to Licensee, Company desires to impart all the skills needed to properly configure and successfully operate the Solution and all its components.

2. This detailed operational Know-how is an Industrial Trade Secret of Company and is protected by the mutual Non-Disclosure Agreement (Attachment C).

3. Company may impart the Know-how during (a) installing and configuring the Solution and/or its components, (b) provision of software maintenance and support, (c) formal staff training, and/or (d) when reviewing or auditing the quality and security of Licensee operations.

4. Company hereby grants to Licensee an exclusive license to use all Know-how and Industrial Trade Secrets pertaining to configuration and operation of the Solution, solely within the Territory.

DRAFT 9

### 3.8.  Conditions of Exclusivity

1. Licensee acknowledges that (a) Company has expended a large amount of time and money (more than US$ 10 million) to develop the Solution, (b) the exclusive right for the Territory is a valuable franchise, (c) Company has the right to select the most capable licensee for each Territory, and (d) by accepting this exclusive license for the Territory Licensee incurs a duty to work this license.

2. This Agreement is based on the Milestones presented in <u>Schedule 8</u> (the "Business Plan"). The Business Plan is a fundamental part of this Agreement. It details the Project Milestones, which in turn establish the expected financial returns agreed to and projected by both Parties. A key purpose of this Agreement and Business Plan is to ensure the successful execution of the Project Implementation and Deployment from an economic and financial standpoint.

3. It is mutually acknowledged that all estimates and goals defined in <u>Schedule 8</u> are conservative, the true market potential may be larger, and the market potential will very likely become larger over time due to economic growth of these markets during the plan period. It is further mutually acknowledged that Licensee performance could be negatively affected by delays of cooperation from telecommunications providers, regulatory agencies or acquirer networks, shortages of qualified personnel or Hardware, inclement weather, and/or new competition.

4. Within fifteen (15) days after the end of each calendar quarter, Licensee will make a written report to Company regarding (a) the number of sales achieved and pending, including any accounts terminated, relative to the goals and objectives of the Business Plan, (b) its current staffing levels, relative to the requirements of <u>Schedule 7</u>, and (c) any other information or factors that are affecting performance, either positively or negatively.

5. If Licensee fails to achieve the agreed rollout milestone and/or staffing objectives for two or more consecutive calendar quarters, a teleconference will be held within five (5) days between the senior management personnel of both Licensee and Company to discuss the deficiency, the reasons for it, and possible actions or remedies to cure the deficiency.

6. If it appears that deficiencies or delays achieving the rollout objectives can in good faith be attributed to factors beyond the control of Licensee, Company and Licensee will agree on a rescheduling or reduction of the plan targets, consent by Company not to be unreasonably withheld. An amended <u>Schedule 8</u> must be signed by both parties.

7. If it appears that deficiencies or delays achieving the rollout objectives cannot in good faith be attributed to factors beyond the control of Licensee, Company may in its sole discretion exercise one or more of the following remedies --

    a.  Declare that this Agreement and the licenses granted herein are non-exclusive within the Territory,

ComNect Strategic Alliance

Contract No. WNI-_____

b. Revoke the Hardware Purchase Discount granted to Licensee in Schedule 6, so that henceforth Licensee must pay full list price for Falcon hardware, or

c. Terminate this Agreement and cancel the Licenses granted herein.

8. If Company elects to terminate this Agreement under Section 3.8.7(c) above, Company will pay Licensee a sum in local currency equivalent to US$ _____ per active customer of Licensee that is successfully migrated to a new Licensee. "Successful migration" means payment by the customer of two (2) monthly invoices from the new Licensee.

## 3.9.  Exclusivity and Non-Competition

1. Without the prior written consent of Licensee Company will not (a) supply any technology or know-how related to the Solution to any third party within the Territory, or (b) offer or provide within the Territory any network communications or transaction processing services that would compete with the Service.

2. All other Company licenses or delivery of technology or know-how related to the Solution to third parties in other territories shall require non-competition with Licensee in the Territory.

3. Licensee will offer network communication or transaction processing services in the Territory solely through the Solution, and will not offer or provide services that compete with the Service through the use of systems other than the Solution.

4. Licensee will not deploy the Solution or offer the Service, directly to customers or indirectly through any intermediaries, in any geographic location outside the Territory.

## 3.10.  Sub-Licensing and Transferability

1. Subject to written approval by Company, Licensee may sublicense the licenses granted herein to one or more Subsidiaries or business process outsourcing vendors within the Territory, through which Licensee may elect to provide or expand its offering of the Service within the Territory, as long as (a) such parties remain bound by all quality control standards, revenue accounting, confidentiality terms, and intellectual property provisions contained herein, (b) Company receives the Percentage Royalty on all associated revenues, and (c) Company has the right to audit all sub-licensee operations for compliance with quality controls and revenue accounting.  Licensee remains accountable for quality control deficiencies or royalty underpayments relative of sub-licensees, must terminate any sub-licensee that does not conform to applicable quality control standards, and must pay in full any royalty deficiencies of such sub-licensees.

DRAFT 9

ComNect Strategic Alliance

Contract No. WNI-_____

2. Company is not required to provide Support and Maintenance services to such sub-licensees under the current Agreement. Each sub-licensee must negotiate a new Support and Maintenance Agreement with Company.

3. Subject to written approval by Company, Licensee may transfer this Agreement, and the associated Support and Maintenance Agreement, to a successor in interest to its entire business operation for implementing the Solution and offering the Service. Such transferee must meet all of the performance standards and other Licensee qualifications defined in this Agreement. Company reserves the right to conduct an appropriate due diligence of any proposed Transferee or sub-licensee, including requesting detailed information about its corporate structure, ownership, history, and financial statements.

# 4.    Fees, Royalties & Other Compensation

A. All compensation payable to Company will be multiplied by an amount sufficient to cover applicable Brazilian withholding taxes, as further defined in Section 4.7 below. These multiples will be adjusted if the tax rates are changed.

B. Unless otherwise expressly provided herein, all payments by Licensee to Company are non-refundable.

## 4.1.   Up-Front Exclusivity Fee

1. In return for the grant of exclusive licenses provided herein to deploy the Solution within the Territory, Licensee will pay Company an up-front fee of US$ 500,000.

2. This fee may be paid in two installments, one half upon signing this Agreement and the balance within three (3) months thereafter.

## 4.2.   Percentage Royalty

1. Licensee will pay to Company a running Percentage Royalty equal to seven percent (7%) of Licensee's gross revenues from the Royalty Base.

2. The Percentage Royalty shall be paid in full on a monthly basis within fifteen (15) days after the end of each month during the License Period.

3. For purposes of this section, the "Royalty Base" means all gross revenues received by Licensee from offering the Service, including transaction fees, support and maintenance charges, and the offering of any other service or product that (a) uses the Solution or (b) is sold under the Licensed Trademarks. There will be no deduction from gross revenue for business expenses, taxes, fees, or capital investments of any kind.

DRAFT 9

ComNect Strategic Alliance

4. The Royalty Base does not include (a) revenue from sales of Hardware purchased from Company, or (b) income from any unrelated business activity of Licensee that does not utilize the Solution or any Company Intellectual Property.

### 4.3. Minimum Royalty

1. As a further condition of exclusivity Licensee will pay Company a minimum royalty of US$ 15,000 for each separate month when this Agreement is in effect.

2. For every month in which the Percentage Royalty exceeds the Minimum Royalty, the Percentage Royalty shall be calculated and paid in full without any reduction or credit because, in some months, the Percentage Royalty was less than the Minimum Royalty.

3. Within fifteen (15) days after the end of each month during the License Period, together with each payment of the Royalty to the Licensor, Licensee shall prepare and deliver to Licensor a Royalty Report for the month for which the payment of Royalty is being made, which Report shall specify the Revenues of the Licensee for that month, the calculation of the amount of the Percentage Royalty, and, if applicable, the payment of the Minimum Royalty.

### 4.4. Records and Audit

1. Licensee shall maintain sufficiently detailed, accurate, and complete records of applicable gross revenues received, according to international accounting practices, to permit an accurate determination of Royalties payable to Company.

2. Company shall have the right to select an independent certified public accountant that is acceptable to Licensee (such acceptance not to be unreasonably withheld) to inspect the records of Licensee quarterly on reasonable notice during regular business hours, to verify Licensee's reports and payments. The entire cost of such inspection shall be borne by Company, and such certified public accountant shall not disclose to Company any information other than information relating to this Agreement. Company shall hold in confidence, and shall obligate such certified public accountant to hold in confidence, all information obtained pursuant to this paragraph.

3. If such audit reveals that Royalties have been underpaid during any calendar quarter in an amount of 1% or more, Licensee shall immediately pay to Company the full amount of any such underpayment plus 25% thereof as a penalty for the underpayment, and License shall reimburse Company for the costs of such audit.

4. Licensee shall provide Company with current access passwords to all NOC computers. Company may use these passwords to perform Support and Maintenance Services, verify

DRAFT 9

ComNect Strategic Alliance

Contract No. WNI-_____

the integrity of transaction processing logs and, estimate Licensee's gross revenues subject to payment of Royalties. Company shall hold in confidence all information obtained pursuant to this paragraph.

### 4.5.    Support and Maintenance Agreement

1. Support Fee. In return for the services defined in the Support and Maintenance Agreement (Attachment D), Licensee will pay Company the base amount of US$ 10,000 per month, payable in advance, plus US$ 0.65 per terminal unit in the field, plus $150 per operational PC host and $350 per Sun host in each NOC. (The per-host fee does not apply to computers in the Licensee's administrative offices which are not used to implement the Solution.)

2. The Support and Maintenance Agreement includes two (2) semi-annual scheduled visits by Company support and marketing staff per year, without further compensation.

3. The Support and Maintenance Agreement only applies to the Licensed Software listed in Schedule 3. It does not cover (a) development of new applications or addition of new functions to existing modules, or (b) support of any non-Company provided software.

4. The Support Fee does not include the costs of training courses (WNI University) to certify Licensee personnel in various aspects of the Service. Separate fees for training classes are provided in Section 6 of the Support Agreement (Attachment D), plus travel, meals, and lodging for instructors.

5. Licensee recognizes that Company has limited qualified training personnel, who must also perform support, maintenance, and development tasks. Whenever any of Licensee's Company-trained staff gives notice of leaving their position, Licensee will use best efforts to direct such person to train and explain their job position to their successor.

6. Company Professional Services Rate. If Licensee requests Company to perform any technical or marketing services which Company is not otherwise obligated by this Agreement or the Support and Maintenance Agreement to provide, Licensee shall pay Company's daily professional services rate of US$ 900 per day, per person, plus travel, lodging and food, when applicable. Licensee shall pay such fees and expenses within ten (10) days after receiving an invoice from Company.

7. Upon performing any maintenance or customization Company will ensure that all graphical interfaces of the Software are reasonably harmonized with Licensee's systems.

### 4.6.    New Product Marketing and Sales

DRAFT 9

1. If Licensee requests Company assistance to market or sell a new application or service offering within the Territory, Company may provide such assistance, personnel time and availability permitting, at its standard daily professional services rates.

2. If Company desires to market or sell a new application or service offering within the Territory, with the cooperation of Licensee, then each Party will bear its own expenses associated with such marketing and sales efforts.

### 4.7.    Remittance Procedures (Brazil)

1. The Support Fee (Section 4.5) is due to Company by the first day of each month. The Percentage Royalty (Section 4.2) plus the Minimum Royalty if any (Section 4.3) are due to Company by the fifteenth day of each month.

2. Licensee is responsible for paying all withholding taxes on remittances of royalties and technical services contract payments to Company and filing all required forms to effect such remittances.

3. Royalties.  Licensee will add the amount of the Brazilian withholding tax (currently 15%) to all royalty payments, (i.e., Licensee will multiply all sums owed to Company for royalties by 1.1765), so that Company will actually receive the amounts provided in Sections 4.1, 4.2, and 4.3 net of the withholding tax.

4. Technical Services.  Licensee will add the amount of the Brazilian withholding tax (currently 25%) to all technical services payments, (i.e., Licensee will multiply all sums owed to Company for technical services by 1.3333), so that Company will actually receive the amount provided in Section 4.5 net of the withholding tax.

5. Licensee will provide Company with true copies of all forms filed with the Brazilian tax and monetary authorities to effect these remittances to Company within 15 days after filing or submission.

6. Licensee will be responsible for all fines or penalties imposed for improper filings or non-payment of taxes on remittances to Company.

### 4.8.    Price Adjustments (Brazil)

1. Twelve (12) months after the Effective Date, or after its most recent adjustment, or after a duration to be defined by the federal government of Brazil with regard to the first twelve (12) months that this contract is in force, any amounts specified in Brazilian Reais shall be adjusted in accordance with the variation in the general price index - domestic availability ("IGP-DI") provided by the Fundação Getúlio Vargas, or with an index defined by the executive branch of government, pursuant to Article 28 of Law No. 1,540-

22 of 03/13/97, or any reissue, replacement or transformation thereof in the law, taking into account the base month of the contract amount.

2. During the first two (2) years there will be no adjustments of amounts payable under this Agreement that are specified in United States Dollars. Thereafter, any fee or charge (except the Royalty Percentage) will be adjusted once per year, on the anniversary date of this Agreement, in accordance with the variation of the Consumer Price Index ("CPI") as published by the Department of Commerce of the United States Federal Government, or any modification or replacement thereof.

## 5.  Other Provisions

### 5.1.  Hardware Sales Terms

1. The Hardware is an integral part of the Solution and may not be resold to competing providers of wireless or wireline network payment services. Hardware may only be sold or delivered to Licensee's customers of the ComNect Service, or if a working unit is returned by a customer, it may be sold or delivered to a different customer of Licensee.

2. So long as Licensee retains exclusivity (as defined in Section 3.8) it may order at the price discounts provided in Schedule 6.

3. Title to the Hardware and the risk of loss will pass to Licensee upon shipment. Title to all software, documentation, and other intellectual property shall remain vested in the Company at all times.

4. Limited Warranty. Company warrants that non-Software Products manufactured by or for Company, will be free from defects in materials and workmanship during the Warranty Period, which shall expire after ninety (90) days from the date of shipment

5. Warranty service shall be administered in accordance with Company practices in effect at the time of shipment. Licensee shall notify Company in writing immediately upon discovery of any defects within the warranty period for return authorization and instructions. Upon receipt of the returned Equipment prepaid by Licensee, Company's sole obligation shall be to repair and/or replace the part found to be defective, at its option. Replacement Equipment may be new or repaired. Returned replaced Equipment shall become Company's property. Replacement Equipment shall be warranted for the unexpired portion of the returned Equipment's warranty.

6. The foregoing warranty is contingent upon proper use of the Products in the applications for which they were intended. This warranty shall not apply to defects or failures to a Product which was subjected to: (a) accident, neglect or misuse; (b) failure of or defect in electrical power, external electrical circuitry, air-conditioning or humidity control; (c) use of the Hardware with other software or hardware not provided by

ComNect Strategic Alliance                                    Contract No. WNI-_____

Company nor approved in writing by Company; (d) improper use or maintenance; (e) unusual physical stress; (f) electrostatic discharges; (g) unusual operational or environmental stress; or (h) modification, adjustment, repair, service or installation by any party other than Company, or persons authorized and certified by Company.

7. Company's sole liability and Licensee's exclusive remedy shall be limited to repair, replacement, credit or refund, Company shall pay all freight charges for shipment of any replacement Product to Licensee during the Warranty Period. Replacement or repair of a Product shall not extend the original warranty for that Product or repair part.

8. Product Returns. To return Hardware that Licensee believes is defective, Licensee shall: (a) notify Company in writing that such Product is believed to be defective and furnish a detailed explanation of any alleged problem; (b) obtain an RMA ("Return Material Authorization") number from Company for the alleged defective Product; and (c) within fifteen (15) days of receipt of the RMA number, return such Product to Company, freight prepaid, with the RMA number prominently attached to Company's repair facility in Woodside, California U.S.A. or such other location as Company may designate in writing.

9. Disclaimer of Warranties. COMPANY MAKES NO WARRANTIES OR CONDITIONS, EXPRESS, STATUTORY, IMPLIED, OR OTHERWISE, AND COMPANY SPECIFICALLY DISCLAIMS THE IMPLIED WARRANTIES AND CONDITIONS OF NONINFRINGEMENT, MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE. NOTWITHSTANDING THE FOREGOING, COMPANY DOES NOT EXCLUDE LIABILITY TO THE EXTENT THAT SUCH LIABILITY MAY NOT BE LIMITED OR EXCLUDED BY LAW.

10. Inherently Dangerous Applications. The Hardware is not authorized for use as critical components in life support systems or for use in aviation, transportation, nuclear or any other inherently dangerous application without the express written approval of company. Life support systems are those which are intended to support or sustain life and whose failure to perform can reasonably be expected to result in a significant injury to the user. Critical components are those components whose failure to perform can reasonably be expected to cause failure of a life support system or affect its safety or effectiveness.

### 5.2.   New Development

1. Licensee or Licensee's customers (or prospective customers) may from time to time submit to Company oral or written suggestions or requests for new features, functions, capabilities, enhancements, or for entirely new or substantially redesigned services or applications, to be added to either the Software or Hardware components of the Solution, or both, generally referred to herein as "New Capabilities."

Contract No. WNI-_____

2. Company shall have no obligation to provide such New Capabilities except upon preparation, negotiation, and execution by both parties of a Statement of Work.

3. Each Statement of Work shall contain functional and technical specifications, a list of deliverables, time schedule, acceptance criteria, and payment terms. The Development Agreement Template in Attachment E provides the general format for a Statement of Work. The technical specification may be a deliverable item. Company may perform such development work directly, or subcontract to a qualified technical services firm.

4. The New Capabilities will become an integral part of the Solution. Licensee will have the exclusive right to offer such New Capabilities within the Territory, and solely within the Territory. Company will acquire a worldwide, fully paid-up sub-licensable license (see Section 5.3), and may offer the New Capabilities to its other licensees as an integral part of the Solution.

5. To implement a new or revised Acquirer message protocol can be a substantial task and requires a negotiated Statement of Work. However, it is expected that the cost will generally be borne by the relevant Acquirer or Front-End Processor.

### 5.3.   Intellectual Property Rights

1. Licensee acknowledges that Company has created the Solution and affirms that Company must remain the foundation and unified source of the Solution and its future technical development on a worldwide basis, for the greatest benefit of Licensee and all other licensees of Company.

2. As a result of obtaining confidential information, including documentation, training, and experience with the details of Company's Solution and the proprietary technical approaches used, Licensee or Licensee personnel may develop or conceive improved concepts, innovations, inventions, processes, formulas, configurations, protocols, or novel applications, collectively known as "Improvements" to the technology of the Solution.

3. Licensee will require all of its officers and employees to sign confidentiality and invention agreements providing that such officers and employees will maintain any potential Improvements in confidence and upon request will assign all rights to such Improvements to Company, or as otherwise directed by Company. Company may from time to time request Licensee to produce copies of such employee confidentiality and invention agreements, for example during an audit of royalties or quality standards.

4. Licensee will promptly disclose any potential Improvements to Company, and permit Company to evaluate whether to file for patent protection for such Improvements. If Company elects to file for patent protection for the Improvements, Licensee will direct its relevant employee(s) to assign all rights to the Improvements and any patent applications, in Brazil and worldwide, to Company.

DRAFT 9

ComNect Strategic Alliance                                    Contract No. WNI-_____

5. Company may also elect to treat the Improvements as an industrial trade secret (for example if patent protection may be unavailable), in which case Licensee will maintain such trade secret in confidence and sign and deliver any document at Company's request acknowledging Company's ownership of such industrial trade secret.

6. Any patents or trade secrets relating to the Solution will be deemed added to the Licensed Patents and/or Trade Secrets without any change in Royalties due by Licensee. Company may elect when and whether to implement and offer the Improvements within the Solution, in keeping with available staff resources, for the benefit of all Licensees.

7. Company will require Company's employees, contractors, and all other Licensees to agree to terms similar to this <u>Section 5.3</u>, and any Improvements conceived or developed by such other Licensees or Company employees or contractors will likewise be added to the Licensed Patents and/or Trade Secrets, without any change in Royalties due, for the full benefit of Licensee.

8. This <u>Section 5.3</u> applies to all inventions and Improvements conceived by Licensee or Company personnel in connection with the Solution, regardless of whether Licensee, a customer of Licensee, or any third party (such as a government agency or university) has paid part or all of the costs of such research or product or application development.

9. Licensee acknowledges that these policies and procedures are to Licensee's benefit, because by this means Licensee will obtain access at no additional cost to Improvements developed by other Licensees worldwide, and such access will be from a single source, namely Company, which Licensee agrees shall be and remain the foundation of the Solution and its technology on a worldwide basis.

10. Upon issuance in the United States of any patent that Company determines was based substantially on Improvements obtained from Licensee under this Section, Company will pay Licensee the sum of US$ 1,000.

### 5.4.   Quality and Security Standards Process

1. As part of the ongoing development of the Solution, Company intends to develop and issue from time to time a series of new and revised standards and policies for customer service, system reliability, computer security, premises security, and financial risk management.

2. Licensee acknowledges that such standards and policies are desirable to enhance the quality and value of the Service, to uphold the reputation for quality of the Licensed Trademarks and the Solution, and to assist Licensee in passing security audits required from time to time by its Acquirer networks, banks, or major customers.

ComNect Strategic Alliance

Contract No. WNI-_____

3. Company will develop such standards and policy documents at its own expense, and will distribute one or more working drafts to its licensees for a forty five (45) day period for review and comment. Licensee should request its relevant technical or operations personnel to review such working drafts, at Licensee's expense.

4. In response to written comments received from licensees, Company may modify such draft standards to produce a final Standard, which will be in accord with generally recognized international standards for financial payments systems and operations.

5. Licensee agrees and undertakes to bring its facilities and operations into conformance with each final Standard within one hundred twenty (120) days after the issuance of such final Standard by Company.

6. Company may grant variances from this requirement (of Section 5.4.5) in writing, upon Licensee request showing that (a) more time is required for conformance, or (b) there are bona fide local conditions or regulations that make literal compliance impossible. In such cases Company may grant a waiver, for as long as such conditions continue to exist.

7. Company standards and policy documents are proprietary information and will be held in confidence, subject to the mutual Non-Disclosure Agreement (Attachment C).

### 5.5.    Disclaimer, Indemnification and Limitation of Liability

1. THE SOLUTION AND ALL RELATED TECHNOLOGY AND CONFIDENTIAL INFORMATION LICENSED HEREUNDER IS PROVIDED ON "AS IS" BASIS. COMPANY DISCLAIMS ANY WARRANTY, WHETHER STATUTORY, EXPRESS OR IMPLIED, INCLUDING WITHOUT LIMITATION, THE WARRANTIES OF MERCHANTABILITY, FITNESS FOR ANY PARTICULAR PURPOSE, TITLE, OR NON-INFRINGEMENT. COMPANY ALSO MAKES NO WARRANTY THAT THE SOLUTION OR CONFIDENTIAL INFORMATION IS ACCURATE ERROR-FREE, UNINTERRUPTED, OR SUFFICIENT TO ENABLE LICENSEE TO OFFER THE SERVICE.

2. TO THE EXTENT PERMITTED BY APPLICABLE LAW, IN NO EVENT AND UNDER NO THEORY OF LIABILITY, INCLUDING, BUT NOT LIMITED TO, TORT, BREACH OF CONTRACT, PRODUCT LIABILITY, INDEMNIFICATION, PERSONAL INJURY OR OTHERWISE, SHALL COMPANY BE LIABLE FOR ANY DIRECT, INDIRECT, INCIDENTAL, PUNITIVE, SPECIAL, OR CONSEQUENTIAL DAMAGES OR LOSSES (INCLUDING WITHOUT LIMITATION DAMAGES FOR LOSS OF DATA, USE, OR PROFITS) ARISING FROM USE OF THE SOLUTION OR THE CONFIDENTIAL INFORMATION EVEN IF COMPANY HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES OR LOSSES.

DRAFT 9

3. Mitigation of Risk. Licensee will develop and follow a written change management policy with respect to new releases of software components, whether of the Solution or of Platform Software, which is usual and customary in the payment processing industry, that must include at least the following elements: (a) Licensee will initially load and run any new software component only in the primary NOC or in the backup NOC, but not in both, for a minimum of twenty four (24) hours, and (b) prior to loading and running any new software component, Licensee will develop a roll-back plan, sufficient to enable Licensee to roll back to the prior configuration rapidly and efficiently if necessary or advisable.

4. Company has the right to defend, or at its option to settle, and Company agrees, at its own expense, to defend or at its option to settle, any third party claim, suit or proceeding (collectively, "Action") brought against Licensee alleging the Solution infringes any United States patent, copyright, or trademark in existence as of the Effective Date and enforceable in Licensee's country, subject to the limitations hereinafter set forth.

5. Company will have sole control of any such Action or settlement negotiations, and Company agrees to pay, subject to the limitations hereinafter set forth, any final judgment entered against Licensee on such issue in any such Action defended by Company. However Company will be relieved of the foregoing obligations unless Licensee notifies Company promptly in writing of such Action, gives Company authority to proceed as contemplated herein, and gives Company proper and full information and assistance to settle and/or defend any such Action.

6. If it is adjudicatively determined, or if Company believes, that the Solution, or any part thereof, infringes any patent, copyright or trademark, or if implementing the Solution and offering the Service, or any part thereof, is, as a result, enjoined, then Company may, at its election, option, and expense: (a) procure for Licensee the right under such patent, copyright or trademark to use, offer or sell, as appropriate, the Products or such part thereof; or (b) replace the Products, or part thereof, with other suitable non-infringing Products or parts; or (c) modify the Products or part thereof to render them non-infringing; or (d) remove the Products, or part thereof, terminate distribution or sale thereof and refund the payments paid by Licensee for such Products less a reasonable amount for use and damage. Company will not be liable for any costs or expenses incurred without its prior written authorization, or for any installation costs of any replaced Products.

7. Notwithstanding the provisions of <u>Sections 5.5.4, 5.5.5 and 5.5.6</u> above, Company has no liability to Licensee for (a) any infringement of patent or copyright claims alleging infringement by completed equipment or any assembly, circuit, module, combination, method or process in which any of the Products may be used but not covering the Products comprising the Solution standing alone; (b) any trademark infringements involving any marking or branding not applied by or requested by Company, or involving any marking or branding applied by Company at the request of Licensee; or (c) the modification of the Solution, or any part thereof, unless such modification was made by Company, where such infringement would not have occurred but for such modifications.

ComNect Strategic Alliance

Contract No. WNI-_____

8. Company's liability arising out of or relating to this Section 5.5 for the allegedly infringing Products that are the subject of any infringement claim shall not exceed (a) in the case of Hardware the aggregate amounts paid by Licensee to Company for the relevant Hardware component giving rise to the claim, amortized on a straight line basis over eighteen (18) months from the date of the applicable purchase order, or (b) in the case of Licensed Software the aggregate Percentage and/or Minimum Royalties paid by Licensee to Company for most recent three (3) month period. This Section 5.5 states the entire liability and obligations of Company and the sole and exclusive remedy of Licensee and its customers, with respect to any alleged patent, copyright or trademark infringement by the Solution or any part thereof.

### 5.6. Export Controls

1. The Software, Hardware, Documentation, and related technology are subject to U.S. export control laws and regulations and may be subject to export or import regulations in other countries. Licensee agrees to comply strictly with all such laws and regulations.

2. Licensee will not export or transfer the Solution or any of its components outside the Territory without Company's written consent, which may be withheld in Company's sole discretion, unless such transfer would assist Licensee to provide the Service within the Territory, in which case consent by Company will not be unreasonably withheld.

3. If Company consents to export or transfer of the Solution or Documentation, Licensee has the responsibility to obtain (a) a re-export license from the U.S. Department of Commerce and/or the U.S. National Security Agency, and (b) any import license that may be required by the destination country.

### 5.7. Termination and Survival

1. Licensee may terminate this Agreement and Licensee's obligations to Company (a) at any time, provided Licensee notifies Company in writing, at least one hundred twenty (120) days in advance, of its intention to terminate this Agreement, and provided that Licensee has paid all fees and expenses due to Company under this Agreement, or (b) if Company breaches any of its material obligations under this Agreement, and does not correct the failure within ninety (90) days after receiving written notice from Licensee.

2. Company may terminate this Agreement, the licenses granted hereunder, and Company's obligations to Licensee if Licensee breaches any of its material obligations under this Agreement, including its obligations to make full and timely payments as required hereunder, and does not correct the failure within thirty (30) days after the receipt of written notice from Company. Such termination shall not prejudice Company's right to damages or any other remedy available at law.

DRAFT 9

ComNect Strategic Alliance                                                  Contract No. WNI-_____

3. Upon the effective date of Termination of this Agreement, Licensee and all subsidiaries or sub-licensees, if any, shall –

    a.  Stop all use of the Licensed Software, delete all copies of the Licensed Software from its computers, and return or certify the destruction of all original and backup copies of the Licensed Software and Documentation,

    b.  Stop all use of the Licensed Trademarks, Licensed Patents, and other Company Intellectual Property,

    c.  Render to Company a final accounting and payment in full of all royalties, support fees and hardware invoices due, as well as fees for any pending development projects incurred or accrued prior to the date of notice of termination.

4. The following provisions will survive Termination of this Agreement --

    a.  <u>Section 2.2.12</u>, Customer Data Confidentiality,

    b.  <u>Section 4.4</u>, Records and Audit,

    c.  <u>Section 4.7</u>, Remittance Procedures,

    d.  <u>Section 6</u>, General Provisions,

    e.  <u>Attachment C</u>, Mutual Non-Disclosure Agreement.

## 5.8.   Notices

1. All notices, consents, requests and other communications relating to this Agreement shall be in writing and shall be sent by hand delivery, by certified or registered mail (return-receipt requested), by e-mail or by recognized national overnight courier service as set forth below:

    a. If to Company:

|            |                                    |
|------------|------------------------------------|
| Attention: | Mr. Charles M. Brown               |
| Entity:    | Wireless Networks, Inc.            |
| Address:   | P.O. Box 620752                    |
|            | Woodside, California  94062  USA   |
| Fax:       | 650-851-7914                       |
| E-mail:    | brown@wireless-networks.com        |

    b. If to Licensee:

|            |                                    |
|------------|------------------------------------|
| Attention: | Mr. Jorge Antonio Silveira Vieira  |
| Entity:    | Wireless Networks do Brasil, Ldta. |
| Address:   | 5th Floor, Room 51                 |
|            | Alameda Araguaia n.º 933           |
|            | Barueri, São Paulo, BRAZIL         |

ComNect Strategic Alliance

Contract No. WNI-_____

Fax:        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-4544
E-mail:

2. Notices delivered pursuant to this <u>Section 5.8</u> shall be deemed given: (a) at the time delivered, if personally delivered; (b) at the time received, if by e-mail or registered or certified mail; or (c) two (2) business days after timely delivery to the courier, if by overnight courier service.

3. Either Party may change its notice address and contact person information from time to time by written notice to the other.

# 6.    General Provisions

1. Other Party's Acts.  Neither Party shall be liable for any losses, injuries, or damages caused by or attributable to the acts and/or omissions of the other Party, its employees, or its agents.

2. Further Documents.  Each Party will promptly execute and deliver any further documents, including witnessing, notarization, and/or legalization, which are necessary or desirable to carry out the purposes or intent of this Agreement.

3. Publicity.  The substance and timing of any written or other public disclosure relating to this Agreement, including any press release or similar disclosure, shall be subject to the prior written approval of both parties.

4. Conflicting Exhibits.  In the event that any provision of the Schedules or Attachments to this Agreement are deemed to be in conflict with the provisions of this Agreement, the provisions of this Agreement shall control.

5. Force Majeure. Neither Party shall be liable for a delay in the performance of its obligations and responsibilities under this Agreement due to causes beyond its control, including, but not limited to, failures or delays in transportation or communication, failures or substitutions of equipment, labor disputes, accidents, shortages of labor, fuel, raw materials or equipment or technical failures, acts of God, catastrophes and war, provided that the delayed party has taken reasonable measures to notify the other, in writing, of the delay. The time for completion of any obligation to which this provision applies shall be extended for a period equivalent to the delay.

6. Amendment. This Agreement shall not be deemed or construed to be modified, amended, or waived, in whole or in part, except by a written agreement executed by the authorized representatives of both Parties.

7. Waiver. No term or provision of this Agreement shall be deemed waived and no breach excused unless such waiver or consent shall be in writing and signed by the Party claimed

DRAFT 9

ComNect Strategic Alliance                                    Contract No. WNI-_____

to have waived or consented. Any consent to or waiver of a breach by either Party shall not constitute a consent to or waiver or excuse of any other different or subsequent breach.

8. Severability. In the event that any provision of this Agreement is held by a court of competent jurisdiction to be unenforceable, invalid or in conflict with any law of any relevant jurisdiction, then that provision shall be enforced to the maximum extent permissible so as to effect the intent of the Parties. The validity of the remaining provisions of this Agreement shall not be affected, and the rights and obligations of the Parties shall be construed and enforced as if the Agreement did not contain the particular provision(s) held to be unenforceable.

9. Assignment. Licensee's rights to assign or sub-license are governed by <u>Section 3.9</u> above.  Company may assign its right to receive payments under this Agreement to a bank or finance company.  Company may assign this Agreement and its rights and duties hereunder to a successor in interest to its entire business operations relating to the Solution, upon notification to Licensee.

10. Relationship of the Parties. In the performance of its services hereunder, Parties will at all times be independent contractors, and this Agreement shall not constitute, nor be deemed to constitute, either Party as an employee, agent, partner or joint venture of the other Party.

11. Governing Law and Venue. The validity, construction, and interpretation of this Agreement and the rights and duties of the Parties shall be governed by and construed in accordance with the laws of the State of California, United States of America, excluding its conflicts of laws provisions. The Parties expressly agree that any action arising out of or relating to this Agreement shall only be brought in a federal or state court in the County of Santa Clara, California, and the Parties hereby submit themselves to the exclusive jurisdiction and venue of such courts.

12. Authority. Each Party represents that it has full power and authority to enter into and perform this Agreement, has the right to disclose all information and materials made available to the other, and the person signing this Agreement, on behalf of each, has been properly authorized and empowered to execute this Agreement.

13. Entire Agreement. This Agreement constitutes the entire agreement between Company and Licensee with respect to the subject matter of this Agreement and supersedes all prior agreements and understandings, whether oral or written, between the parties with respect to the subject matter of this Agreement. If Licensee issues a purchase order or other document containing any additional terms, these will be considered as stricken, even if acknowledged by Company, and will have no effect on this Agreement.

14. This Agreement shall be governed by United States and California law and binds the parties and their successors, being executed in an irrevocable nature.

DRAFT 9

ComNect Strategic Alliance                                Contract No. WNI-_____

15. Dispute Resolution. All disputes arising out of or in connection with the present Agreement shall be finally settled under the Commercial Arbitration rules of the American Arbitration Association. The arbitration shall take place in Santa Clara County, California. The language adopted for the arbitration shall be English.

16. Attorney Fees. If either Party employs attorneys to enforce any rights arising out of or relating to this Agreement, the prevailing Party in such disputes shall be entitled, in addition to its other rights hereunder, to recover reasonable fees of attorneys, accountants and other professionals, including costs and fees on appeal.

17. No Drafting Party. In negotiating this Agreement both Parties have been represented by legal counsel and it is mutually agreed that there will be no presumption against either Party on the grounds that such Party drafted the provision in question.

18. Language. This Agreement is executed in English and in Portuguese. In case of any discrepancy, the English version shall prevail.

19. Counterparts. This Agreement may be executed in counterparts and by facsimile such that when taken together the counterparts shall be deemed a true original of the Agreement between the parties.


IN WITNESS WHEREOF, the Parties hereby executed this Agreement by and through their respective and duly authorized representatives.

São Paulo, September ___, 2004

WIRELESS NETWORKS, INC.            WIRELESS NETWORKS DO BRASIL, LTDA.




_____          _____
Mr. Charles Michael Brown          Mr. Jorge Antonio Silveira Vieira
President and CEO                  General Manager




*Witnesses –*

ComNect Strategic Alliance

Contract No. WNI-_____

1. _____     2. _____

Name:                               Name:

DRAFT 9

ComNect Strategic Alliance

# 7. Schedules

## 7.1. Schedule 1: Licensed Trademarks & Trade Names

A. Trademarks

| Country | Mark | Reg. No. | Class |
|---------|---------|-----------|-------|
| Brazil | COMNECT | 825158869 | 35 |
| Brazil | COMNECT | 825158850 | 42 |

B. Trade Names

Falcon
Falcon/S
Wireless Networks

## 7.2. Schedule 2: Licensed Patents

| Patent No. | Title | Date of Patent |
|------------|-------|----------------|
| US 5,706,274 | CSMA with Dynamic Persistence | Jan 6, 1998 |
| US 5,722,066 | PSTN Transaction Processing Network Employing Wireless Transceivers | Feb 24, 1998 |
| US 5,852,773 | PSTN Transaction Processing Network Employing Wireless Concentrator / Controller | Dec 22, 1998 |
| US 6,192,053 | Enhanced Adjacency Detection Protocol for Wireless Applications | Feb 20, 2001 |

DRAFT 9

ComNect Strategic Alliance                                    Contract No. WNI-_____

### 7.3. Schedule 3: Licensed Software Modules

## Wireless Transaction Processor (WTP) - Transaction Gateway

| Name | Version |
|---|---|
| WTP ISO8583 BCD | 4.01 |
| WTP ISO8583 Visa 30 | 4.10 |
| WTP ISO8583 Redecardpdv | 4.02 |
| WTP ISO8583 Visapdv | 4.00 |
| WTP ISO8583 ASCII Tecban | 4.01 |
| MultiPOS Port Multiplexer | 1.00 |
| OracleLogger | 1.00 |
| Wireless POS Protocol | 1.50 |

## Wireless Management System (WMS) - Transaction Monitor

| Name | Version |
|---|---|
| Transaction Subsystem | 2.10 |
| Network Subsystem | 2.10 |
| Wireless Management System eXtension (WMX) | 1.00 |

## Wireless Data Collector (WDC) - Transaction Data Collectors

| Name | Version |
|---|---|
| Router Status Collector | 2.02 |
| Uninterruptible Power Supply (UPS) Status Collector | 1.00 |
| OracleToBilling Synchronization | 1.00 |
| Falcon Monitor | 1.00 |

## Wireless Data Entry (WDE) - Infrastructure Data Entry

| Name | Version |
|---|---|
| Web Module | 1.20 |
| Tomcat Application Server (Linux OS) | 4.0.18 |

## Network Operations Center (NOC) Management

| Name | Version |
|---|---|
| Internet Protocol (IP) Packet Monitor | 1.00 |

DRAFT 9

ComNect Strategic Alliance

Contract No. WNI-_____

| | |
|---|---|
| Falcon Downloader | 1.00 |
| Database Automatic Data Integrity Test Program | 1.00 |
| Database Automatic Updater | 1.00 |
| Web Authentication Proxy | 1.00 |
| Network Operating Center (NOC) Explorer | 1.00 |

## Security Gateway

| Name | Version |
|---|---|
| Custom OpenBSD | 3.4 + WNI Patches |
| Custom GRand Unified Bootloader (GRUB) | 0.94 + WNI Patches |
| Custom Internet Key Exchange (IKE) Daemon | 3.4 + WNI Patches |
| AutoConfiguration Tools | 1.00 |
| Monitoring Tools | 1.00 |
| Falcon-S Tunnel Concentrator | 1.00 |

## Falcon

| Name | Version |
|---|---|
| Falcon Configurator | 1.00 |
| Falcon Firmware Updater | 1.00 |
| Falcon Operating System (OS) | 1.00 |

## Falcon-S

| Name | Version |
|---|---|
| Custom OpenBSD 3.4 + Falcon-S/Patches | 0.80 |

DRAFT 9

ComNect Strategic Alliance

Contract No. WNI-_____

## 7.4.    Schedule 4: Licensed Documentation

Company documentation is located on the server enigma.wireless-networks.com, which requires a password for access. Documentation volumes currently include --

A. <u>Software Modules</u>

  WMS - Wireless Management System
  WDE - Wireless Data Entry
  WTP - Wireless Transaction Processor
  WDC - Wireless Data Collector
  WSG - Wireless Security Gateway
  Web Proxy

B. <u>Databases</u>

  NOCDB
  WNIDB – Principal Operational Database
  BillDB

C. <u>Network Operations Center (NOC)</u>

  NOC Management
  NOC Security
  NOC Configuration

D. <u>Wireless Network Hardware</u>

  Falcon-S
  Falcon

Documentation will be updated to reflect new versions of the software and hardware, and Licensee will receive access to such updated versions, along with delivery of the new or revised software or hardware modules, provided it continues to pay support and maintenance fees in a timely manner.

## 7.5.    Schedule 5: NOC Hardware Requirements

A. Licensee will acquire, at a minimum, the following computer hardware for each of the main and backup NOC:

DRAFT 9

ComNect Strategic Alliance

Contract No. WNI-_____

1. MAIN (WTP) SERVER: Sun Fire 280R, Medium configuration + 4x Gigabit Ethernet adapter (2 UltraSparc-III 1.2 GHz processors, 2 GB RAM, 2x 73GB FCAL Disks, redundant power supply)

2. DATABASE SERVER: Sun Fire V65x, Medium configuration + 3 UltraSCSI HD (2x 3GHz Xeons, 2GB RAM, 4x73GB HD total, redundant power supply)

3. 3 x SECURITY GATEWAYS: Sun Fire V20z, Small configuration (AMD64 Opteron, 1GB RAM, no disk needed)

4. Good quality switches, and at least 10 Intel EtherExpress Network Cards
5. One good quality UPS
6. One good quality 19" Rack

7. At least 4-5 Cisco routers, depending on the network connections to the Internet, the telcos, and authorizers (banks), and the firewall configurations, etc.

8. POS Terminal homologation (certification) and test lab setup.

B. To make best use of the hardware, preferably half of the transactions will be directed (via load balancing) through one NOC and the other half through the other. If one NOC fails all traffic is then load balanced through the other. All aspects of support and maintenance are simplified when both NOCs have identical hardware configurations. This arrangement provides assurance that the failure of the main NOC will not lead to customer downtime, loss of service quality, and potential damage to reputation.

## 7.6.    Schedule 6: Falcon Hardware Pricing Plan

1. The prices for Falcon hardware devices are given in the table below.

| Hardware Product | List Price | Licensee Price |
|---|---|---|
| Falcon/S * | US$ 325.00 | US$ 225.00 |
| Falcon Assembly | US$ 785.00 | US$ 550.00 |
| Falcon Antenna | US$   4.50 | US$    3.15 |
| Falcon Power Supply | US$  19.00 | US$ 13.30 |

(* Includes Board, CF memory 64MB, LP USB Adapter.)

2. All prices are "FOB Company" (Woodside, California USA).

3. Licensee Prices represent a thirty percent (30%) discount off the List Price. Company may add additional hardware products or models, and may change the List and Licensee Prices from time to time, but such List Prices will not be more than two hundred fifty percent (250%) of Company's factory invoice price (i.e., 60% margin).

DRAFT 9

ComNect Strategic Alliance

Contract No. WNI-_____

4. The Licensee price is conditioned on Licensee maintaining exclusivity in the Territory. If Licensee loses exclusivity in accord with <u>Section 3.8</u>, it may still obtain hardware, but must thereafter pay the full list price.

## 7.7.   *Schedule 7: Licensee Staffing Requirements*

Licensee must hire and train at least the following qualified professional staff --

### A. <u>Managerial Personnel</u>

General Manager, with local banking or payments industry knowledge required
Marketing and business development executive to develop and manage relationships with Banks, Acquirers, Processors, etc
Bookkeeper for financial records, monthly reports, budget monitoring
Admin assistant

### B. <u>Technical Personnel</u>

1 RF engineer (to evaluate radio capabilities in field installations)
1 software engineer
2 network engineers
2 customer support engineers
2 field technicians – supervisory level
1 test lab POS homologation (certification) engineer

### C. <u>Professional Service Providers</u>

Legal Counsel
Accountants
Regulatory Consultant, with experience in the Territory

## 7.8.   *Schedule 8: Licensee Territory Rollout Plan*

In consideration of receiving an exclusive license to deploy and deliver Company's ComNect Solution in the Territory, Licensee agrees to meet the following performance milestones, as further discussed above in <u>Section 3.8</u>.

A. Primary NOC Operational by three (3) months.
B. Backup NOC Operational by five (5) months.
C. Training and Certification of Engineering / Sales Staff by six (6) months.

D. <u>Market Size Estimates</u>

DRAFT 9

ComNect Strategic Alliance                                    Contract No. WNI-_____

As of the effective date of this Agreement, the Parties stipulate the following figures.

Estimated number of Shopping Centers in the Territory ___550___
Estimated number of POS Terminals in the Territory ___1 million___

It is understood that all figures and estimates stated in this plan are conservative, that the true market potential may be larger, and that the market potential will very likely become even larger over time due to economic growth of these markets during the plan period.

E. Phased Sales Penetration and Deployment Plan

| Period | Shopping Centers | Percent of SC Mkt | Merchants | POS Terminals | Percent of POS Mkt |
|--------|------------------|-------------------|-----------|---------------|---------------------|
| 2005 Q1 | | | | | |
| 2005 Q2 | | | | | |
| 2005 Q3 | | | | | |
| 2005 Q4 | | | | | |
| | | | | | |
| 2006 Q1 | | | | | |
| 2006 Q2 | | | | | |
| 2006 Q3 | | | | | |
| 2006 Q4 | | | | | |
| | | | | | |
| 2007 Q1 | | | | | |
| 2007 Q2 | | | | | |
| 2007 Q3 | | | | | |
| 2007 Q4 | | | | | |

## 7.9.    Schedule 9: Company Marketing Support Commitments

1. To Support Licensee's marketing and development efforts in the Territory, Company will provide the following marketing support.

| Company Action | Before NOC Operational | First Year | Second Year |
|----------------|------------------------|------------|-------------|
| Meetings with local Acquirers, CAPs, and Processors | 10 | 5 | 5 |
| Meetings with shopping center owners | 3 | 2 | 1 |
| Attend industry trade shows in or near Territory | 1 | 1 | 1 |

2. Such support will be billed to Licensee at Company's standard professional services rates as defined in Section 4.5.

ComNect Strategic Alliance

## 8.  Attachments

### 8.1.  Attachment A: ComNect™ Solution Description

[ComNect brochure follows this page]

ComNect Strategic Alliance

Contract No. WNI-_____

## 8.2. Attachment B: Licensee Service Level Agreement

This Attachment is an integral part of the Agreement, and establishes the levels of service quality to be observed by Licensee during its operation of the ComNect Service.

### 1. POS Terminal Availability

The average availability of each POS terminal in the ComNect network shall be 99.5%, measured in periods of 90 (ninety) days using the following formula:

Availability (%) = 100 × available minutes for the period / total minutes for the period.

### 2. Turnaround for Service Response and Repair

In order for the availability objective to be met, WNB shall comply with the turnaround times stipulated below for each case.

### 2.1 Radio Equipment

The service response for equipment replacement must be provided within 180 (one hundred eighty) minutes following the placement of the service call and the solution must be provided within 30 (thirty) minutes following the service response.

Company and Licensee shall establish the number of hardware equipment units required for each point of access so that they can be replaced immediately.

Once this set of spare units has been established for each point of access, Licensee shall replace defective hardware equipment within three (3) days of receiving them at its repair department.

### 2.2 Points of Access (Concentration in Each Shopping Center or Mall)

The service response provided by Licensee must be performed within one hundred twenty (120) minutes following the placement of the service call, and the solution must be provided within sixty (60) minutes following the service response.

### 2.3 Network Operations Center

The service response provided by Licensee must be performed within five (5) minutes following the placement of the service call, and the solution must be provided within thirty (30) minutes following the service response.

### 3. Response Time

ComNect Strategic Alliance

Contract No. WNI-_____

In the case of the traditional model of dial-up connection there are three elements which contribute to the total response time: access time, long-distance network time, and authorizer (host) time.

The access and WAN times are combined in the case of radio access, and together form the response time in the ComNect network. This time corresponds to the routing of the message from the POS to the Acquirer host port, and to the routing of the response from the Acquirer host to the POS, without regard to the response time of the host.

The response time on the ComNect network will be a maximum of five (5) seconds in the case of ground networks, and a maximum of seven (7) seconds in the case of satellite networks.

4. Backup (Equipment Configurations)

The architecture of the ComNect network provides backup at the following points:

4.1 Access Points (Concentration in Each Shopping Center or Mall)

- The equipment is powered by a remotely-monitored uninterruptible power supply ("UPS") with sixty (60) minute autonomy.
- The dedicated links to the network operations center (NOC) have dial-up backup.

4.2 Network Operations Center

- The equipment is powered by a UPS system with thirty (30) minute autonomy and a diesel generator with unlimited autonomy.
- The computer and network equipment has spares configured for immediate entry into operation.

4.2.1 The communication links to each Acquirer shall be duplicated using alternate means of access, within ninety (90) days.

4.2.2 A backup network operations center (NOC), comprising the required servers, access to the ComNect network, and access to the Acquirer network(s), shall be implemented and functional within one hundred fifty (150) days.

DRAFT 9

eComNect Strategic Alliance                                    Contract No. WNI-_____

### 8.3.   Attachment C: Confidentiality and Nondisclosure Agreement

The following Confidentiality and Nondisclosure Agreement is entered into by and between Company and Licensee.

1. This Agreement shall apply to all confidential and proprietary information disclosed by the Parties to the other, including but not limited to confidential product planning information, product specifications and other proprietary and business and technical information (hereinafter referred to as "Confidential Information"). As used herein, "Confidential Information" shall be in written, graphic, machine recognizable or other tangible or electronic form and marked "Confidential" or "Proprietary" or shown by implication that it is imparted or disclosed in confidence, or if disclosed orally or visually, shall be reduced to writing in summary form, identified as "Confidential Information" and sent to the Receiving Party within 15 days following such oral or visual disclosure.

2. Company and Licensee mutually agree to hold the other Party's Confidential Information in strict confidence and not to disclose such Confidential Information to any third parties except after receiving prior consent by the disclosing Party in writing. Company and Licensee shall use the same degree of care to avoid disclosure of such Confidential Information as each employs with respect to its own proprietary information of like importance or a greater degree if reasonable.

3. Company and Licensee agree that they will not use the other Party's Confidential Information for any purpose other than for the intended purposes, without the prior written permission of the other Party.

4. Company and Licensee mutually agree they may disclose such Confidential Information to their respective responsible employees with a bona fide need to know, and Company and Licensee agree to instruct all such employees not to disclose such Confidential Information to third parties and will ensure that such employees have agreed to similar non-disclosure provisions with Company or the Licensee, its own employees respectively.

5. Information shall not be deemed Confidential Information and the receiving Party shall have no obligation regarding any information for which it can be proven in written documentation (a) is already known to the receiving Party at the time that it is disclosed without use of the Confidential Information; (b) is or becomes publicly known through no wrongful act contrary to this Agreement of the receiving Party; (c) is rightfully received from a third party without obligation of confidence or restriction on disclosure from receiving Party and without breach of this Agreement; (d) is independently developed by the receiving Party without use of Confidential Information; (f) is disclosed pursuant to a requirement of a valid court order, provided that the Receiving Party provides (i) prior written notice from the disclosing Party of such obligation, (ii) the opportunity to oppose such disclosure, and (iii) it is disclosed for the extent and purposes or the order only.

DRAFT 9

ComNect Strategic Alliance

Contract No. WNI-_____

6. Except as otherwise provided, all Confidential Information shall remain the property of the disclosing Party, and upon the written request of either Party, the other Party shall promptly return to the disclosing Party all Confidential Information disclosed to it and all copies thereof or at the disclosing Party's option shall destroy all such Confidential Information and shall provide the receiving Party with a certificate that all Confidential Information has been destroyed.

7. Except as otherwise provided, Company and Licensee recognize and agree that nothing contained in this Agreement shall be construed as granting any rights, by license or otherwise to any Confidential Information disclosed pursuant to this Agreement.

8. This agreement shall be binding upon and inure to the benefit of the Party's successors and assigns. This Agreement may not be assigned by either Party without the written consent of the other Party, and any purported assignment not permitted hereunder shall be void. This document constitutes the entire agreement between the Parties with respect to the subject matter hereof, and supersedes all previous, understandings and agreements, either oral or written, between the Parties or any official or representative.

9. The obligations undertaken by each Party pursuant to this Agreement shall remain in effect for ten (10) years from the last date of disclosure of Confidential Information, and shall survive any termination or expiration hereof, except that source code released under the escrow agreement will remain confidential for thirty (30) years.

10. None of the Confidential Information disclosed by the Parties constitutes any representation, warranty, assurance, guarantee or inducement by either Party to the other with respect to the infringement of trademarks, patents, copyrights; any right of privacy; or any rights of third persons.

11. The Parties hereto are independent contractors.

12. This Agreement may be modified only by written amendment signed by both Parties. This Agreement shall be construed in accordance with the laws of the State of California without regard to the conflict of laws provisions and shall be subject to the jurisdiction of the courts of the State of California.

13. The receiving Party may make copies of Confidential Information only to the extent necessary for the purpose of this Agreement provided that the copies are marked "Confidential" and treated as Confidential Information in accordance with the terms of this Agreement.

14. The Parties reaffirm the obligation of strict confidentiality, security, and non-use of customer financial transaction data (see Section 2.2.12 of the main Agreement).

DRAFT 9

ComNect Strategic Alliance

Contract No. WNI-_____

## 8.4.   Attachment D: Support & Maintenance Agreement


[Support & Maintenance Agreement follows this page.]

DRAFT 9

ComNect Strategic Alliance

Contract No. WNI-_____

8.5. Attachment E: Development Agreement Template

## Statement of Work

**Client:**   WNB
**Vendor:**   WNI

**Date:**

1. Project Name: _____

2. Project Description:

3. Functional Specification: See Attachment ___

4. Task List:

| Task | Description | Cost (US$) | Due Date |
|------|-------------|-----------|----------|
| 1 | | | |
| 2 | | | |
| 3 | | | |

5. Deliverables:

6. Skills Required:

7. Acceptance Criteria:

8. Payment Terms:

9. Signatures:

DRAFT 9