1  JEFFREY F. RYAN, ESQ. SBN 129079
   RYAN & STEINER
2  An Association of Attorneys
   455 North Whisman Road, Suite 200
3  Mountain View, CA 94043-5721
4  Telephone:    (650) 691-1430
   Facsimile:    (650) 968-2685
5
   Attorneys for Plaintiff,
6  CHARLES M. BROWN

7                   UNITED STATES DISTRICT COURT

8                  NORTHERN DISTRICT OF CALIFORNIA

9                        SAN FRANCISCO DIVISION

10

11 | CHARLES M. BROWN,                              | Case No. 3:07-cv-04301 EDL
12 |                  Plaintiff,                    | **DECLARATION OF MICHAEL SIRI IN SUPPORT OF APPLICATION FOR TEMPORARY RESTRAINING ORDER, ORDER TO SHOW CAUSE AND PRELIMINARY INJUNCTION**
13 |         vs.                                    |
14 | WIRELESS NETWORKS, INC., a Delaware            |
15 | corporation, and DOES 1 THROUGH 50,            |
   |                                                | Dept.:  Courtroom E, 15th Floor
16 |                  Defendants.                   | Judge:  Magistrate Elizabeth D. Laporte

17

18 I, MICHAEL SIRI, declare as follows:

1. I am over the age of 18 and a resident of California. I have personal knowledge of the facts set forth herein, and if called to testify as a witness, would testify thereto.

2. I am currently a shareholder/investor in Wireless Networks, Inc. ("WNI") as an individual, in connection with one of our family entities, SCP-1, LC, as it's managing partner, and as the representative for Mary Ann Siri and Linda Siri, my sisters, who are also investors. Please note that the total amount of our investment in WNI is in excess of $500,000.00. (Note, SCP-1 was formally a California General Partnership. In 2006 it was changed and is now a Limited Partnership with Siri Family LC as its general partner and Michael Siri as it representative.)

3. My background is in engineering and I have received a BS and Masters of Engineering degree from University of California Davis. For the past 30 years the majority of my time has been spent on real estate development/investment and property management. Having been mentored by some of the largest developers in Silicon Valley, I have negotiated leases and property deals with large multinational companies and many start-up companies over this period of time. In addition I have served as a member of the board of directors on various companies and have been involved on those boards with companies from start up to acquisition, and of course some successful, some not. I am currently involved with two start-ups (not including WNI) in an investment and advisory capacity.

4. Our first investment in WNI started in January 2000, after a considerable amount of diligence and discussions with Charles Brown ("CB") its founder and CEO. At the point of our initial investment the business model for WNI had already been implemented in Brazil and it was simply a matter of time and prudent growth before the subsidiary company there Wireless Networks, Brazil ("WNB") would be profitable. I was very impressed with what CB had put together in such a short time with a small close-knit group of engineers in San Mateo, California, and his ability and expertise to carry this concept to Brazil and implement the business model. I had great hopes for the success for this model and in fact it was clear that the WNB model was very close to profit. WNI had procured the blessing of the largest banks in Brazil which in fact and in an unprecedented act of trust the bank allowed WNI to handle all of its credit card data processing.

5. Over the course of time CB had parlayed the model which was functional in Brazil to several countries expressing interest in the Far East. Clearly this company had promise; however, it needed more capital. CB and the other investors agreed that due to the performance of the Brazil model it would be better to look for private money rather than expose a major portion of the company to hard core venture capital investors. CB's extensive contacts in Brazil where he spent a considerable amount of time setting up WNB led him to Ruy de Souza who he viewed as an asset intimate with knowledge of the local Brazilian customs and business mentality. In or about 2002, Mr. de Souza verbally agreed to invest in the company and in fact I met with Mr. de Souza and CB at a local restaurant on his first trip to the U.S. to discuss this investment with and CB. At that meeting which took place at Buck's Restaurant in Woodside, California, Mr. de Souza expressed the same sentiment which I had in the business model in Brazil which was nearly profitable and the great potential to spin this model off in other markets throughout the world. At that time I thought he would indeed be an asset to the company.

6. Hindsight being 20-20, we should have realized that Mr. de Souza was not being totally forthright, as CB had a great deal of difficulty procuring the written documents which Mr. de Souza verbally agreed on, and in fact CB never received the signed license agreement which was essential for WNI to keep the core engineers on staff. Mr. de Souza rather made some payments in the amount of license payments however, never signed the proper documents and in fact finally refused to.

7. As the major stockholder in WNI and WNB Mr. de Souza acted in a manner I have not seen before in any of my dealings in Silicon Valley. Several of us shareholders would occasionally set up meetings to get updates from CB as to the status of the company and update us on execution of materials and strategy previously agree on. We were met with terrible reports of the uncooperative nature of Mr. de Souza, not wanting to hold shareholder meetings, not supplying financial data on the performance of WNB which he put himself in charge of. In fact Mr. de Souza continually decreased payments to WNI which caused CB to terminate the core of engineers responsible for the generation and upkeep of the programs which made WNB a successful model. In effect Mr. de Souza was systematically starving out WNI.

8. It was not until about Feb. or March 2007 that CB finally received rudimentary financial data from WNB just before Mr. de Souza requested a shareholder meeting in Los Angeles on or about July 07. Unfortunately due to medical problems, I was unable to attend that meeting; however, I understand that Mr. de Souza was not present either. Basically that meeting restructured the Board of Directors to exclude CB and include several of Mr. de Souza's associates from Brazil. It became evident to several of us shareholders that Mr. de Souza was positioning the company to move all assets to Brazil totally ignoring and disregarding his fiduciary responsibilities to the remaining shareholders of the company and disregarding proper corporate policy and regulations with regards to financial reporting. In point, financials provided by Mr. de Souza prior to the July 07 shareholders meeting indicated gross revenues of about 3 million with roundly 75% profit. Unfortunately included in the financials were, on one line item roughly $800,000.00 in professional fees in addition to salaries, expenses, legal and otherwise, and no explanation for these fees were provided when we requested them through CB. In effect Mr. de Souza has excluded CB to the point of stripping him of any influence and/or affording zero information for CB to disseminate to us shareholders. Mr. de Souza is and has been having his way with the company with total disregard to the shareholders who built the intellectual foundation of the company with their roughly 6 million dollar investment in a business model which has now only touched the surface of the depths of profitability which it can achieve.

9. I am now convinced that Mr. de Souza plans to defraud the rest of us shareholders by systematically stripping the founding company WNI of its engineering team and founding management (and their morale) by withholding licensing payments due to WNI and previously agreed to by Mr. de Souza, which in effect stymied the American part of the Company from any growth whatsoever, by ignoring fundamentally potentially beneficial financial partnering opportunities, by retarding growth of WNB so as to reduce its profitability, by refusing to have regular meetings of the shareholders, by refusing to report financials of the company to WNI and the rest of the shareholders and by using the distance between the United States home of WNI and Brazil to insulate himself from the scrutiny shareholders would normally be afforded here in the U.S.

10. It is clear to me that Mr. de Souza actions have prohibited the company from achieving it's full potential and has defrauded me of my investment of over half a million U.S. dollars. Mr. de Souza should absolutely be stopped from moving the corpus intellectual property (Source Code) from the United States until a full judicial hearing can be afforded the shareholders of WNI, including any potential future legal action. No assets should be allowed to be transferred by Mr. de Souza.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed September _10_, 2007, at Palo Alto, California.

_____
MICHAEL SIRI