1    JEFFREY F. RYAN, ESQ. SBN 129079
     RYAN & STEINER
2    An Association of Attorneys
     455 North Whisman Road, Suite 200
3    Mountain View, CA 94043-5721
     Telephone:    (650) 691-1430
4    Facsimile:    (650) 968-2685

5    Attorneys for Plaintiff,
     CHARLES M. BROWN
6

7

8              UNITED STATES DISTRICT COURT

9              NORTHERN DISTRICT OF CALIFORNIA

10             SAN FRANCISCO DIVISION

11

12   CHARLES M. BROWN,              Case No.: C07-4301 EDL

13             Plaintiff,           **THIRD AMENDED COMPLAINT**

14        vs.                       **[JURY TRIAL DEMANDED]**

15   WIRELESS NETWORKS, INC., a Delaware
     corporation, and DOES 1 THROUGH 50,
16

17             Defendants.

18

19        Plaintiff Charles M. Brown, alleges:

20                      PARTIES

21        1.    Plaintiff Charles M. Brown ("Brown" or "Plaintiff") is, and at all times relevant

22   herein was, a citizen and resident of the State of California.

23        2.    Defendant Wireless Networks, Inc. ("Defendant" or "WNI") is a Delaware

24   corporation.  Plaintiff is informed and believes and thereon alleges that WNI's principal place of

25   business is in Brazil.

26

27

28

---

                              1
                **THIRD AMENDED COMPLAINT**
BROWN v. WIRELESS NETWORKS, INC.                    CASE NO. C07-4301 EDL

JURISDICTION AND VENUE

3.    This action was originally commenced in the Superior Court of California, County of San Mateo, and was removed to this Court by WNI under 28 U.S.C. § 1441. Subject matter jurisdiction in this matter is premised upon defendant's allegations of diversity of citizenship between WNI and Brown under 28 U.S.C. § 1332. Venue is based upon 28 U.S.C. § 1391(a)(2) and (3) in that a substantial part of the events or omissions giving rise to the claim occurred within this judicial district, and having appeared in the state court, WNI defendant was subject to personal jurisdiction within the district at the time the action was commenced. Assignment to this Division is pursuant to L.R. 3-2.

GENERAL ALLEGATIONS

4.    At all times relevant herein prior to July 13, 2007, Brown was an employee of WNI.

5.    Plaintiff is informed and believes and thereon alleges that Defendant WNI is, and beginning in 2004 has all times herein mentioned was, the alter ego of Ruy Rothschild de Souza ("de Souza"), a citizen and resident of Brazil, and of de Souza's other controlled entities Wireless Networks do Brazil ("WNB"), a Brazilian subsidiary of WNI, and MRG International, Inc. ("MRG"), and there exists, and at all times herein mentioned has existed, a unity of interest and ownership between defendant WNI and WNB, MRG and de Souza, such that any separateness has ceased to exist, in that de Souza completely controlled, dominated, managed, and operated the corporate entities and intermingled the assets of each to suit the convenience of de Souza by transferring and allowing royalty free use of the fixed assets of defendant WNI by WNB in violation of written agreements between WNI and WNB, and by withholding payments due WNI from WNB without justification thereby increasing WNI's debt to MRG in order to allow de Souza to increase his ownership of WNI through option agreements with MRG allowing conversion of debt into stock, in order to evade payment of the obligations owed to creditors of WNI.

## FIRST CLAIM FOR RELIEF - ACCOUNT STATED

6.     On or about December 31, 2004, at Palo Alto, California, an account was stated in writing by and between plaintiff and defendant and on such statement a balance of $17,000 in unpaid wages was found due to plaintiff from defendant. Defendant agreed to pay to plaintiff said balance at its board meeting on or about April 19, 2005. [A copy of the December 31, 2004 account is attached hereto as Exhibit "A" and made a part hereof.  A copy of the board minutes of April 19, 2005 is attached hereto as Exhibit "B" and made a part hereof.]

7.     Although demanded by plaintiff from defendant, neither all nor any part of the agreed balance has been paid.

8.     There is now due, owing, and unpaid from defendant to plaintiff the sum of $17,000, together with pre-judgment interest thereon at the legal rate of interest from and after December 31, 2004, which defendant has failed and refused to pay despite demand therefor.

## SECOND CLAIM FOR RELIEF – BREACH OF WRITTEN CONTRACT

9.     On or about June 30, 2001, defendant became indebted to plaintiff in the principal amount of $71, 892.29, pursuant to a promissory note bearing interest at the rate of nine percent (9%) per annum until fully paid.  A true and correct copy of this promissory note is attached hereto as Exhibit "C" and made a part hereof.  Exhibit C further provided that in the event of a failure of full and timely payment, the entire unpaid principal became immediately due and payable including all costs and expenses, including attorneys fees, incurred by plaintiff in collection on the note.

10.     Exhibit C was approved and ratified and defendant's payment obligations renewed at defendant's board meeting on or about April 19, 2005.  [Exhibit "B"].

11.     WNI has, despite demand therefor, failed and refused to make full payment on Exhibit C, such that the principal amount of $25,100.91 remains due and owing, plus  interest at 9% from its inception, plus attorneys fees.

1

### THIRD CLAIM FOR RELIEF – BREACH OF WRITTEN CONTRACT

2      12.     On or about January 30, 2003, defendant became indebted to plaintiff in the

3  principal amount of $2,000.00, pursuant to a promissory note bearing interest at the rate of nine

4  percent (9%) per annum until fully paid.  A true and correct copy of this promissory note is

5  attached hereto as Exhibit "D" and made a part hereof.  Exhibit D further provided that in the

6  event of a failure of full and timely payment, the entire unpaid principal became immediately due

7  and payable including all costs and expenses, including attorneys fees, incurred by plaintiff in

8  collection on the note.

9      13.     Exhibit D was approved and ratified and defendant's payment obligations

10  renewed at defendant's board meeting on or about April 19, 2005. [Exhibit "B"].

11      14.     WNI has, despite demand therefor, failed and refused to make full payment on

12  Exhibit D, such that the principal amount of $2,000.00 remains due and owing, plus  interest at

13  9% from its inception, plus attorneys fees.

14

### FOURTH CLAIM FOR RELIEF – UNPAID WAGES

15      15.     Within the past two years, plaintiff was employed by and rendered services for

16  and on behalf of defendant pursuant to an oral agreement for which defendant promised to pay

17  plaintiff $21,000.00 in wages together with pre-judgment interest thereon at the legal rate of

18  interest from and after April 15, 2007, which defendant has failed and refused to pay despite

19  demand therefor.

20

### FIFTH CLAIM FOR RELIEF – CALIFORNIA LABOR CODE 2802 FOR MONEY PAID AT DEFENDANT'S SPECIAL INSTANCE AND REQUEST

21

22      16.     Within the past two years, plaintiff expended monies, in an amount subject to

23  proof but not less than $10,092.09, for defendant's benefit and at defendant's special instance

24  and request for which plaintiff is entitled to be reimbursed under California Labor Code § 2802,

25  plus interest at the legal rate. By oral and written agreement, Defendant promised to pay plaintiff

26  $1,500 per month for an office facility, health and life insurance premiums, $969.15 per month

27  for an auto, including maintenance, insurance and associated expenses, and for any excess cash

28

1 | balances of Defendant after paying salaries and consultants to be used by plaintiff at his sole

2 | discretion.

3 | SIXTH CLAIM FOR RELIEF - DEFAMATION

4 | 17.    At all times herein mentioned, plaintiff was, and now is, an entrepreneur and

5 | businessman and resides in the City of Woodside, County of San Mateo, State of California.

6 | Plaintiff has resided in the City of Woodside for twenty-two [22] years and at all times has

7 | enjoyed a good reputation both generally and in his/her occupation.

8 | 18.    On or about September 7, 2007, defendant published a letter which is attached

9 | hereto as Exhibit E and made a part hereof.

10 | 19.    The following statements are false as they apply to the plaintiff:

11 |     a.    that plaintiff "did not cooperate, and frustrated attempts to implement

12 |        [WNI's] operation";

13 |     b.    that plaintiff was "using the Company's engineers and resources to

14 |        develop a new generation of systems to render the same services WNI

15 |        renders to the market through a new company, unrelated to WNI, to be

16 |        owned by him and some new investors";

17 |     c.    that plaintiff "has attempted to raise obstacles to thwart the success of the

18 |        Company . . . [including] delaying access to the Company's corporate

19 |        records and documents."

20 | 20.    This letter is libelous on its face.  It clearly exposes plaintiff to hatred, contempt,

21 | ridicule, and obloquy because it accuses plaintiff, an entrepreneur who develops start-up

22 | companies and technologies with the help of investors, of misusing and usurping corporate

23 | assets, and acting against the best interests of the company to the detriment of its investors.

24 | 21.    This letter was seen and read by persons who reside in and around the Silicon

25 | Valley in California.  Plaintiff has been required to send a response to the defamatory letter to all

26 | of the shareholders in an effort to mitigate his damages from the libelous statements.  A true and

27 | correct copy of Plaintiff's November 16, 2007, letter to the shareholders of Defendant is attached

28 | hereto as Exhibit F and it is made a part hereof.

1    22.    As a proximate result of the above-described publication, plaintiff has suffered

2    loss of his/her reputation, shame, mortification, and hurt feelings all to his/her general damage.

3    23.    The above-described publication was published by the defendant with malice,

4    oppression and in that WNI is seeking to prevent plaintiff, who WNI has failed and refused to

5    pay the amounts it owes him, from being able to move forward with other business opportunities

6    by ruining his reputation within the investor community, and thus plaintiff seeks an award of

7    punitive damages.

8    PRAYER

9    Wherefore plaintiff prays for relief as follows:

10    1.    On the <u>first claim for relief</u>:  For damages in an amount not less than $17,000,

11    plus interest, according to proof and Exhibit G.

12    2.    On the <u>second claim for relief:</u>  For damages in an amount not less than

13    $25,100.91, plus interest according to proof, and attorneys fees as provided by contract in an

14    amount according to proof and Exhibit H.

15    3.    On the <u>third claim for relief</u>:  For damages in an amount not less than $2,000.00,

16    plus interest according to proof, and attorneys fees as provided by contract in an amount

17    according to proof and Exhibit I.

18    4.    On the <u>fourth claim for relief</u>:  For unpaid wages in an amount not less than

19    $21,000.00, plus interest according to proof and Exhibit G, and attorneys fees pursuant to

20    California Labor Code § 218.5.

21    5.    On the <u>fifth claim for relief</u>:  For general damages according to proof, for special

22    damages according to proof, and for punitive damages;

23    6.    On <u>all claims for relief</u>:  For costs of suit incurred herein, and for such other and

24    further relief as the court may deem proper

25    Dated: November 16, 2007              **RYAN & STEINER**

26

27    By:    /s/ Jeffrey F. Ryan
          Jeffrey F. Ryan
          Attorneys for Plaintiff
28          CHARLES M. BROWN

# EXHIBIT A

Exhibit A

## Wireless Networks, Inc.
### Balance Sheet
### As of December 31, 2004

|  | Dec 31, 04 |
|---|---|
| **ASSETS** | |
| **Current Assets** | |
| **Checking/Savings** | |
| 1030 ¡ Citibank, F.S.B. | 3,926.67 |
| **Total Checking/Savings** | 3,926.67 |
| | |
| **Accounts Receivable** | |
| 1210 ¡ Accounts Receivable - WNB | 472,279.04 |
| **Total Accounts Receivable** | 472,279.04 |
| | |
| **Other Current Assets** | |
| 1120 ¡ Inventory | 687,989.65 |
| 1255 ¡ Acct Rec - Brazil Modems | 122,151.00 |
| 1260 ¡ Acct Rec - Brazil Computers | 36,101.00 |
| 1410 ¡ Notes Receivable - WNB | 923,925.88 |
| 1411 ¡ Accrued Interest Rec. - WNB | 150,084.72 |
| **Total Other Current Assets** | 1,920,252.25 |
| | |
| **Total Current Assets** | 2,396,457.96 |
| | |
| **Fixed Assets** | |
| 1500 ¡ Property & Equipment | 68,139.72 |
| 1600 ¡ Accumulated Depreciation | -61,915.00 |
| **Total Fixed Assets** | 6,224.72 |
| | |
| **Other Assets** | |
| 1900 ¡ Investments | 1,861,245.54 |
| 1930 ¡ Patents | 171,436.00 |
| 1940 ¡ Organization Cost | 0.00 |
| **Total Other Assets** | 2,032,681.54 |
| | |
| **TOTAL ASSETS** | **4,435,364.22** |

**Wireless Networks, Inc.**

**Balance Sheet**

**As of December 31, 2004**

**LIABILITIES & EQUITY**
  **Liabilities**
    **Current Liabilities**
      **Accounts Payable**

| | |
|---|---:|
| 2000 ¡ Accounts Payable | 229,218.86 |
| **Total Accounts Payable** | 229,218.86 |
| | |
| **Other Current Liabilities** | |
| 2210 ¡ Accrued Salaries Payable | 17,000.00 |
| 2230 ¡ Notes Payable | 553,486.44 |
| 2235 ¡ Accrued Interest Payable | 33,161.01 |
| 2800 ¡ Due to Shareholder | 36,203.58 |
| **Total Other Current Liabilities** | 639,851.03 |
| | |
| **Total Current Liabilities** | 869,069.89 |
| | |
| **Total Liabilities** | 869,069.89 |
| | |
| **Equity** | |
| 3000 ¡ Common Stock | 330,525.30 |
| 3200 ¡ Paid In Capital | 9,095,650.97 |
| 3900 ¡ Retained Earnings | -5,737,100.05 |
| **Net Income** | -122,781.89 |
| **Total Equity** | 3,566,294.33 |
| | |
| **TOTAL LIABILITIES & EQUITY** | **4,435,364.22** |

**Wireless Networks, Inc.**
**Profit & Loss**
**July through December 2004**

| | Jul - Dec 04 |
|---|---|
| **Ordinary Income/Expense** | |
| **Income** | |
| 4000 ¡ Revenue | 31,264.20 |
| 4050 ¡ Freight-In Reimbursed | 342.01 |
| 4051 ¡ Freight-Out Reimbursed | 491.70 |
| 4085 ¡ Support Fees | 2,500.00 |
| **Total Income** | 34,597.91 |
| | |
| **Cost of Goods Sold** | |
| 5000 ¡ Cost of Goods Sold | 32,807.20 |
| 5050 ¡ Freight-In Expense | 221.14 |
| 5051 ¡ Freight-Out Expense | 328.72 |
| **Total COGS** | 33,357.06 |
| | |
| **Gross Profit** | 1,240.85 |
| | |
| **Expense** | |
| 6000 ¡ Engineering and Development | 81,097.38 |
| 6010 ¡ Salaries-Gen & Admin | 36,000.00 |
| 6020 ¡ Consulting | 12,000.00 |
| 6120 ¡ Bank Service Charges | 336.86 |
| 6160 ¡ Dues and Subscriptions | 222.85 |
| 6180 ¡ Insurance | 718.76 |
| 6200 ¡ Interest Expense | 73,340.15 |
| 6210 ¡ Bus Development-Brazil | 1,136.77 |
| 6270 ¡ Professional Fees | 12,802.25 |
| 6280 ¡ Payroll Tax Expense | 5,346.50 |
| 6290 ¡ Rents | 810.00 |
| 6340 ¡ Communications | 2,412.33 |
| 6350 ¡ Business Development | 10,312.01 |
| 6550 ¡ Office Expense | 1,777.58 |
| 6570 ¡ Expense HW & SW | 157.86 |
| 6824 ¡ State - Tax | 1,387.50 |
| **Total Expense** | 239,858.80 |
| | |
| **Net Ordinary Income** | -238,617.95 |
| | |
| **Other Income/Expense** | |
| **Other Income** | |
| 7010 ¡ Interest Income | 115,417.06 |
| 7032 ¡ Debts Written Off (Contingent) | 419.00 |
| **Total Other Income** | 115,836.06 |
| | |
| **Net Other Income** | 115,836.06 |
| | |
| **Net Income** | **-122,781.89** |

**Wireless Networks, Inc.**
**Statement of Cash Flows**
**July through December 2004**

| | Jul - Dec 04 |
|---|---|
| **OPERATING ACTIVITIES** | |
| **Net Income** | -122,781.89 |
| **Adjustments to reconcile Net Income** | |
| **to net cash provided by operations:** | |
| **1210 ¡ Accounts Receivable - WNB** | -25.00 |
| **1410 ¡ Notes Receivable - WNB** | -245,390.80 |
| **1411 ¡ Accrued Interest Rec. - WNB** | -115,417.06 |
| **2000 ¡ Accounts Payable** | 14,125.00 |
| **2230 ¡ Notes Payable** | -1,992,010.64 |
| **2235 ¡ Accrued Interest Payable** | -416,675.02 |
| **2240 ¡ Option Deposit** | -100,000.00 |
| **2500 ¡ Income tax payable** | -835.00 |
| **2800 ¡ Due to Shareholder** | 3,146.39 |
| **Net cash provided by Operating Activities** | -2,975,864.02 |
| | |
| **INVESTING ACTIVITIES** | |
| **1915 ¡ Wireless Networks Do Brazil** | 45,000.00 |
| **Net cash provided by Investing Activities** | 45,000.00 |
| | |
| **FINANCING ACTIVITIES** | |
| **3000 ¡ Common Stock** | 1,127.91 |
| **3200 ¡ Paid In Capital** | 2,928,136.09 |
| **Net cash provided by Financing Activities** | 2,929,264.00 |
| | |
| **Net cash increase for period** | -1,600.02 |
| | |
| **Cash at beginning of period** | 5,526.69 |
| **Cash at end of period** | **3,926.67** |

# EXHIBIT B

MINUTES OF A SPECIAL MEETING OF THE BOARD OF DIRECTORS
OF
WIRELESS NETWORKS, INC.

A special meeting of the Board of Directors of Wireless Networks, Inc., a Delaware corporation, (the "Company"), was held as follows:

| | |
|---|---|
| Date: | April 19, 2005 |
| Time: | 10:45 AM Pacific Time |
| Place: | 350 Cambridge Avenue, Suite 150 |
| | Palo Alto, California. |
| Kind of Meeting: | Special |
| How Called or Noticed: | Notice waived |
| Director Present: | Mr. Charles Brown |
| Directors Absent: | None |
| Other Persons Present: | James Hagan, Esq. attorney for the |
| | Company, and Mr. Ruy Rothschild de Souza |

The following matters of business were considered and conducted.

1. Mr. Brown, as President of the Company, called the meeting to order. On motion duly made, seconded, and unanimously carried, Mr. Hagan was elected as Recording Secretary to record the minutes of this meeting.

2. Mr. Brown noted that Mr. Redett, previously a director of the Company, has resigned from that position, leaving Mr. Brown as the only director of the Company. Mr. Brown also noted that the Company has just issued to Mr. Ruy Rothschild de Souza's company, MRG International, Inc., an affiliate of Cruzamerica, 112,791.2064 shares of its common stock, a majority of the Company's outstanding common stock. Acting under and pursuant to Section 223(a)(1) of the Delaware Corporation Law, Mr. Brown elected Mr. Ruy Rothschild de Souza as a director of the Company to serve as such without compensation. Mr. Ruy Rothschild de Souza accepted the position of a director of the Company and thereafter participated in the meeting as a director. Mr. Brown observed that Mr. Brown presently serves as the President, Secretary, and Treasurer of the company. This matter was discussed. No change was made.

3. Mr. Brown presented to the meeting financial statements as of December 31, 2004, for the company and for its wholly-owned subsidiary, Wireless Networks do Brazil. These financial statements were reviewed in detail by the directors. Thereafter, on

motions duly made, seconded, and unanimously carried, each of those financial statements was approved.

4. Mr. Brown presented to the meeting two promissory notes which evidence indebtedness due from the company to him, one in the amount of $71, 892.29 and one in the amount of $2,000.00. These promissory notes were discussed and considered. Thereafter, on motions duly made, seconded, and unanimously carried, the following resolutions were adopted:

> RESOLVED, that each of the aforesaid promissory notes shall be, and each of them is hereby, approved and ratified;

> RESOLVED FURTHER, that the officers of this corporation shall be, and they are hereby, authorized, directed, and empowered to sign and deliver said promissory notes and to take any and all actions as may in their judgment be necessary or appropriate to carry out and perform said promissory notes and the foregoing resolution.

5. Mr. Brown presented to the meeting a Fourth Amendment (to August 31, 2004) and a Fifth Amendment (to December 31, 2004) to the loan and option agreement executed by and between the Company and Cruzamerica in January, 2002. These documents were reviewed and considered. Thereafter, on motions duly made, seconded, and unanimously carried, the following resolutions were adopted:

> RESOLVED, that the Fourth Amendment and the Fifth Amendment to the aforesaid loan and option agreement shall be, and each of them hereby is, approved and ratified;

> RESOLVED FURTHER, that the officers of this corporation shall be, and they are hereby, authorized, directed, and empowered to sign and deliver said Fourth Amendment and Fifth Amendment and to take any and all actions as may in their judgment be necessary or appropriate to carry out and perform said agreements and the foregoing resolution.

6. Mr. Brown presented to the meeting a promissory note due from Wireless Networks do Brazil to this company in the amount of $1,074,010.52 as of December 31, 2004. This promissory note was reviewed and considered. Thereafter, on motions duly made, seconded, and unanimously carried, the following resolution was adopted:

RESOLVED, that the aforesaid promissory note shall be, and it is hereby, approved and accepted;

7. Mr. Brown presented to the meeting a power of attorney, similar in form and content to other powers of attorney approved in the past, by means of which to authorize Mr. Ruy Rothschild de Souza to conduct the business of the Company in Brazil. This document was reviewed and considered. Thereafter on motions duly made, seconded, and unanimously carried, the following resolutions were adopted:

RESOLVED, that the aforesaid power of attorney shall be, and it is hereby, approved and ratified;

RESOLVED FURTHER, that the officers of this corporation shall be, and they are hereby, authorized, directed, and empowered to sign and deliver said power of attorney and to take any and all actions as may in their judgment be necessary or appropriate to carry out and perform said power of attorney and the foregoing resolution.

8. Mr. Hagan suggested that the Company send a letter to all shareholders informing them of the conversion by Cruzamerica of debt into common stock, the resignation of Mr. Redett as a director, and the election of Mr. Ruy Rothschild de Souza as a director. Mr. Brown and Mr. Ruy Rothschild de Souza undertook to do so.

9. Mr. Brown noted that the company was current in its tax and filings and its Delaware corporation filings.

10. Mr. Brown observed that the Company may need a small line of credit of up to $5,000 for use in the immediate future. This matter was discussed and considered. Thereafter, on motions duly made, seconded, and unanimously carried, the standard bank line of credit resolutions attached hereto were approved, ratified, and adopted, and the officers of the corporation were authorized and empowered to sign and deliver such documents, and to take such actions, as may be in their judgment necessary or appropriate to obtain such a line of credit and to carry out and implement the foregoing resolutions.

11. There being no further business to come before the meeting, on motion duly made, seconded and unanimously carried, the meeting was adjourned at 11:05 A. M. Pacific Time.

Date: April 19, 2005

as Recording Secretary

# EXHIBIT C

**Exhibit C**

$71,892.29

Woodside, CA<br>June 30, 2001

## PROMISSORY NOTE

FOR VALUE RECEIVED, **Wireless Networks, Inc.**, a Delaware corporation ("Borrower") hereby promises to pay to the order of **Charles M. Brown** ("Lender") in lawful money of the United states of America, on **June 30, 2003**, the principal sum of **Seventy One Thousand Eight Hundred Ninety Two Dollars and Twenty Nine Cents ($71,892.29)**. This Note will bear interest at the rate of nine percent (9%) per annum until the date of maturity, and thereafter will bear interest at the rate of nine percent (9%) per annum until fully paid.

In the event that Borrower shall fail to make full and timely payment of the principal hereunder when due, the entire unpaid principal amount of this Note shall automatically become immediately due and payable without demand or notice, and Borrower shall pay such further amount as shall be sufficient to cover all costs and expenses (including reasonable attorney's fees) directly or indirectly incurred by Lender in connection with the collection of this Note.

Borrower hereby waives notice of default, notice of acceleration, notice of prepayment, presentment, protest, or notice of dishonor. Borrower may prepay at any time, in part or in full, without penalty.

**WIRELESS NETWORKS, INC.** (Borrower)


By: Charles Brown, President                    By: Secretary

# EXHIBIT D

$2,000.00

Woodside, CA
January 30, 2003

## PROMISSORY NOTE

FOR VALUE RECEIVED, **Wireless Networks, Inc.**, a Delaware corporation ("Borrower") hereby promises to pay to the order of **Charles M. Brown** ("Lender") in lawful money of the United states of America, on **January 30, 2005**, the principal sum of **Two Thousand Dollars and No Cents ($2,000.00)**. This Note will bear interest at the rate of nine percent (9%) per annum until the date of maturity, and thereafter will bear interest at the rate of nine percent (9%) per annum until fully paid.

In the event that Borrower shall fail to make full and timely payment of the principal hereunder when due, the entire unpaid principal amount of this Note shall automatically become immediately due and payable without demand or notice, and Borrower shall pay such further amount as shall be sufficient to cover all costs and expenses (including reasonable attorney's fees) directly or indirectly incurred by Lender in connection with the collection of this Note.

Borrower hereby waives notice of default, notice of acceleration, notice of prepayment, presentment, protest, or notice of dishonor. Borrower may prepay at any time, in part or in full, without penalty.

**WIRELESS NETWORKS, INC. (Borrower)**

By: Charles Brown, President

By:  Secretary

# EXHIBIT E

Wireless Networks, Inc.
Rua Eng. Antonio Jovino, 200 cj 43
Sao Paulo 05727-220
SP- Brasil

September 7, 2007

To the Shareholders of Wireless Networks, Inc.:

I am writing to you in my capacity as the recently elected (July 2007) Chairman of Wireless Networks, Inc.

As you may know, I have been working in a managerial capacity with both WNI and its wholly-owned subsidiary Wireless Networks do Brasil ("WNB") since 2002. In August 2004, pursuant to the exercise of rights under an Option Agreement, acting through MRG International, an entity wholly-owned by me, I became the holder of more than two-thirds of the outstanding shares of WNI. At that time I had already invested more than US$ 3 million in WNI.

In 2002, the Company's challenge was to implement its operations in Brazil, where it had been running only on a pilot basis, since 2000. The business plan presented by Mr. Charles Brown, the then President of the Company, at that time contained totally unrealistic assumptions. As a result, neither the intended financial projections nor the expansion of the Company's operations was achieved.

Nevertheless, we were able to modify the Company's business model, charging not only the acquiring companies as proposed initially, but also the merchants, for the network services that increased the speed of their sales and decreased their communication expenses.

The revised model proved to be correct, increasing significantly the unit revenue and decreasing the Company's breakeven point. The revised model would generate additional revenues as long as more transactions were added to our network from additional acquirers. It would also prevent the Company from facing a decrease in revenues from anticipated tough price negotiations with its original clients, Visanet and Redecard, major debit and credit card processing companies in Brazil.

Today our network handles around 2.5 million transactions a month, with a monthly transaction average per merchant 5 times greater than the original target.
This new market approach demanded new solutions to be developed by the Company, but enabled us to serve important retail chains (heavy users) and to balance lower deployment rate. To service these retail chains, which maintain stores within and outside shopping malls, WNI developed solutions using broadband networks available at the merchants' sites.

This development process encountered internal problems from the beginning. It was intended that WNB would provide the market demands in order to allow WNI to develop the necessary solutions. Despite my efforts to facilitate this process between the

two teams (the Brazilian and US/WNI engineers), Mr. Brown did not cooperate, and frustrated attempts to implement the operation.

In fact, I became aware that, instead of facilitating the process within WNI and WNB, Mr. Brown was using the Company's engineers and resources to develop a new generation of systems to render the same services WNI renders to the market through a new company, unrelated to WNI, to be owned by him and some new investors. This may explain the basis for some of the difficulties.

The above is a brief explanation of the reasons that led me to call the shareholders meeting in July 2007 to elect a new Board, committed to the development of WNI's business.

Since Mr. Brown's resignation as President of the Company (two days after the election of the new Board), he has attempted to raise obstacles to thwart the success of the Company. Actions have included delaying access to the Company's corporate records and documents and commencing legal action against the Company, seeking, among other things, back wages allegedly due and payment of loan he allegedly made to the Company in 2003.

In addition to his claim for money damages, Mr. Brown requested that the Court "attach" the Source Code containing all the Company's systems and refuse access to same to both WNB and WNI. His request for attachment was based, among other things, on the specious claim that the Source Code is the only asset of the Company. In fact, WNB is an asset of WNI, and is the asset which generates the revenues to support WNI. In addition to impeding the continuing operations of WNI, Mr. Brown's tactics are costing the Company time and money.

We intend to vigorously defend against the litigation commenced by Mr. Brown. WNI's lawyers have instructed me, however, not to discuss the lawsuits in any detail. If you have questions relating to the pending legal action, please provide them to me in writing and they will be forwarded to our lawyers for a response.

Please be assured that I have and will continue to dedicate my efforts to the success of our business, for the benefit of all shareholders. I continue to believe that the prospects for WNI are very good.

I am currently reviewing the Company's financial status and intend to present to you in the near future a description of plans for the development of the Company's business. Meanwhile, feel free to contact me at the address below with any questions you may have.

Thank you,

Ruy Rothschild de Souza
ruysouza@comnect.com.br

# EXHIBIT F

# Charles M. Brown

t   650-851-2858 ext.101
f   650-851-7914
email:  cbrown@flyingcircuit.com


November 15, 2007


Dear Fellow Shareholder,

I am writing to you in response to a letter sent to you by Mr. Ruy de Souza, Chairman of Wireless Networks, Inc., dated September 7, 2007. In this letter Mr. Souza chose to make defamatory and libelous statements against me, and further representations were made by him regarding his operation of our companies, Wireless Networks, Inc. and its wholly-owned subsidary, Wireless Networks do Brasil.

After giving the matter some thought, I have decided to respond directly to you regarding Mr. Souza's outrageous claims and accusations, if only to clear the record. While we can all understand that reasonable people can disagree about how a business goes about creating value via its management, strategy and objectives, Mr. Souza goes beyond the pale. While the response is lengthy, its intent is to provide a clarification of the issues.

Mr. Souza states the following:

The business plan presented to Mr. Souza by me "...contained totally unrealistic assumptions. As a result, neither the intended financial projections nor the expansion of the Company's operations was achieved."

Mr. Souza, his lawyers, consultants and technical advisors spent several months performing due diligence on any and all representations made to him and advisors by me and my associates at the Company, including:

1.  Visiting existing customer sites and talking to merchants regarding their opinions and level of satisfaction with the wireless transaction service provided. This was done with my approval and without prior knowledge as to who would be visited, what questions would be asked of the merchant, or any other knowledge of what they were doing in verifying the service. Mr. Souza and his advisors were given a customer list and told they could talk to anyone they liked, which is exactly what they did. In fact, I never knew who he and his associates visited or what was said to him by our customers. I was also negotiating with two other interested investors and had no time to follow the various actions of Mr. Souza and his minions.

2.  Mr. Souza directly performed an exhaustive review of the financial projec-
tions, including detailed review of Excel spreadsheets with me at his office,
and further review by his representatives. In fact, he and his advisors took an
active role in editing the budgets and detailed spreadsheets according to sce-
narios they thought more and at which they took an active role and suggested
some minor, yet detailed modifications of the financial projections and as-
sumptions. This review was performed over several weeks at a cell by cell
level of detail of the formulas in the excel spreadsheets and assumptions relat-
ing to them. At no time did he or his advisors ever refer to any presentations
by the Company as "totally unrealistic assumptions" as he states in his letter to
you.

3.  Mr. Souza was given permission to talk to the Company's credit card partners,
Visanet do Brasil, Redecard (MasterCard), AMEX and the banks. By that time
the Company had secured service contracts from the credit card companies and
these were also reviewed in detail by Mr. Souza and his attorneys. I personally
arranged and attended meetings of senior executives of the financial institu-
tions who were introduced to Mr. Souza. He was given freedom of action to
ask anything he wanted to ask of them including confidential business details,
which he did. I later learned that he had private telephone conversations with
the Company's credit card partners and customers without my specific ap-
proval or knowledge. While I considered this a breach of confidence, I over-
looked it at the time as overzealous due diligence. Our customer relations
were very strong at that time and I did not consider anything he could say or
do could upset that relationship. Our customers told me that while they under-
stood why he did it, they thought his methods were inappropriate in light of the
open format of the prior meetings.

4.  Mr. Souza had access to all private and confidential information at WNI and
WNB. All corporate documents, contracts, employee files, everything was
made available to him without exception. Two large binders were immedi-
ately provided to him with copies of all corporate records, contracts, etc. The
only restriction placed upon his due diligence activities were not to talk to our
customers without my prior approval of the process, and especially the credit
card companies.

Mr. Souza claims he had to change the business model and by doing so added
greater value, and that he was compelled to do so because he later realized original
model was faulty. Neither I nor my associates at WNI or WNB ever heard him or
any of his advisors make such an assertion. He says, "Nevertheless, we were able
to modify the Company's business model, charging.....the revised model proved to
be correct..."

1. Mr. Souza had access to volumes of information and everything that has ever
been written by the Company regarding its planning processes, technologies
and strategies. He unilaterally decided to abandon the original business model

of focusing on shopping centers with international expansion beyond Brazil, without my concurrence and without making any effort to discuss the matter.

2. You may recall the re-capitalization the Mr. Souza demanded as a condition to his investment, where the original shareholders invested an additional $250,000 to eliminate any future or potential obligations. We complied with these requests to the letter. Shortly after the final check had arrived from the re-capitalization plan in May of 2002, Mr. Souza called me and said that he had decided to change the business model. He was bringing in a marketing and sales organization that had industry experience and could execute his proposed new model. I questioned this after having spent many hours of conversations in understanding their needs, and pointing out to him it took years to build credibility with them, and they should be consulted. The Company had service contracts and its network operations center in São Paulo was connected to the bank network in Brazil. He said that he would hire a marketing company with prior industry experience that would easily execute his new strategy, and that was the way it was going to be, whether I agreed or not.

5. In a startup operation that has built credibility with large financial institutions, brick by brick, with partners, customers, and has successfully established trusted relationships and network connections with the banking system, making a decision to change a working and agreed-upon model should not be taken lightly. The Company had negotiated a premium transaction price with the credit card companies and the financial projections showed the business worked on that basis. It is disruptive to go about changing the business model willy-nilly, especially without consulting your partners and customers, who were depending on the Company to deploy the service in over 500 shopping centers in Brazil, with their full support. This decision made no sense then and makes no sense now.

6. If the WNI business model was so lame, why is it that all of the major equipment providers in the credit card industry have been trying to adopt it? Verifone, an equipment company you may have heard of located in No. California, has adapted the WNI services-based business model. In fact, I have knowledge of some discussions with WNB in Brazil. Hypercom has tried to do it and failed.

7. I strongly suggested that the company focus on creating a marketing and service distribution strategy in concert with the credit card companies, and that this would result in rapid and low cost expansion of our products and services, and without the need to make a large investment in a marketing and a sales distribution operation. Visanet had discussed with me their interest in a marketing and distribution alliance to expand our service throughout Brazil, where they had representatives covering every shopping center and merchant location in the country. This was a compelling opportunity in my view. Mr. Souza offhandedly dismissed this idea and said he had already contracted with a marketing company that he thought was perfect for the sales and distribution task he

had in mind, whatever that was.  His choice for this challenging task was a small company with a half-dozen staff with limited ability to do anything outside the state of São Paulo.  It became clear later why he preferred this nonsensical business decision when I learned later that Mr. Souza had an equity investment in this Company.  It also proved to be a conflict of interest on the part of Mr. Souza as he was using funds from WNB to support this operation.  On my final trip to Brazil in 2005, I insisted that this relationship be terminated for nonperformance and failure to operate in a business-like manner.  In addition to failing to meet even minimal objectives, the company's sales tactics were damaging the reputation of the Company.

8.  Pricing considerations in the financial transaction industry reflect an elastic demand curve.  Large financial institutions work on discounts for larger volumes.  It was understood between the Company and the credit card companies that increased transaction volume would result in a decreased price charged to the credit card companies.  The Company would benefit from economies of scale and near-zero cost marketing by virtue of its sales and distribution relationship with the credit card companies, and the credit card companies would benefit from lower prices and wider distribution of transaction services, beginning with shopping centers, and then to "street" locations.  It was a simple win-win situation for the Company and our customers.  The merchants would benefit from lower cost, better and faster service.  In 2001, our service was superior to anything else offered in the market.  I still believe it was a huge mistake to disrupt a working model supported by written contracts with the credit card companies.  The future pointed the way to bringing value-added services to merchants via the network services established for transaction services at the merchant location, or up-selling the merchant, not in trying to double-charge the merchant for financial transaction services.  While there was an economic justification for merchants to use our system instead of a phone line, given the trends in the telecommunications industry this could not be expected to last, and was a weak premise for any service business model.  Subsequent market developments have proven this assertion to be correct.

9.  Mr. Souza never bothered to listen to our customers.  As in other matters, he assumes because he said it or thought of it that it must be correct.  His knowledge and experience of the communications and technology services industries is limited.

Mr. Souza states that "Today, our network handles around 2.5 million transactions a month

1.  The business could be ten times that size by now with regional expansion achieved through existing relationships with the credit card companies.  Those companies are setup to operate regionally and to expanse intra-region is a relatively straight-forward process once established in a key market like Brazil.  The Company would have established similar operations as it has in Brazil in at least three other countries by now, had he done what he agreed to do, which

was sign a license agreement and allow additional capital to be brought into the Company. He reneged on the core business model to simply retain control and obstructed efforts to bring in additional resources for expansion.

2. To this day Mr. Souza refuses to provide an explanation as to why he did not execute contracts with Siemens, on two separate occasions. Siemens had invested nearly $20 million in providing telecom services into premium shopping center locations in São Paulo. They had tried to go around WNB by going directly to the credit card companies, who sent them to us, by prior agreement. The only explanation I received from Mr. Souza was that there was friction between Siemens and Mr. Souza's marketing company, and it "wasn't a good deal." Another excellent service distribution opportunity squandered. Siemens has a service network worldwide, and I had had discussions with them as early as 1999 regarding partnering with them for distribution of our services. IBM as well, in the Philippines.

3. Mr. Souza states, "this new market approach demanded new solutions to be developed by the Company, but enabled us to serve important retail chains..."

4. These "new solutions" he alludes to were developed from our base in California, by WNI's software engineers under my leadership. We expanded the source code base and network service by developing new software to run over cellular networks, cable modems and DSL links.

5. There was a constant turnover of engineering personnel at WNB. Lack of professionalism in dealing with knowledge workers was the man problem as Mr. Souza's prior business experience was managing unskilled labor in a bread company.

6. WNB refused, or more likely was unable to provide any standard functional specifications that described a new service proposal, as is required in building and implementing new software. Engineers cannot write code in the dark. Mr. Souza then complained because they didn't know what they wanted, or what they were doing. I recommended changing personnel to a higher professional level, including providing for a proper level of compensation, and was rebuffed by Mr. Souza on dozens of occasions. I have a disk full of web logs of this farce if anyone would care to see it.

7. After nearly four years of requesting one, I never saw a functional spec from WNB after Mr. Souza took control. We developed the code by trial and error as to what they were trying to achieve.

8. Mr. Souza only hires and approves of lackeys. Competence is of only minimal importance in his management style.

Mr. Souza states "Mr. Brown was using the Company's engineers and resources to develop a new generation of systems to render the same services WNI renders....."

1.  There has never been any other entity involved in this industry with which I was associated, conducted by me or anyone else associated with the Company, including the engineers. No technology or other expertise has been transferred by the Company to any other entity, person or other association.

2.  Wireless Networks do Brasil has been using WNI's technology illegally and without a license.

Mr. Souza states, "In addition to his claim for money damages, Mr. Brown requested the Court "attach" the Source Code containing...."

1.  Mr. Souza agreed prior to, and as a condition of his investment, to enable the execution of a standard technology license and services agreement between WNI and WNB. This has been discussed at length and was an essential feature of the Company's business value proposition. The model was along the lines of a franchise model, where the Company would prove the service and business model in Brasil with major financial institutions, and then leverage that success in expansion to other countries. This was the core value proposition of the Company and was dependent upon having the License and Service Agreements in place between two separate legal entities Wireless Networks, Inc., the US holding company, and Wireless Networks do Brasil, its wholly-owned subsidiary. Instead, he did everything possible to obstruct this process, refusing to sign a license without a complete transfer of all of WNI's technology and assets, including its Source Code, and generally engaged in an operation of obfuscation and a policy of surreptitious undermining of the Company's core assets, its people and intellectual property. He has gradually stripped the Company of its intellectual property while claiming that WNI had no assets, and everything should be transferred to Brazil for the "good of the company."

2.  Mr. Souza continues to operate under the delusion that the only asset of WNI was the source code. He has failed to take into account its management and engineering expertise, which built the opportunity and value proposition into which he invested. He has failed to understand that WNI created a unique value proposition which depended heavily on business and technical expertise built over several years, starting from an idea. I understand this phenomenon to be due to his lack of entrepreneurial experience and acumen.

3.  Mr. Souza and his lawyers attempted for nearly two years to force me and the Company's engineers, often through nefarious means, to turn over the Company's source code to WNB. I consistently refused and he was unsuccessful in coercing the engineers. Over the source code issue and its being held by the court at the time of publication of his letter, did he finally correspond with you in the five years since he has been controlling the Company. At that time, the source code was in the possession of the court and various Declarations had been filed by me numerous shareholders and I requesting the court hold the source code until the matter could be resolved providing an equitable benefit to shareholders other than Mr. Souza, and because Mr. Souza was in Brazil,

where it would be difficult to retrieve any asset once transferred by the Company. Once the source code left WNI for Brazil, WNI's business model of international expansion using WNB as an existence proof was fatally undermined. Mr. Souza and his crew at WNB have neither the expertise nor credibility to expand the Company beyond Brazil.

4.  The source code represented years of work and investment of our money, most of which had been completed before Mr. Souza's investment into WNI. It was an important and material corporate asset of WNI, the US holding company. It was my fiduciary duty to safeguard and protect the Company's assets and value proposition from Mr. Souza, and many of you agreed with me. The source code could only be properly transferred to another entity with shareholder approval or pursuant to a proper technology license agreement. Since the only type of license agreement Mr. Souza was willing to execute was a technology transfer agreement, which required the company to transfer its intellectual property to WNB, was proof of his objective to strip the company of its assets for his own benefit. So, Mr. Souza reconstituted the Board of Directors at a meeting held 800 miles away from the location of most of the shareholders in the Bay Area. Upon removing me from the Board, I resigned. He didn't bother to attend the Shareholders Meeting that he called to take corporate control of WNI in Los Angeles. He then had his lawyers make demands upon me for immediate transfer of all of the Company's assets, in particular the source code, under threat of legal action against me personally.

5.  The purpose of my original legal suit was to try and safeguard the assets of WNI for your benefit and mine, and to collect funds due to me from the Company. Mr. Souza attacked me personally in an attempt to gain favor with the court and demonstrate his correspondence with the shareholders after the Court received Declarations from many of you regarding your opposition to moving the code to Brazil. His scurrilous and outrageous attack on me via his letter to you will be the subject of further legal proceedings for libel.

6.  By virtue of legal actions from another vendor for nonpayment of obligations, the court took possession of the source code subject to settlement of that claim. At that time I informed you that WNB had made no payments to WNI for "de facto" license fees since March of 2007, that the engineers had resigned for nonpayment of fees and wages, and all that remained was to transfer the source code and Mr. Souza would have effectively completed the gutting of WNI for the benefit of WNB. In addition, he had refused to provide any financial information on WNB and only did so just prior to my resignation on July 13, 2007, at the behest of his lawyers. He had previously refused to provide financial information after repeated requests from me. His specious and false claims in this letter are now a matter of litigation under a libel action filed by me.

Mr. Souza's intransigence, lack of transparency, self-dealing and general incompetence have taken what was an excellent opportunity and turned it into a missed op-

portunity. Under any objective standard of management competence he would be released from a management role in this Company.

He has operated this company as his "alter ego" since he called me up that day and said he was changing the business model, all to the detriment of the shareholders investment, including his own. Since he consistently refused to cooperate with me in providing a consolidated financial statement presentation of Wireless Networks, Inc. and its wholly-owned subsidiary, Wireless Networks do Brasil, and has refused to hold shareholders meetings, it is clear that his real expertise lay in writing scurrilous letters full of misstatements. In a nutshell, he has failed to take responsibility for his actions.

I am looking forward to whether or not Mr. Souza will hold a shareholders meeting, provide a consolidated statement and in general, provide any information to us regarding the operations of the Company.

Finally, the last sentence of his letter states, "Meanwhile, feel free to contact me at the address below with any questions you may have." As all of you who have tried to contact Mr. Souza in the past via telephone already know that he doesn't return phone calls, so he says that you will need to write him a letter. If you have any questions or comments regarding this letter you can just call or email me.

Sincerely yours,


Charles Brown
Shareholder and Litigant

# EXHIBIT G

Wireless Networks, Inc.
Accrued Compensation Payable due Charles Brown
November 15, 2007

| | Due | Amount | Prin + Int. Balance | No. of Days | Interest @ 9.00% | Accum. Accrued Interest |
|---|---|---|---|---|---|---|
| **Account Stated:** | | | | | | |
| Balance per FS at 6-30-03 | 12/31/04 | 17,000.00 | 17,000.00 | 1,035 | 4,338.49 | 4,338.49 |
| Total | 11/15/07 | | 21,338.49 | | | |
| | | | | | | |
| Total Principal | | 17,000.00 | | | | |
| Total Interest | | 4,338.49 | | | | |
| | | $21,338.49 | | | | |
| | | | | | | |
| **Unpaid Wages:** | | | | | | |
| CB- April | 4/15/07 | 6,000.00 | 6,000.00 | | 0.00 | 0.00 |
| CB- May | 5/15/07 | 6,000.00 | 12,044.38 | 30 | 44.38 | 44.38 |
| CB- June | 6/15/07 | 6,000.00 | 18,133.48 | 30 | 89.10 | 133.48 |
| CB- July 13 | 7/13/07 | 3,000.00 | 21,258.67 | 28 | 125.20 | 258.67 |
| | 11/15/07 | 21,000.00 | | | | |
| | | | | | | |
| Total Principal | | 21,000.00 | | | | |
| Total Interest | | 258.67 | | | | |
| | | $21,258.67 | | | | |

# EXHIBIT H

**Notes Payable - Shareholder (C. Brown)**

Jul '00 - Dec 05

| Type | Date | Num | Name | Memo | Acct | Amount | Principal Balance | Prin + Int. Balance | No. of Days | Interest @ 9.00% | Accum. Interest |
|---|---|---|---|---|---|---|---|---|---|---|---|
| General Journal | | | | | | | | | | 0.00 | 0.00 |
| General Journal | 06/30/2001 | CPA ADJ 111 | Adjustment CPA | Promissory Note 1 date June 30, 2002 | 2800 | 58,192.29 | 58,192.29 | 58,192.29 | 0 | 0.00 | 0.00 |
| General Journal | 06/30/2001 | CPA ADJ 111 | Adjustment CPA | Promissory Note 1 date June 30, 2002 | 2800 | 13,700.00 | 71,892.29 | 71,892.29 | 0 | 0.00 | 0.00 |
| Check | 02/20/2002 | 1230 | Wells Fargo Bank | Payment on Loan to C. Brown | 2800 | -6,791.38 | 65,100.91 | 65,100.91 | 230 | 3,692.02 | |
| Check | 07/15/2002 | 1325 | Charles Brown | Repay Loan to C. Brown | 2800 | -3,000.00 | 62,100.91 | 62,100.91 | 145 | 2,220.32 | |
| Check | 07/31/2002 | 1330 | Charles Brown | Repay Loan to C. Brown | 2800 | -3,000.00 | 59,100.91 | 59,100.91 | 16 | 233.17 | |
| Check | 08/21/2002 | 1348 | Charles Brown | Repay Loan to C. Brown | 2800 | -3,000.00 | 56,100.91 | 56,100.91 | 21 | 290.50 | |
| Check | 09/10/2002 | 1360 | Charles Brown | Repay Loan to C. Brown | 2800 | -3,000.00 | 53,100.91 | 53,100.91 | 19 | 248.77 | |
| General Journal | 06/30/2003 | 2003-No.9 | Adjustment CPA | Promissory Note 1 date June 30, 2002 | 2800 | -31,000.00 | 22,100.91 | 22,100.91 | 290 | 1,580.37 | |
| General Journal | | WNI-No.5 | | Accrue Interest through 06-30-03 | | | | 30,366.06 | | 8,265.15 | 8,265.15 |
| | 12/17/2004 | 0029 | | Note Interest Payment 12-16-04 / Note dated June 30, 2001 | | 150.00 | | | | (150.00) | |
| General Journal | 12/31/2004 | #3-FYE2004 | | Accrue Interest through 12-31-04 | | | | 33,158.81 | 540 | 2,942.75 | 11,057.90 |
| General Journal | 06/30/2005 | #6-FYE2005 | | Accrue Interest through 6-30-05 | | | | 34,630.51 | 180 | 1,471.71 | 12,529.60 |
| | 12/31/2005 | #1-FYE2005 | | Principal + Interest through 12-31-05 | | | | 35,167.54 | 180 | 1,537.03 | 14,066.63 |
| | 02/13/2006 | 0063119 | | Note Interest Payment 2-13-06 / Note dated June 30, 2001 | | 250.00 | | | | (250.00) | |
| | 06/30/2006 | #4-FYE2006 | | Principal + Interest through 6-30-06 | | | | 37,522.78 | 180 | 1,605.24 | 15,421.87 |
| | 12/31/2006 | #1-FYE2007 | | Principal + Interest through 12-31-06 | | | | 39,188.18 | 180 | 1,865.39 | 17,087.27 |
| | 04/16/2007 | | | Accrue Interest through 4-16-07 | | | | 40,212.44 | 106 | 1,024.06 | 18,111.53 |
| | 04/16/2007 | | | Loan from C. Brown | | 2,500.00 | 24,600.91 | 42,712.44 | | | |
| | 04/30/2007 | | | Accrue Interest through 4-30-07 | | | | 42,859.88 | 14 | 147.45 | 18,258.97 |
| | 08/25/2007 | | | Principal + Interest through 6-25-07 | | | | 43,441.13 | 55 | 581.25 | 18,840.22 |
| | 06/25/2007 | | | Loan from C. Brown | | 500.00 | 25,100.91 | 43,441.13 | | | |
| | 06/30/2007 | | | Principal + Interest through 6-30-07 | | | | 43,995.31 | 5 | 54.17 | 18,894.40 |
| | 11/15/2007 | | | Principal + Interest through 11-15-07 | | | | 45,459.81 | 135 | 1,464.50 | 20,358.90 |

| | | |
|---|---|---|
| Total Principal | | 25,100.91 |
| Total Interest | | 20,358.90 |
| | | 45,459.81 |

# EXHIBIT "I"

**Notes Payable - Shareholder (C. Brown)**

Jul '00 - Dec 05

| Type | Date | Num | Name | Memo | Acct | Amount | Principal Balance | Prin + Int. Balance | No. of Days | Interest @ 9.00% | Accum. Accrued Interest |
|---|---|---|---|---|---|---|---|---|---|---|---|
| General Journal | 12/31/2002 | | | Promissory Note 2 dated June 30, 2003 | 2600 | 1,000.00 | 1,000.00 | 0.00 | 0 | 0.00 | |
| Deposit | 12/31/2002 | | Charles Brown | Promissory Note 2 dated June 30, 2003 | 2600 | 1,000.00 | 2,000.00 | 1,000.00 | 27 | 0.00 | |
| Deposit | 01/27/2003 | | Charles Brown | | | 0.00 | 2,000.00 | 2,000.00 | | 13.32 | |
| General Journal | | | | | | | | 2,000.00 | | 0.00 | |
| General Journal | | | WN-No.5 | Accrue Interest through 06-30-03 | | | | 2,013.32 | | 13.32 | 13.32 |
| General Journal | 12/16/2004 | 3029 | Note Interest Payment 12-16-04 | Note dated January 30, 2003 | | 150.00 | | | | (159.00) | (129.29) |
| General Journal | 12/31/2004 | #3-FYE2004 | | Accrue interest through 12-31-04 | | | | | 15 | 7.40 | |
| | | | | Principal + Interest through 12-31-04 | | | | 1,870.71 | 180 | 83.03 | |
| General Journal | 06/30/2005 | #6-FYE2005 | | Accrue interest through 6-30-05 | | | | | 180 | 86.71 | (46.26) |
| | | | | Principal + Interest through 6-30-05 | | | | 1,953.74 | | | |
| General Journal | 12/31/2005 | #1-FYE2006 | | Accrue interest through 12-31-05 | | | | | 180 | 40.46 | 40.46 |
| | | | | Principal + Interest through 12-31-05 | | | | 2,040.46 | | | |
| General Journal | 02/13/2006 | 3119 | Note Interest Payment 2-13-05 | Note dated January 30, 2003 | | 250.00 | | | | (250.00) | (118.98) |
| General Journal | 06/30/2006 | #4-FYE2006 | | Accrue interest through 6-30-06 | | | | | 180 | 90.56 | (35.50) |
| | | | | Principal + Interest through 6-30-06 | | | | 1,851.02 | | | |
| General Journal | 12/31/2006 | #1-FYE2007 | | Accrue interest through 12-31-06 | | | | | 180 | 83.49 | |
| | | | | Principal + Interest through 12-31-06 | | | | 1,964.50 | | | |
| | 04/30/2007 | | | Accrue interest through 4-30-07 | | | | | 120 | 58.13 | 22.63 |
| | | | | Principal + Interest through 4-30-07 | | | | 2,022.63 | | | |
| | 06/30/2007 | | | Accrue interest through 6-30-07 | | | 2,000.00 | | 60 | 29.92 | 52.55 |
| | | | | Principal + Interest through 6-30-07 | | | | 2,052.56 | | | |

Total Principal    2,000.00
Total Interest    52.56
**$2,052.56**